

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
 2
 3   * * * * * * * * * * * * * * * * * * * * * * *

 4   ARNOLD K. RICHARDS and
     MARY L. RICHARDS, his wife,
 5            Plaintiffs,
 6
 7
     vs.          CIVIL ACTION NO. 1:17-CV-50-IMK
 8
 9
10   EQT PRODUCTION COMPANY,
     a Pennsylvania Corporation,
11
            Defendant.
12
     * * * * * * * * * * * * * * * * * * * * * * *
13
14
15
         Deposition of KRISTY TOIA taken by the
16   Plaintiffs under the West Virginia Rules of Civil
     Procedure in the above-entitled action, pursuant
17   to notice, before David A. Absher, a Notary
     Public, at Hampton Inn & Suites, 474 Johnson Road,
18   Washington, Pennsylvania 15301, on the 30th day of
     November, 2017.
19
20
21        REALTIME REPORTERS, LLC
             David A. Absher
22            713 Lee Street
           Charleston, WV 25271
23           (304) 344-8463
           realtimereporters.net
24
```

Page 2

```
 1              APPEARANCES:
 2
     APPEARING FOR THE PLAINTIFFS:
 3
 4        Scott A. Windom, Esquire
          WINDOM LAW OFFICES, PLLC
          101 East Main Street
 5        Harrisville, WV 26362
 6
     APPEARING FOR THE DEFENDANT:
 7
 8        David K. Hendrickson, Esquire
          HENDRICKSON & LONG, PLLC
          214 Capitol Street
 9        Charleston, WV 25301
10        Stephen E. Hastings, Esquire
          EQT CORPORATION
11        625 Liberty Avenue, Suite 1700
          Pittsburgh, PA 15222
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**EXHIBIT**

**4**

Page 3

```
 1              EXAMINATION INDEX
 2
     BY MR. WINDOM                          6
 3
     BY MR. HENDRICKSON                   147
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1              EXHIBIT INDEX
 2
 3   1   Remittance Statement, Owner No.        59
         255953, Check No. 1772696
 4   2   Lease Agreement between Pearl          85
         Hutchinson and D.C. Hutchinson, Her
 5       Husband; Ruby Dotson and J.E. Richards
 6   3   Lease Agreement between Pearl          85
         Hutchinson and D.C. Hutchinson, Her
 7       Husband; Archie C. Richards and Elsie
         M. Richards, His Wife, and J.E. Richards
 8
     4   Lease Agreement between A.H. Hodge and  86
 9       Ona Hodge, His Wife, and J.E. Richards
10   5   Amendment and Ratification of Oil and   88
         Gas Lease, Lease No. 919996
11
     6   Amendment and Ratification of Oil and   88
12       Gas Lease, Lease No. 919997
13   7   Amendment and Ratification of Oil and   88
         Gas Lease, Lease No. 919987
14
     8   Remittance Statement, Owner No.        108
15       258485, Check No. 1847379
16   9   EQT Production Company Spreadsheet     126
17  10   EQT Production Company's Responses to  129
         Plaintiffs' First Set of Combined
18       Discovery Requests to Defendant
19  11   Verification                          129
20
21
22
23
24
```

Page 5

```
 1            P R O C E E D I N G S
 2            THE VIDEOGRAPHER:  The time is 11:15
 3 A.M.  We are now on the record.  This is the video
 4 deposition of Kristy Toia taken in the Matter of
 5 Arnold and Mary Richards versus EQT Production
 6 Company, Case No. 1:17-CV-50-IMK, held in
 7 Washington, Pennsylvania, taken on this 30th day
 8 of November, 2017.
 9            My name is Justin Ebeling.  I'm the
10 legal video specialist.  The court reporter is
11 David Absher.  We are associated with Realtime
12 Reporters.
13            Will counsel please introduce
14 themselves and whom they represent?
15            MR. WINDOM:  Scott Windom
16 representing the plaintiffs.
17            MR. HENDRICKSON:  David Hendrickson
18 on behalf of EQT.
19            THE VIDEOGRAPHER:  Will the court
20 reporter please swear in the deponent?
21            K R I S T Y   T O I A
22 was called as a witness by the Plaintiffs,
23 pursuant to notice, and having been first duly
24 sworn, testified as follows:
```

Page 6

```
 1            EXAMINATION
 2 BY MR. WINDOM:
 3    Q.  Ms. Toia, my name is Scott Windom, and I
 4 represent Arnold and Mary Richards.  I introduced
 5 myself before we get -- or before we got started
 6 here today.  Do you understand who I represent?
 7    A.  Yes.
 8    Q.  Okay.  You don't know the Richardses, I'm
 9 guessing?
10    A.  No.
11    Q.  Okay.  And never met them before?
12    A.  No.
13    Q.  Can you go ahead and tell me your full
14 name for the record?
15    A.  Kristy Kathleen Toia.
16    Q.  K-R-I-S-T-Y?
17    A.  S-T-Y, uh-huh.
18    Q.  Kathleen with a K?
19    A.  Uh-huh.
20    Q.  And --
21    A.  T-O-I-A.
22    Q.  Where do you live at?
23    A.  Pittsburgh, Pennsylvania.
24    Q.  How long have you lived in Pittsburgh?
```

Page 7

```
 1    A.  40 years.
 2    Q.  Have you ever lived in West Virginia?
 3    A.  No.
 4    Q.  Do you have any family in West Virginia?
 5    A.  No.
 6    Q.  Do you have any in-laws or anybody from
 7 West Virginia?
 8    A.  No.
 9    Q.  Have you been deposed before?
10    A.  Yes.
11    Q.  I -- I presume that to be the case.  Let
12 me ask you:  There are some cases that are pending
13 or have been pending in Federal Court in West
14 Virginia.  One is the McDonald (phonetic) case.
15            Are you familiar with the McDonald
16 case?
17    A.  No.
18    Q.  Okay.  What cases have you given
19 testimony in or provided testimony in?
20            MR. HENDRICKSON:  Scott, that case
21 is actually over.  It's been concluded.
22 McDonald --
23            MR. WINDOM:  The McDonald --
24            MR. HENDRICKSON:  -- has, yes.
```

Page 8

```
 1            MR. WINDOM:  Yeah.  Okay.
 2    A.  Hamrick (phonetic).
 3    Q.  Hamrick?
 4    A.  Uh-huh.  That is the only one for West
 5 Virginia.
 6    Q.  Okay.
 7    A.  Did you want --
 8            MR. HENDRICKSON:  Scott, Hamrick's
 9 been consolidated with Leggett, so her testimony
10 actually in Hamrick is also applicable in Leggett.
11 L-E-G-G-E-T-T.
12    Q.  Okay.  But you haven't testified in the
13 Leggett case specifically.  You testified in the
14 Hamrick case that was --
15            MR. HENDRICKSON:  She was -- she
16 testified once in both.
17            MR. WINDOM:  Once in both, okay.
18    Q.  Besides those two cases, have you
19 testified in any other cases for EQT?
20    A.  Yes.  There was a Texas matter.  I
21 honestly can't remember the litigants --
22            THE DEPONENT:  I'm sorry?
23            MR. HENDRICKSON:  Terry?
24            THE DEPONENT:  I can't remember.
```

**Page 9**

```
 1      Q.  Did you -- did you provide 30(b)
 2  testimony?  Do you know what a 30(b) witness is?
 3      A.  No.
 4      Q.  Okay.  Did you testify as a fact witness,
 5  or were you the Corporate representative for
 6  EQT --
 7      A.  I --
 8      Q.  -- in any of these cases?
 9      A.  I was the Corporate representative for
10  the Texas matter.
11      Q.  On what topics were you testifying on
12  behalf of EQT?
13      A.  For the Texas matter, it was -- the case
14  was involving whether the property had profit,
15  proceeds of -- I'm trying to think of the term.
16  Whether the well was profitable or not.
17      Q.  Paying quantities?
18      A.  Paying quantities, that's it.
19      Q.  Okay.  And were there any other witnesses
20  that testified on behalf of EQT as the Corporate
21  representatives in that case, or were you the only
22  one?
23      A.  I believe I was the only one.
24      Q.  Okay.  Now, in Hamrick and Leggett, were
```

**Page 10**

```
 1  you the Corporate representative on any issues
 2  there, or were you a fact witness?
 3      A.  Fact witness.
 4      Q.  Okay.  So besides Hamrick, Leggett, and
 5  the Texas case, have you testified in any other
 6  matters?
 7      A.  There was a matter where EQT was the
 8  plaintiff, and that was what we refer to as a
 9  journey matter.
10      Q.  J-O-U-R-N-E-Y --
11      A.  Uh-huh.
12      Q.  -- journey?  What court was that in?
13      A.  I'm not quite sure.
14      Q.  Okay.  Where did you give your testimony?
15      A.  In Pittsburgh.
16      Q.  Do you know who the defendants were in
17  that matter?
18      A.  I can't remember the name of that either.
19      Q.  Were you the 30(b) Corporate designee, or
20  were you a fact witness in that?
21      A.  I believe I was a fact witness in that
22  one as well.
23      Q.  Just basically the -- the substance of
24  your testimony, can you summarize that for me in
```

**Page 11**

```
 1  the -- in the journey case?
 2      A.  Right.  So EQT was sued because there was
 3  a trespassing issue, and the defendant -- then we
 4  went back because they were the ones who drew up
 5  the leases --
 6      Q.  Uh-huh.
 7      A.  -- originally, so we were going back to
 8  them to try to recover some -- some of that
 9  liability.
10      Q.  Okay.  So were there two cases, or did
11  EQT counter-sue the plaintiffs?
12      A.  No.  It was the -- so EQT was sued --
13      Q.  Uh-huh.
14      A.  -- and there was a settlement based off
15  of that where there was a trespass issue.
16  However, we relied on the draw the -- drawing the
17  leases from another company --
18      Q.  Okay.  So --
19      A.  -- which was --
20      Q.  -- so there was a --
21      A.  Not related.
22      Q.  -- a third party --
23      A.  A third party, right.
24      Q.  -- that EQT then sued?
```

**Page 12**

```
 1      A.  Right.
 2      Q.  I understand now.  Any other matters in
 3  which you've given testimony?
 4      A.  I was -- I testified in court on a
 5  Kentucky matter, which was Big Sandy.
 6      Q.  And I think we were off record, you said
 7  that lasted about four minutes?
 8      A.  No.  That one actually lasted a little
 9  bit longer.
10      Q.  Okay.
11      A.  And then there was -- I was called back
12  to Kentucky for a different matter.  It was a
13  bankruptcy issue with Magnum Hunter.
14      Q.  Oh, I think we're all familiar with the
15  Magnum Hunter bankruptcy.  With the Big Sandy,
16  what was that one about?
17      A.  That one was -- well, we were -- they --
18  we were paying gas royalties when they were only
19  entitled to oil royalties.
20      Q.  Okay.  So were -- was EQT a defendant in
21  that case?
22      A.  Yes.
23      Q.  Do you recall the plaintiffs?
24      A.  Big Sandy.
```

ARNOLD R. RICHARDS, ESQAM.                                    KRRBY TOIA
EQT PRODUCTION COMPANY                                      November 30, 2017

Page 13

1      Q. And is Big Sandy like a mineral company
2 or a land company?
3      A. I think they're a mineral company.
4      Q. Okay. Okay. Any other cases in which
5 you've given testimony that you can recall?
6      A. That is it.
7      Q. I'm not going to belabor the procedure in
8 that matter, then. You understand that you're
9 under oath?
10     A. Uh-huh.
11     Q. And -- and you'll have to answer
12 verbally, yes or no?
13     A. Yes.
14     Q. Okay. And -- and you understand that
15 you've sworn to tell the truth and that I'm going
16 to ask you questions?
17     A. Yes.
18     Q. And that I'm going to rely on the answers
19 that you give me in this Case?
20     A. Yes.
21     Q. Let me just go back to a couple things.
22 What was the gist of your testimony in the Hamrick
23 case?
24     A. It was to discuss the deductions and then

Page 14

1 also the issue of whether liquids -- or the -- or
2 the NGLs not being paid to royalty owners.
3      Q. Okay. And who was plaintiff's counsel in
4 that case?
5          MR. HENDRICKSON: It was Marvin
6 Masters.
7          MR. WINDOM: It was Marvin?
8          MR. HENDRICKSON: Yeah.
9          MR. WINDOM: And -- and he's also
10 counsel in the Leggett case; is that right?
11         MR. HENDRICKSON: Yes.
12         MR. WINDOM: Okay. Are both those
13 in Northern District?
14         MR. HENDRICKSON: Yes.
15         MR. WINDOM: Okay.
16         MR. HENDRICKSON: One's in front of
17 Judge Stamp. The other's in front of Judge
18 Bailey.
19 BY MR. WINDOM:
20     Q. All right. Let me ask you about your
21 education. Where did you go to high school?
22     A. North Hills in Pittsburgh.
23     Q. And after you graduated -- I presume you
24 graduated high school?

Page 15

1      A. I did, and went on to La Roche College --
2      Q. Okay.
3      A. -- which is also in Pittsburgh.
4      Q. Can you spell that for me?
5      A. L-A-R-O-C-H-E.
6      Q. Did you go to La Roche right after high
7 school?
8      A. Yes.
9      Q. And did you get a degree from La Roche?
10     A. Yes.
11     Q. What degree did you get?
12     A. In accounting.
13     Q. What kind of degree did you get? Was it
14 a --
15     A. A bachelor's.
16     Q. Bachelor's. Did you follow that up with
17 any other schooling?
18     A. No.
19     Q. Did you work while you were at La Roche?
20     A. Yes.
21     Q. Okay. Did you do accounting work while
22 you were at La Roche?
23     A. Accounting work, yes.
24     Q. Who for?

Page 16

1      A. Actually one of the professors at La
2 Roche.
3      Q. Okay. Did you do any oil and gas
4 accounting while you were at La Roche?
5      A. No.
6      Q. After you graduated from La Roche, where
7 did you work?
8      A. It was a health care company --
9      Q. Uh-huh.
10     A. -- called Health Net. They were located
11 in California, Woodland Hills, California.
12     Q. And you were working out of Pittsburgh?
13     A. I actually moved there.
14     Q. Okay. So when you said you lived in
15 Pittsburgh 40 years, those aren't 40 continuous
16 years?
17     A. Well, yes, that's true. I was only there
18 for about three years. Two, three years.
19     Q. And what did you do for Health Net?
20     A. Just corporate accounting.
21     Q. Did you take care of like accounts
22 receivable and billings on medical issues?
23     A. It was actually more balance sheet
24 reconciliations.

Page 17

1   Q. When you say "balance sheet
2 reconciliations," was that --
3     A. Or I'm sorry, bank reconciliations, so
4 bank accounts.
5   Q. Did you do any auditing?
6     A. No.
7   Q. If there were issues with any bank
8 reconciliations, did you take care of clearing
9 those issues up, or did you send it to a
10 controller or somebody that handled that matter
11 for the company?
12     A. It depends on the matter. If it was
13 something that I could handle myself, I would, or
14 I would have to take it up to primarily maybe the
15 treasury department.
16   Q. Okay. All right. After Health Net,
17 where did you work?
18     A. EQT.
19   Q. When did you begin with EQT?
20     A. That was in 2003.
21   Q. What was your starting position with
22 EQT in 2003?
23     A. Staff accountant.
24   Q. What were your jobs as staff accountant

Page 18

1 for EQT in 2003?
2     A. I maintained mostly the payroll
3 accounting.
4   Q. How many employees did you maintain
5 payroll for?
6     A. I couldn't even take a guess. It was the
7 entire Company.
8   Q. Would you issue checks for the entire
9 Company?
10     A. No. I would actually -- more on the
11 accounting side, where I'd reconcile to make sure
12 that the labor was coded properly, any of the
13 benefits that were paid out were reconciled with
14 whatever was withheld versus what was paid to the
15 benefits companies, the third parties.
16   Q. Okay. Would you -- 401(k)s --
17     A. Yeah. Again --
18   Q. -- the --
19     A. -- that was just the accounting for that,
20 reconciling --
21   Q. Okay.
22     A. -- again, whether what was withheld was
23 actually paid to the 401k company.
24   Q. All right. Were you promoted from staff

Page 19

1 accountant at some point in time?
2     A. Yes.
3   Q. And when was that?
4     A. That would have been in 2006.
5   Q. What job did you take in 2006?
6     A. That was a senior financial analyst.
7   Q. What are the job duties of a senior
8 financial analyst at EQT?
9     A. At that time -- there's various. So at
10 that time, I was moved from -- where the payroll
11 accounting was, we call the shared services
12 department, which is kind of like a Corporate
13 accounting.
14     It does all the accounting for all
15 the business units.
16   Q. Okay.
17     A. When I was promoted, I was moved to the
18 production accounting group as the senior
19 financial analyst.
20   Q. All right. I want to back up here for
21 just a minute.
22     A. Uh-huh.
23   Q. You said that you were in the shared
24 services department. Do I have that right?

Page 20

1     A. Correct.
2   Q. Okay. And that's all business units at
3 EQT?
4     A. Correct. It does -- performs accounting
5 for all those functions.
6   Q. Okay. And that would be all the
7 subsidiaries that are wholly owned by EQT?
8     A. Correct.
9   Q. And would that include EQT Gathering?
10     A. It was Gathering, uh-huh.
11   Q. Would that include EQT Energy?
12     A. Correct.
13   Q. Okay. How many subsidiary companies
14 would you have worked for or been the senior
15 financial analyst for at that time?
16     A. So shared services, again --
17   Q. Right.
18     A. -- was more of a Corporate function, and
19 then when I moved into production company, I've
20 been there ever since.
21   Q. Okay. And production company is just
22 EQT Production?
23     A. Correct.
24   Q. Okay. You're not working for any of

ARNOLD R. RICHARDS, et al.
EQT PRODUCTION COMPANY

Case 1:17-cv-00050-IMK-MJA   Document 31-3   Filed 01/12/18   Page 6 of 38   PageID #: 310

KRISTY TOIA
November 30, 2017

Page 21

1 those other companies now?
2    A.  No.
3    Q.  Okay.  So back between 2003 and 2006, how
4 many companies would you have worked for?
5    A.  Just one, which was the EQT Corporation.
6    Q.  Right.  But you -- so the shared services
7 department, you only worked for EQT?
8    A.  Correct.
9    Q.  Okay.
10    A.  There was more of a Corporate function,
11 so we actually had our own separate company, if
12 you will, and everything rolled into that one
13 company.
14    Q.  So in -- between 2003, 2006, you never
15 performed any accounting functions for any of the
16 subsidiary companies?
17    A.  No.  More on a Corporate level.
18    Q.  All right.  So in 2006, what were your
19 job duties?
20    A.  When I first moved into the production
21 accounting group, I was responsible for revenue
22 accounting.
23        So that was where we were accounting
24 for the volumes that were produced and then sold,

Page 22

1 and then ensuring that our royalty owners were
2 paid properly and distributing those checks.
3    Q.  Okay.  When you talk about volumes -- and
4 there are some industry terms and I'm sure there
5 are some accounting terms, and -- and they may or
6 may not be the same.
7    A.  Uh-huh.
8    Q.  When you're talking volumes, how does gas
9 get measured with EQT?
10    A.  There is a meter at the wellhead.
11    Q.  And --
12    A.  It's an electronic meter.
13    Q.  Okay.  And does that meter measure
14 Mcf, or does that meter measure some other unit?
15    A.  It measures Mcf.
16    Q.  Okay.  Now, when we say Mcf, that's 1,000
17 cubic feet of gas; is that right?
18    A.  Uh-huh.  Yes.
19    Q.  Yes, okay.  Now, when you pay royalties
20 or --
21        MR. WINDOM:  Strike that.
22    Q.  When EQT pays royalties, EQT pays
23 royalties not on the Mcf; is that right?
24    A.  It is paid on a dekatherm or MMbtu.

Page 23

1    Q.  Okay.  And when we say MMbtu, that is a
2 million British thermal units?
3    A.  Uh-huh.  Correct.
4    Q.  Okay.  And the MMbtu content of an Mcf of
5 gas can vary from well to well; is that right?
6    A.  I'm pretty sure, yeah.  I mean, I think
7 it's pretty much similar in the area, but it could
8 be from one area -- more area to area.
9    Q.  Okay.  So when you were working in
10 revenue accounting in 2006 and you were paying
11 royalty on volumes, was there a calculation that
12 was made to determine what that value was, or did
13 EQT only pay on the Mcf?
14    A.  No.  There -- there is a determination.
15 There's a Btu factor.  I'm not exactly sure how
16 that's figured out, but it's -- I don't know if
17 there's a separate measurement there as well that
18 comes up with the MMbtu, but there's a -- the
19 higher Btu content.
20        And then to allocate it back down to
21 the Mcf level, there's that Btu factor applied.
22    Q.  So when you're dealing with --
23 some gas burns hotter, I think --
24    A.  Right.

Page 24

1    Q.  -- they determined; is that right?
2    A.  Right.
3    Q.  So 1,000 cubic feet of gas that has a
4 higher content would pay more than a similar
5 volume of gas with a lower Btu content?
6    A.  Correct.
7    Q.  And your calculation that you used in
8 revenue accounting would account for that change
9 in Btu content?
10    A.  Correct.
11    Q.  Do you know where the MMbtu content of
12 the gas is determined?
13    A.  I can't say that for sure.
14    Q.  Do you know if it's determined at the
15 well site?
16    A.  I would imagine it would have to be.
17    Q.  And is there a report that you all would
18 get that would explain or tell you what the
19 MMbtu content for that particular gas was?
20    A.  I can't say there's actually a report,
21 but we would probably get that information from
22 our gas measurement team.
23    Q.  Okay.  And a gas measurement team would
24 then send you the calculation to use to create the

Page 25

1 royalty?
2     A.  Yes.
3     Q.  And who at EQT is in charge of the gas
4 measurement team?
5     A.  His name's Dave Bindsiel.
6     Q.  B-E --
7     A.  B-I-N-D-S-E-I-L.
8     Q.  B-I-N-D-S-E-I-L?
9     A.  Uh-huh.
10    Q.  And where does Dave work?
11    A.  In Pittsburgh.
12    Q.  Same office you work in?
13    A.  Yes.
14    Q.  How long has he been with EQT?  Do you
15 know?
16    A.  Probably longer than I have.  I can't say
17 for sure how many years, though.
18    Q.  Now, once you -- once you have a value of
19 the MMbtu and -- and can make your royalty checks,
20 did -- were you in charge of -- of writing those
21 checks?
22    A.  We would put them through a system, and
23 the system would generate it automatically.
24    Q.  Now, when you say you would put them

Page 26

1 through a system, what kind of system would you
2 put them through?
3     A.  It's called Enertia, E-N-E-R-T-I-A.
4     Q.  And the Enertia system, is that
5 proprietary software that EQT has developed, or is
6 it a program --
7     A.  It's a --
8     Q.  -- in the oil and gas industry?
9     A.  Correct.  It's a program, oil and gas
10 industry.
11    Q.  Do you know how long EQT has been using
12 the Enertia system?
13    A.  Since 2001.
14    Q.  Tell me -- if you would, just walk me
15 through.  You get a calculation of the dekatherms
16 in a given unit of -- of gas.  What would you do
17 then from that point to a check is produced and
18 ready to go to the royalty owner?
19    A.  So the process is -- it's twofold.
20 There's a production allocation and then the
21 revenue allocation.
22        So the production allocation, after
23 the month is closed, which is typically on a -- on
24 a one-month lag, those volumes, the produced

Page 27

1 volumes at the wellhead and the volumes sold at
2 the sales meter, sales point, those -- that
3 information is in a system called FlowCal,
4 F-L-O-W-C-A-L, which is maintained by our gas
5 measurement team.
6     Q.  Okay.
7     A.  So those volumes are interfaced into
8 Enertia.
9     Q.  Okay.
10    A.  What the production allocation process
11 does within Enertia is that it takes the sales
12 meter, which all those wellhead meters are -- are
13 connected to, and it allocates back to each
14 individual well based on its production.
15    Q.  Okay.  So those are sub-meters, I guess
16 is the -- the way that it's termed in the oil and
17 gas industry.  Would you agree with that?
18    A.  Well, it's a -- each -- each well would
19 have its own individual wellhead meter, and they
20 all flow into one sales point, and that would be a
21 sales meter.
22    Q.  Okay.  And where are the sales meters
23 typically located?
24    A.  I can't say that for sure.

Page 28

1     Q.  Okay.  You don't know if they're on the
2 lease or at some other point within --
3     A.  It would really just be where the
4 gathering point is.
5     Q.  Okay.  So there is gas that's fed through
6 a meter on the well site --
7     A.  Uh-huh.
8     Q.  -- at each well?
9     A.  Correct.
10    Q.  And then some point down the road there's
11 a sales meter, and we don't know the distance
12 between the -- the wellhead meters and the sales
13 meter?
14    A.  Yeah.  I'm not sure.
15    Q.  And that can vary?
16    A.  It could probably vary.
17    Q.  Now, you had indicated that there were
18 produced volumes versus volumes sold.
19    A.  Uh-huh.
20    Q.  Why would there be different volumes
21 produced versus sold?
22    A.  Well, each well would have its own
23 measurement, whereas the sales point has a
24 collective measurement.

Page 29

1    Q.   Okay.  So you're -- when you're saying
2  volumes sold, that could be the volumes from 100
3  wells or 10 wells?
4    A.   Correct.
5    Q.   You're not including line loss or those
6  types of things in there?
7    A.   There could potentially be some line
8  loss, but with the newer Marcellus wells, there
9  typically is none.
10    Q.   Now, let me ask you this:  If you go --
11  let's say you have 10 wells that are run through
12  10 meters, and those 10 wells are sold through 1
13  sales meter.
14    A.   Uh-huh.
15    Q.   If the volume from those 10 individual
16  wells do not add up or -- or exceed the volume
17  that goes through the sales meter, then there's
18  been a loss or shrinkage or some volume that is
19  not calculated for that sales meter, correct?
20    A.   Correct.
21    Q.   How is that allocated by EQT?  Is it per
22  well?
23    A.   It's based on production.  So we have a
24  value of what we got paid per dekatherm at the

Page 30

1  sales meter.  Then that gets allocated down to the
2  well level based on the production of each well.
3    Q.   So it's based on --
4    A.   So it gets --
5    Q.   -- a percentage?
6    A.   Yes.
7    Q.   Okay.  So it's not -- if you lose 100
8  dekatherms and you have 10 wells, it's not 10
9  dekatherms per well?
10    A.   Correct.
11    Q.   You would actually divide it out.  If one
12  well's making twice as much, it would get twice as
13  much of the loss?
14    A.   Correct.
15    Q.   Okay.  So back to our check creation.
16    A.   Okay.  So once we run through that
17  process, we've determined how much of those sold
18  volumes should get allocated to each individual
19  well.
20    Q.   Okay.
21    A.   I'm sorry.  I should -- not volume, but
22  the value.  So we know a value of what we --
23    Q.   Okay.
24    A.   -- what EPC got paid.

Page 31

1         MR. HENDRICKSON:  Excuse me.
2    A.   Then once it through -- runs through that
3  production allocation, we move onto the revenue
4  allocation, where then Enertia will look at the
5  individual owners on each of those wells.
6    Q.   And I'll get to that a little bit
7  later --
8    A.   Uh-huh.
9    Q.   -- because I know there's a -- with
10  horizontal wells, there's a calculation that has
11  to be done on -- on the owners as opposed to -- if
12  you just have one well on one lease and it's the
13  vertical well --
14    A.   Oh, correct.
15    Q.   -- the horizontal wells take a
16  different --
17    A.   Correct.
18    Q.   -- method of accounting; is that right?
19    A.   It's based on ownership, yeah, on each
20  individual well.  I don't think it's a separate
21  accounting.  It's just ownership level.
22    Q.   Okay.  So when you say the -- the value
23  sold per well, that's based on the dekatherm?
24    A.   Correct.

Page 32

1    Q.   Okay.  And you say what EPC was paid.
2  EPC is?
3    A.   Equitable Production Company.
4    Q.   Okay.  And --
5    A.   Or EQT Production Company.  Sorry.
6    Q.   When EPC is paid, do you get a statement?
7  Are you able to look at that and see what EPC was
8  paid?
9    A.   Yeah.  So EE, Equitable Energy, pays EPC,
10  and on a monthly basis we will get what we call a
11  wire file that lists every meter and the value of
12  what EE is paying EPC.
13    Q.   And that information is then put into the
14  Enertia?
15    A.   Correct.
16    Q.   And then Enertia makes a calculation out
17  to the royalty owners?
18    A.   Correct.
19    Q.   At -- tell me what happens next.
20    A.   So once it goes through again that
21  production allocation process, we have a value and
22  a volume for each well.  Then it -- when it runs
23  through the revenue allocation process, that's
24  where it gets down to the owner level.

Page 33

1    So each well will have what we call a
2 deck, which contains all the division order
3 interest information.
4    Q. Okay.
5    A. So each deck will list all the owners
6 that have interest in that well. What Enertia
7 does is it takes that value and the volume and
8 allocates it to each individual owner based on
9 their interest specified in that deck.
10    Q. So once it goes into Enertia, is there
11 any way for Kristy Toia or anybody else to change
12 the values that are in that system?
13    A. No. We actually have some auditing where
14 they've tested that we cannot manipulate any of
15 those calculations.
16    Q. Now, let me ask you this: Do you rely on
17 the accuracy of Enertia?
18    A. Yes.
19    Q. Do you believe in -- you're using Enertia
20 since, I think you said, 2001?
21    A. Yes.
22    Q. That -- that you believe that it is
23 accurate?
24    A. Yes. And again, we've had internal and

Page 34

1 external auditing on the system.
2    Q. Have -- during the internal and external
3 auditing, have there been any issues identified
4 with the Enertia system?
5    A. No.
6    Q. So how is a check then created?
7    A. So once the revenue allocation process is
8 completed, the -- all the funds go into an
9 automatic suspense.
10    And then after -- after we close,
11 which is typically the end of the -- each month,
12 ten days later, usually by ten business days, I
13 should say, then we distribute and cut the royalty
14 checks.
15    Q. Okay. So the -- the monies are held for
16 ten days until the checks can be created?
17    A. Correct.
18    Q. Is there usually a certain time in the
19 month when those checks are created?
20    A. It's usually by the tenth — tenth
21 business day.
22    Q. And the volumes that are sold, the -- the
23 price is based on an index price; is that correct?
24    A. Correct. First of the month index price.

Page 35

1    Q. And what index price does EQT use?
2    A. It varies. It depends on -- the
3 interstate pipeline and where that gas is
4 delivered to will depend on what index price we
5 use.
6    Q. So if you're selling to Dominion, it
7 might be different than if you're selling to
8 another company, for instance Columbia --
9    A. Correct.
10    Q. -- is that right?
11    A. Yes.
12    Q. And -- and each company may use a
13 different index price of what they pay for their
14 gas?
15    A. I'm assuming so.
16    Q. Okay.
17    A. I'm not quite sure the intricacies of
18 that.
19    Q. So you can't say that the first of the
20 month everybody gets paid X number of dollars per
21 dekatherm, that it would vary depending on where
22 the wells are located?
23    A. It's -- correct. Actually, not where the
24 wells are located, but where the sales point is,

Page 36

1 where the gas is delivered to.
2    Q. Okay. How many sales points do you know
3 of -- does EQT have?
4    A. Area-wide, it is probably about ten
5 different prices, but for Marcellus, it mostly
6 goes into M2.
7    Q. Okay. Who is M2? Good question?
8    A. Yeah.
9    MR. HENDRICKSON: If she knows,
10 yeah. If she knows.
11    MR. HASTINGS: TETCO.
12    MR. WINDOM: TETCO? Okay.
13    MR. HASTINGS: T-E-T-C-O. Texas
14 Eastern, I think.
15    Q. And do you know where the -- the sales
16 point is for M2?
17    A. I'm not quite sure where it's located,
18 no.
19    Q. Is it in West Virginia? Do you know?
20    A. I'm not sure.
21    Q. Okay. So if I have a vertical well in --
22 in West Virginia that EQT may have had that --
23 that's 50 years old, that gas may be sold, even if
24 it's on the same lease, to a different company

ARNOLD, RICHARDS, ET AL. v.
EQT PRODUCTION COMPANY

KRISTY TOIA
November 30, 2017

Page 37

1  than Marcellus gas from the same lease; is that
2  right?
3      A.  Possibly.
4      Q.  And I would say they probably certainly
5  go into different pipelines.  I don't know if you
6  know that or not but --
7      A.  Yeah.  I'm sure.
8      Q.  All right.  So let's get back to your
9  experience here for a minute with -- with EQT and
10  -- and your employment history.  We sort of got
11  off track.  What was your next promotion at EQT?
12      A.  From there, I was moved to assistant
13  controller.
14      Q.  What year was that?
15      A.  I'm going to say maybe in 2009.
16      Q.  Okay.  So you worked about --
17      A.  2010?
18      Q.  -- three years and then got promoted to
19  assistant controller?  Another three years, I
20  guess.
21      A.  I would say maybe more like five years --
22      Q.  Okay.
23      A.  -- was to assistant controller.
24      Q.  Okay.  And I believe --

Page 38

1          MR. HENDRICKSON:  But you believe by
2  2011?
3          THE DEPONENT:  Yeah.
4      Q.  Yeah.  Your prior testimony was that you
5  were -- you were a senior financial analyst in
6  2006 --
7      A.  Correct.
8      Q.  -- so it would have been about 2011,
9  then?
10      A.  Correct.
11      Q.  Okay.  And how long were you the
12  assistant controller?
13      A.  For three years.
14      Q.  What were your job duties as assistant
15  controller?
16      A.  So I was still under production
17  accounting, but the assistant controller for the
18  accounting group, and I moved out of the revenue
19  accounting and did more of general accounting,
20  financial reporting.
21      Q.  Okay.  When you say general accounting
22  and financial reporting, is that more --
23      A.  It's more on expenses, SG&A expenses.
24      Q.  Okay.  When you say "SG&A expenses" --

Page 39

1      A.  Salaries, general, and administrative
2  expenses.  We -- I analyzed LOE, which is the
3  lease operating expenses.
4      Q.  Okay.  When you say "lease operating
5  expenses," those are fuel --
6      A.  These are actually expenses incurred for
7  operating a well.
8      Q.  Right.  And that would be -- a vertical
9  well versus a horizontal well, you -- you handled
10  all those, or would --
11      A.  Yes.
12      Q.  Okay.  And if that included tubing that
13  needed to go out to a well, you would handle the
14  accounting on that?
15      A.  Correct.
16      Q.  What about labor?
17      A.  Yeah.  That would be part of either --
18  depending on if it was a well operator, that would
19  fall under the LOE expenses.  If it was like my
20  salary or engineers, that would fall under SG&A.
21      Q.  Okay.  So if a truck -- let's say you all
22  had to hire a truck to go out and -- and swab a
23  well.  Would that go under the lease expense?
24      A.  Yes.  And then we also -- or I also

Page 40

1  handled or oversaw the capital expenses.  So these
2  are costs relating to actually drilling the wells.
3      Q.  And that was for vertical and Marcellus?
4      A.  Correct.
5      Q.  Were they drilling -- was EQT drilling
6  many vertical wells in 2011?
7      A.  I would say none at that point.
8      Q.  And the capital expenses for drilling a
9  Marcellus well, would that be basically from the
10  time the landman went out to try and acquire the
11  lease all the way through getting it produced and
12  starting to get it into the line?
13      A.  Correct.
14      Q.  Did you have any other job duties in
15  2011?
16      A.  No.
17      Q.  Okay.  As the assistant controller?
18      A.  Correct.
19      Q.  And your next promotion you said was
20  about three years later?
21      A.  Correct.  So I believe then it would have
22  been 2014 time frame --
23      Q.  Uh-huh.
24      A.  -- where I moved into my current role,

Page 41

1 which is director of revenue accounting.
2     Q. So did you sort of circle back to where
3 you were in --
4     A. Yes.
5     Q. -- 2006?
6     A. Yes.
7     Q. Okay.  Back to royalty distributions?
8     A. Yes.
9     Q. Had the system for royalty payments
10 changed during the time that you had -- had been
11 working with the leases and the capital expenses
12 and those types of things, or had it pretty much
13 stayed the same from when you were there in 2006?
14     A. Stayed the same.
15     Q. You didn't have to learn new tricks or
16 anything --
17     A. No.
18     Q. -- when you went there?  And you've been
19 in that same job now I guess a little over three
20 years?
21     A. Yeah.  Yes.
22     Q. How many employees do you oversee?
23     A. I currently have one direct report, who
24 then has five employees.

Page 42

1     Q. Are they all accountants?
2     A. Yes.
3     Q. So you have six people under you
4 directly?
5     A. Yes.
6     Q. And who did you report to at EQT?
7     A. The controller of production.  His name
8 is Jeff Mitchell.
9     Q. What does the controller of production
10 do?
11     A. He -- he will oversee really all of
12 production accounting, which includes all the
13 revenue accounting, and then the general
14 accounting, like I mentioned when I was assistant
15 controller.
16     Q. So who's the person that reports directly
17 to you?
18     A. Her name is Megan Hillman (phonetic).
19     Q. And what's Megan's job?
20     A. She's basically my sidekick.  We kind of
21 work together closely, but she has more of the
22 direct reports that are doing the actual
23 processing that go to her.
24     And then I -- we help each other out,

Page 43

1 you know, trying to figure out issues if we have
2 any.
3     Q. So the five employees that are -- are
4 below Megan, what exactly do they do on a daily or
5 monthly basis as far as revenue is concerned?
6     A. We -- the way we have things organized is
7 by district, so Marcellus is a district versus
8 non-Marcellus.  We have a Virginia District,
9 Kentucky.
10     Each individual has their own, and
11 they're responsible for that closing process, like
12 I had mentioned with the production allocation,
13 revenue allocation.
14     Then during -- we have a financial
15 close after that where we have to record
16 everything in our general ledger, reconcile that
17 information, that data.  And then they have
18 various functions within -- during the month that
19 they could be responsible for.
20     Q. Which employee's in charge of the
21 Marcellus District?
22     A. Her name is Samantha Ritter.
23     Q. R-I-T-T-E-R?
24     A. Yes.

Page 44

1     Q. And she would be the person who is taking
2 care of the -- the Richards' lease, for instance,
3 where the -- the Marcellus revenue is being
4 created?
5     A. Correct.
6     Q. So with regards to the -- the Richards'
7 lease in Ritchie County, West Virginia, Samantha
8 Ritter would get some data, and would she enter it
9 into the Enertia system?
10     A. As I mentioned before, it's pretty much
11 all interfaced, so the -- that information comes
12 from FlowCal, the volume information.
13     We get the pricing information or the
14 value information from EE when they make the
15 payment to us, and Samantha would be responsible
16 for basically loading by meter what that value is.
17     And then she would just basically --
18 we call it walk the buttons.  You just push
19 buttons and it runs through that process.
20     Q. It --
21     A. So it's pretty much all -- all automatic.
22     Q. When -- when you say "push buttons," is
23 there a big control panel that you're pushing, or
24 is it a computer --

Page 45

1    A. Click of a mouse.

2    Q. -- keyboard?  Okay.

3        MR. HENDRICKSON:  It's NASA.

4        MR. WINDOM:  Right.  That could get
5 us to the moon, right?  I mean --

6    Q. Okay.  The royalty statements that are
7 created by EQT, does anybody spot check those or
8 go through and -- and double check the numbers
9 that are created or --

10   A. No.

11   Q. They'll just get stuffed in an envelope
12 and shot out to the owner?

13   A. We actually have a third party that does
14 that for us.

15   Q. Okay.  And who's that third party?

16   A. Mellon Bank.

17   Q. Now, Mellon Bank, do they actually create
18 the check, or is the check created by EQT and then
19 shipped to Mellon?

20   A. Mellon creates the check and the
21 remittent statement.

22   Q. And the remittent statement is what has
23 the volumes and the prices and so forth --

24   A. Correct.

Page 46

1    Q. -- right?  Is that done in Pittsburgh?
2 Do you know?

3    A. I believe so.

4    Q. And Mellon doesn't have any way to
5 manipulate or change the values that are in those
6 checks?

7    A. No.

8    Q. Okay.  They just get the data, put it
9 into the -- the check writing software, and write
10 the --

11   A. Correct.

12   Q. -- checks?

13   A. Correct.  We extract data from Enertia,
14 and then it gets sent to Mellon through a secured
15 type of site.

16   Q. What kind of data can be put into the
17 Enertia system exactly?  I mean, how many
18 different fields are there in the Enertia system?

19   A. I don't know how to answer that.  There's
20 quite a few, because we also use Enertia for our
21 land administration, DI (phonetic) information, so
22 there's a lot of attributes that go along with
23 owners, wells, meters.  I don't know how to even
24 start explaining.

Page 47

1    Q. Okay.  Well, let's just talk about
2 royalty of oil and gas ownership.

3        And if I am a royalty opener and
4 you're going to pay me for volumes sold on a
5 Marcellus well that I have on my farm, the data
6 that would be critical to me in that Enertia
7 system would be, of course, the volume sold, and
8 that comes through FlowCal, right?

9    A. Uh-huh.  Correct.

10   Q. And actually we -- we -- I said volume,
11 and that's not correct.  The -- the value for the
12 dekatherm.

13   A. Well, it is volume.

14   Q. Okay.

15   A. Yeah.  From FlowCal.

16   Q. So FlowCal sends a volume, and then you
17 get the conversion rate?

18   A. Correct.

19   Q. Okay.  And -- and that's entered into the
20 system as well?

21   A. Correct.

22   Q. And you get the payment value from EE,
23 correct?

24   A. Correct.

Page 48

1    Q. And that's entered into Enertia?

2    A. Correct.

3    Q. And then you have -- what other
4 information is entered into Enertia at that point?

5    A. On the revenue accounting side, there
6 would be none.

7    Q. Okay.  As far as expenses, are there any
8 expenses that are entered into the Enertia system?

9    A. Oh, yes, there would be.

10   Q. Okay.  What are those?

11   A. It would be really any -- any of the
12 gathering charges or any charges relating to
13 gathering and getting the gas to market.

14   Q. Okay.  What are -- typically what are
15 those charges?

16   A. It varies.  It depends on the area, and
17 this -- and -- it's what EE charges EPC.

18   Q. Okay.  What about severance taxes?  Are
19 those included in the Enertia system?

20   A. That is, yes.

21   Q. Okay.  Who puts that data into the
22 Enertia system?

23   A. We establish that from our tax
24 department.  They will let us know what those tax

ARNOLD RICHARDSON, et al. vs.
EQT PRODUCTION COMPANY

KRISTY TOIA
November 30, 2017

Case 1:17-cv-00050-IMK-MJA   Document 31-3   Filed 01/12/18   Page 13 of 38   PageID #: 317

Page 49

1 rates are, and we will create what is called a tax
2 deduct.
3         And so depending on the state, we put
4 in whether it's a percentage on volume or
5 percentage on value that gets established from us
6 in Enertia.
7    Q. Okay. So that's just a formula that's in
8 a field there, and then it calculates itself?
9    A. Correct.
10    Q. Populates the -- the remittent statement?
11    A. Correct.
12    Q. Now, as far as the -- the other expenses
13 that are included, you said gathering is included
14 on a royalty statement --
15    A. Correct.
16    Q. -- as an expense. What other expenses do
17 you know of would be entered into the Enertia
18 system for inclusion in a royalty check?
19    A. There would be no -- no other.
20    Q. Okay. Now, who at EQT would be
21 responsible for entering that expense data into
22 the Enertia system?
23    A. On an annual basis, we will receive a
24 rate from our Midstream Planning group, which gets

Page 50

1 updated usually by the end of January -- January
2 of each year, which is then used for the following
3 year.
4    Q. Okay. So that -- is that an estimate
5 then that you work from, or is that --
6    A. No. It's a rate that is provided from
7 Midstream Planning. I'm not sure everything
8 that's involved in that rate or how that rate is
9 calculated, but they give us that rate and that's
10 what we put in the system.
11    Q. Okay. So is that gathering rate
12 consistent throughout the calendar year?
13    A. Yes.
14    Q. And is it based on Mcf or is it based on
15 dekatherm? How -- how do they create that value?
16    A. It's based on dekatherm, and it can be
17 converted to Mcf.
18    Q. Using a reverse calculation --
19    A. Correct.
20    Q. -- based on the dekatherms?
21    A. Correct.
22    Q. And we were using initials EE. That's
23 EQT Energy, LLC?
24    A. Correct.

Page 51

1    Q. Is that, as far as you know, the only
2 company that is buying Marcellus gas in -- in West
3 Virginia?
4    A. As far as I know.
5         MR. HENDRICKSON: Would you clarify
6 that? I don't really understand the question.
7    Q. Okay. You said that -- that EE sends you
8 the value?
9    A. Uh-huh.
10    Q. Is there any other company that sends you
11 any values on the Marcellus gas?
12    A. No.
13    Q. Okay.
14         MR. HENDRICKSON: I'm sorry. I
15 didn't --
16    Q. So --
17         MR. HENDRICKSON: -- understand the
18 question.
19    Q. -- would EE -- EQT Energy, LLC, be the
20 only company that is buying that gas?
21    A. Yes.
22    Q. Who does EE sell their gas to? Is it
23 directly to TETCO?
24    A. I can't answer that. I just know that

Page 52

1 they purchase the gas at the wellhead from EPC.
2 From where it goes there --
3         MR. HENDRICKSON: That's not in her
4 daily routine.
5         MR. WINDOM: Understand.
6    Q. Now, when you're dealing with a vertical
7 well, you're only dealing with the lease acreage
8 for that vertical well and -- and those particular
9 owners; is that right?
10    A. That's not my area of expertise, but I
11 would say yes.
12    Q. Okay. In a -- in a horizontal well,
13 those wells can sometimes go 2 or 3 miles
14 horizontally; is that right?
15    A. I believe so, yeah.
16    Q. You have exponentially more owners in
17 that well?
18    A. Correct.
19    Q. Now, how does EQT determine how an
20 individual royalty owner would be paid on a well
21 that encompasses maybe 1,280 acres?
22    A. I can't answer that. That is all work
23 that's performed in our land administration
24 department.

Page 53

1     Q. How is that data, that ownership
2  interest, how is it determined?  Do you know?
3     A. I do not know.  Again, land
4  administration handles all of that --
5     Q. And --
6     A. -- and they enter that into Enertia.
7     Q. And who would be the person in land
8  administration that could tell me more about that?
9     A. Mike Barbour.  B-A-R-B-O-U-R.
10    Q. So does the accounting department get a
11 value from the land administration department, or
12 is it just put into Enertia and you're relying
13 what's put into Enertia?
14    A. We just rely what's put in Enertia by
15 land administration.
16    Q. Is that done through a division order?
17    A. Correct.
18    Q. Who creates that division order?
19    A. That's part of the land administration.
20    Q. Okay.  You're relying on their work as
21 far as that division order's concerned?
22    A. Correct.
23    Q. And who would -- who would check the
24 accuracy, if anyone, at EQT on whether or not

Page 54

1  those division orders are correct?
2     A. That would be Mike Barbour.
3     Q. Do you know what Mike's education
4  background is?
5     A. I do not.
6     Q. You would agree with me that the royalty
7  that is paid to an individual oil and gas owner is
8  determined by the -- the lease language?
9     A. Yes.
10    Q. And you would agree with me that there
11 can be different royalty percentages in a unit?
12 For instance, if I have an old lease, that may be
13 12-and-a-1/2 percent, correct?
14    A. Yes.
15    Q. And if I have a newer lease, it may be 17
16 or 18 percent?
17    A. Perhaps.
18       MR. HENDRICKSON:  That's kind of
19 getting out of her daily routine.  I mean, she's
20 not really here to interpret leases.  She can tell
21 you how they pay the checks once, you know, she
22 gets the information from Enertia.
23       MR. WINDOM:  She -- she understood,
24 I think, and she answered that -- that was

Page 55

1  correct.  So I mean, I'm just asking her --
2       MR. HENDRICKSON:  Okay.
3       MR. WINDOM:  -- if -- if she knows
4  these things.
5     Q. And you would agree with me that -- that
6  the division order --
7       MR. WINDOM:  Well, strike that.
8     Q. You don't know about division orders --
9     A. No.
10    Q. -- and you don't create those.  Okay.
11 You would agree that a lease is a binding
12 contract, though, between --
13       MR. HENDRICKSON:  Again --
14    Q. -- the lessor and the lessee?
15       MR. HENDRICKSON:  -- you're asking
16 her to make a legal conclusion on that.  I mean,
17 that's not what she's here for.
18    A. Yeah.  I can't answer that.
19       MR. HENDRICKSON:  She's not here as
20 a 30(b) witness.  She's here as a fact witness to
21 testify about what she -- what she does in her --
22 in her job.  I mean, that's not -- that's not
23 daily routine.
24    Q. Do you know if a lease would be a binding

Page 56

1  contract between a lessor and a lessee?
2     A. I really can't answer that.
3     Q. Okay.
4     A. I don't have that background.
5     Q. Do you know whether or not EQT operates
6  leases that are 100 years old?
7     A. I do not know.
8     Q. Do you agree with me that it would be
9  improper for EQT to pay a royalty which is less
10 than what is stated in a lease?
11    A. I can't answer that either.
12    Q. How are NGLs calculated by the revenue
13 department or the accounting department?
14    A. Those are paid to EE, so EPC does not
15 record any sort of revenue generated from NGLs.
16    Q. Okay.  So EQT Production gets no revenue
17 from NGLs?
18    A. No.  Those revenues belong to EE.
19    Q. When EE gets profits from NGLs, do you
20 know who those are paid to?
21    A. EE.
22    Q. And EQT is the owner of EE?
23    A. Correct.
24    Q. Is there -- in revenue accounting, you --

Page 57

1 you said that you were in that portion of
2 accounting that kind of handled all of the EQT
3 subsidiaries in 2003; is that right?
4    A. That was for payroll accounting, correct.
5    Q. Just for payroll?
6    A. Correct.
7    Q. Okay. For revenue accounting, is there a
8 similar part of the accounting department that
9 handles revenue for EE in the same building where
10 you are?
11    A. Yes, there is. And we do see those
12 statements in the production company.
13    Q. Okay. So you see the EE statements?
14    A. Yes.
15    Q. And you know that EE gets paid for NGLs?
16    A. Correct.
17    Q. You just know that it doesn't come to
18 EQT directly?
19       MR. HENDRICKSON: Object to the form
20 of the question.
21    Q. You see the statements where EE is paid
22 for NGLs?
23    A. Correct.
24       MR. HENDRICKSON: Which EQT are you

Page 58

1 talking about, Scott?
2    Q. EQT Production Company does not get paid,
3 but you see the EE statements that come in?
4    A. Yes.
5    Q. Who pays EE for the NGLs?
6       MR. HENDRICKSON: I don't think she
7 would know that. That's not --
8       MR. WINDOM: Well, she's seen --
9 she's seen the statements. If she knows, then she
10 can testify to it.
11    A. So West Virginia, we have MarkWest that
12 processes liquids for EE, and also Williams.
13    Q. And does MarkWest send a monthly
14 statement to EE for the NGLs?
15    A. Yes.
16    Q. Okay. And does Williams do the same?
17    A. Yes.
18    Q. Ultimately, if EQT Energy, LLC, makes a
19 profit at the end of the year, do you know where
20 that money goes?
21    A. No. I mean, it's Corporate. To the
22 Corporation, I would assume.
23    Q. You say it goes to the Corporation?
24    A. EQT Corporation.

Page 59

1    Q. Are you familiar at all with lease
2 modifications?
3    A. No.
4       DEPOSITION EXHIBIT NO. 1
5       (Remittance Statement, Owner No.
6       255953, Check No. 1772696, was
7       marked for identification purposes
8       as Deposition Exhibit No. 1.)
9       MR. WINDOM: Mark this as Exhibit 1,
10 please.
11       MR. HENDRICKSON: Thank you, sir.
12       MR. WINDOM: Yeah.
13    Q. Ms. Toia, I'm going to hand you what has
14 been marked for identification as Deposition
15 Exhibit 1 of your deposition here today --
16    A. Okay.
17    Q. -- okay, and just ask you to look over
18 that document and tell me when you've had a chance
19 to review it.
20    A. Okay.
21    Q. Have you seen a document similar to that
22 before?
23    A. Yes.
24    Q. Okay. What is -- or what are the two

Page 60

1 documents that are combined to be Exhibit 1 to
2 your deposition?
3    A. They are both remittent statements.
4    Q. Now, the owners are listed on those
5 remittent statements; is that correct?
6    A. Yes.
7    Q. Now, the front page says Arnold K.
8 Richards?
9    A. Yes.
10    Q. And the back page says Arnold K. Richards
11 and Mary L. Richards?
12    A. Yes.
13    Q. And they have different owner numbers --
14    A. Yes.
15    Q. -- would you agree with that?
16    A. Yes.
17    Q. What is the owner number, and how is that
18 created?
19    A. That is a number that is just established
20 when a new owner is created in the system, and
21 it's just a random number.
22    Q. Now, with regards to the -- the front
23 page of that document, which is just the Arnold K.
24 Richards, Owner No. 255953, I want to discuss that

Page 61

1  remittent statement with you if you don't mind.
2      A.  Okay.
3      Q.  Okay.  I notice that all of these
4  production dates were for November of 2016; is
5  that correct?
6      A.  Looks correct.
7      Q.  And this document doesn't have a date on
8  it that I can see, as far as when it was issued.
9      A.  Yeah.
10     Q.  It was probably on the check that was on
11  the --
12     A.  Yeah.
13     Q.  -- bottom of the --
14     A.  I was going to say --
15     Q.  -- statement.
16     A.  Yeah.
17     Q.  Okay.
18     A.  Exactly.
19     Q.  So -- so I don't -- I don't have a date
20  when this was issued, but --
21     A.  Uh-huh.
22     Q.  -- based on your testimony where it was
23  usually a month behind and then it was ten days
24  after that --

Page 62

1      A.  Yes.
2      Q.  -- guess this was probably sometime in
3  January of 2017.  Would that seem reasonable?
4      A.  That would be reasonable.
5      Q.  Okay.  Now, this remittent statement has,
6  it looks like, five different wells listed; is
7  that correct?  Would that be your interpretation?
8      A.  Yes.
9      Q.  And those wells are identified by a
10  six-digit code overtop of the production date?
11     A.  Yes.
12     Q.  And then below that production date is
13  the November 2016 production -- or I'm sorry,
14  below the well number is the production date for
15  November 2016?
16     A.  Yes.
17     Q.  And then out from that, these all say
18  gas.  Would that mean that these were all sales of
19  natural gas?
20     A.  Correct.
21     Q.  And there would be no oil, I don't guess,
22  in this statement?
23     A.  Correct.
24     Q.  Now, what does the RI mean after the word

Page 63

1  "gas"?
2      A.  Royalty interest.
3      Q.  Now, if I am looking at the Enertia
4  system when -- when this document is created, what
5  data would be entered into the Enertia system as
6  far as the well number, the production date?
7          Would that all be in there already,
8  or is that something that you all would have to
9  enter on a monthly basis?
10     A.  No.  That would already be in there.
11     Q.  Okay.  Now, the decimal interest, is that
12  the -- the royalty that they are paid?
13     A.  Yes.
14     Q.  And is that already entered in the
15  Enertia system as well?
16     A.  Yes.
17     Q.  So those would -- would be constants in
18  the system from month to month and year to year?
19     A.  Those are entered by land
20  administration --
21     Q.  Okay.
22     A.  -- so we -- we don't make a determination
23  whether they change or not.
24     Q.  Right.  But certainly, unless there would

Page 64

1  be a change of ownership or some circumstance, you
2  would expect that that 12-and-a-1/2 percent would
3  be there all the time?
4      A.  Yes.
5      Q.  Okay.  Now, as far as the -- the net
6  price, do you see that?
7      A.  Yes.
8      Q.  What does net price mean?
9      A.  That's the price that was paid per
10  volume.
11     Q.  Okay.  Now, that -- that's not the gross
12  price.  That is the net price that includes the
13  gathering and all those things or --
14         MR. HENDRICKSON:  Where are you
15  seeing that?  Oh, okay.  I got it.  I'm sorry.  I
16  apologize.
17     A.  I honestly can't answer that.  I'd have
18  to go back and calculate that.
19     Q.  Okay.  And how would you calculate that?
20     A.  I would just back into it based on that
21  volume and the revenue.
22     Q.  Okay.  It -- the statements that you get
23  on a monthly basis, would it have the price, the
24  sales price of the gas?

Page 65

1    A. Which statements?
2    Q. You said that -- that you would get a --
3 a calculation from FlowCal and you'd get the
4 calculation --
5    A. Oh --
6    Q. -- from EE and you'd get all these
7 reports.
8    A. Correct.
9    Q. Okay. So here it shows the net price for
10 the Well No. 515361 at $1.31.
11    A. Yes.
12    Q. And that's a unit?
13    A. Yes.
14    Q. A dekatherm?
15    A. Again, I can't remember whether that's a
16 per dek or per Mcf.
17    Q. Okay. And it says that it is a net
18 price, though.
19    A. I see that, yes.
20    Q. Okay. Now, there's another well that has
21 a -- the one just below that says $1.32.
22    A. Yes.
23    Q. And then the one at the bottom says
24 $1.33.

Page 66

1    A. Yes.
2    Q. Do you know why those values would be
3 different if they were all measured for the same
4 first day of the month?
5    A. There is some conversion that takes place
6 from the MMbtu to the Mcf, so depending on -- the
7 heat content could change that price.
8    Q. Okay. So would that lead you, then, to
9 believe that this is not an Mcf price, but rather
10 a dekatherm price?
11    A. I can't say that for sure.
12    Q. Now, with regards to the owner volume and
13 the gross volume, do you see that column?
14    A. Yes.
15    Q. The owner volume is determined by --
16       MR. WINDOM: Strike that.
17    Q. Tell me how you -- you get the owner
18 volume.
19    A. You take the gross volume times that
20 decimal interest to get your owner volume.
21    Q. So if I take 1,832 units, whether it's
22 Mcf or dekatherms, and multiply it by .125 or
23 12-and-a-1/2 percent, then that would give me 229
24 owner units?

Page 67

1    A. Correct.
2    Q. And then I would multiply that 229 by the
3 $1.31?
4    A. Correct.
5    Q. And that would give me the owner revenue?
6    A. Can I do the math real quick?
7    Q. Sure.
8    A. That should give you the -- the owner
9 revenue.
10    Q. Okay.
11    A. The $1.31 times the owner volume should
12 give you the owner revenue.
13    Q. Okay. And then from that, $12.80 from
14 the -- the top well there was taken out in owner
15 taxes?
16    A. Correct.
17    Q. And then there were no owner deducts?
18    A. Correct.
19    Q. And then we have an owner net of $288.27?
20    A. Correct.
21    Q. And then those five wells were added
22 together to create a check for $950.04?
23    A. Correct.
24    Q. Now, on these particular wells, you --

Page 68

1 you don't know if these are vertical or
2 horizontal, do you?
3    A. I do not, no.
4    Q. Okay. Just looking at this data, you --
5 you can't make a determination on that?
6    A. No.
7    Q. Let's flip over to the next page. Can we
8 agree that the production date for these six wells
9 was the same production date as the five on the
10 front page?
11    A. Yes.
12    Q. And can we agree that these are different
13 wells?
14    A. Yes.
15    Q. Can we also agree that these are all gas
16 royalties and there are no oil royalties included?
17    A. Yes.
18    Q. So we're dealing apples to apples in that
19 regard?
20    A. Yes.
21    Q. Okay. Now, these wells have a well
22 number, and then they have another number in
23 parentheses. Do you see that?
24    A. Yes.

Page 69

1    Q. Do you know what that parenthetical
2 number represents?
3          MR. HENDRICKSON: I'm sorry.
4    A. The PUL96 number, that's what you're
5 talking about?
6    Q. That's correct.
7    A. That's the pad or put ID.
8    Q. Okay. And the H1, H2 through H6, would
9 those be horizontal legs?
10   A. I -- I'm not sure. Can't answer that.
11   Q. So as you look at this, you know that
12 these six wells were all drilled on the same pad?
13   A. Correct.
14   Q. Based on that, can we presume, from your
15 experience, that these would be horizontal wells?
16   A. Yes.
17   Q. And we look at the volumes and we can
18 almost confirm that?
19   A. Correct.
20   Q. Okay. Now, again, this has a net price.
21 Do you see that net price?
22   A. Yes.
23   Q. And the net price for these six wells was
24 all consistently $1.34 in November of 2016?

Page 70

1    A. I see that.
2    Q. And -- and that is -- depending on which
3 value we were looking at on the front page, that
4 was one, two, or three pennies a unit different?
5    A. Yes.
6    Q. Would your experience in -- in this
7 regard lead you to believe that -- that that penny
8 or two difference would be the thermal calculation
9 for the gas?
10   A. Either that or it could be just some
11 rounding, because those numbers are a lot smaller.
12 The volumes are a lot smaller.
13   Q. Okay. And these may not even be sold to
14 the same company as the -- the wells on the front
15 page?
16   A. Perhaps.
17   Q. May go --
18   A. Yes.
19   Q. -- through a different sales point?
20   A. Yes.
21   Q. So when you look at the -- the decimal
22 interest here, it's much smaller than the decimal
23 interest on the front page?
24   A. Yeah. Yes, I see that.

Page 71

1    Q. Okay. Would -- again, you're dealing
2 with horizontal wells. You're dealing with a lot
3 more owners --
4    A. Yes.
5    Q. -- sharing in the interest; is that
6 right?
7    A. Yes.
8    Q. Okay. So when you look at the -- the
9 owner volume here, how would you come up with that
10 owner volume?
11   A. It should be the gross volume times in a
12 decimal interest to get owner volume.
13   Q. Okay. So the same way we did it on the
14 front page?
15   A. Yes.
16   Q. You -- you take that -- for instance, on
17 the -- the Pullman (phonetic) 96H1 well, we would
18 take $72,695 -- or 695.9 units, multiply it by the
19 .02869200 --
20   A. Yes.
21   Q. -- and that would come up with 2,085.79
22 for the volume?
23   A. Yes.
24   Q. And -- and what data here would be

Page 72

1 entered by employees of EQT?
2    A. This, again, would have all been done
3 through a process.
4    Q. Okay. So somebody would have had to have
5 entered the net price?
6    A. The -- the value -- like I said, the
7 value gets uploaded, and then the net price that's
8 presented here is just a calculation.
9    Q. Okay. And you say the net price is a
10 calculation?
11   A. Correct. So we have a value --
12   Q. Right.
13   A. -- that we were paid, and then we have
14 the volume, and we get paid on a dekatherm.
15   Q. Okay.
16   A. So when we calculate that back to an Mcf
17 level, it gets -- this net price gets basically
18 backed in too.
19   Q. Okay. So from your testimony, then, I
20 gather that this $1.34 is actually an Mcf value?
21   A. Yes.
22   Q. Okay. And that would be the same on the
23 front page, that that would be an Mcf value?
24   A. Yes.

Page 73

1    Q.  Okay.  So the calculation that is entered
2  or the calculation that is made allows someone in
3  accounting to enter into Enertia the $1.34, the
4  $1.31 value?
5    A.  Again, we don't actually calculate that
6  ourselves.  It's -- it's done by the system.  We
7  upload the value that EE has paid us --
8    Q.  Okay.
9    A.  -- and then, based on the volumes that we
10 get from gas measurement for what was sold, that's
11 what that backs into that price.
12   Q.  And you would expect that to be correct
13 based on your experience with Enertia --
14   A.  Yes.
15   Q.  -- that it doesn't mess that up?
16   A.  Yes.
17   Q.  Okay.  Now, when you go from gross volume
18 to owner revenue, you would multiply that -- that
19 owner volume --
20   A.  Yes.
21   Q.  -- by the $1.34?
22   A.  Correct.
23   Q.  And that would give you $2,787.72?
24   A.  Yes.

Page 74

1    Q.  And based on your experience, that would
2  be accurate?
3    A.  There's some rounding, again, in there,
4  because that $1.34 could be $1.33 something.  So
5  it could be a little -- few pennies or dollars off
6  based on the rounding.
7    Q.  Well, why don't we do this:  Would you
8  multiply that $1.34 times $2,085.79?
9    A.  I get $2,794.95.
10   Q.  That is, what, more than $7.00 off; is
11 that right?
12   A.  Yes.
13   Q.  So when Mr. and Mr. -- Mr. and
14 Mrs. Richards get their royalty statement, they
15 can't take that net price value and rely on it,
16 can they?
17   A.  They cannot.  But there -- like I said,
18 there's going to be more decimals in there that
19 get to the $2,787.
20   Q.  And I'm not arguing with you that that
21 might be the case, but why don't you multiply the
22 next one, $1.34 times $1069.26?
23   A.  $1,432.81.
24   Q.  Again, that -- the rounding error seem to

Page 75

1  be in EQT's favor, do they not?
2        MR. HENDRICKSON:  Well, object to
3  the question, and it assumes facts not in
4  evidence.
5        I mean, she's already explained to
6  you that the net price is a calculation that they
7  re-calculate backwards.  It's not -- it's not what
8  they're -- they're basing their payment on.
9    A.  Correct.  The revenue -- the owner
10 revenue piece is more important.  That is going to
11 be correct.
12        That's what we were -- what we would
13 have been paid by EE, what we're passing back to
14 royalty owners, and again, that price here is just
15 a calculation back.
16   Q.  Well --
17   A.  That price doesn't depend on what that
18 owner revenue is.
19   Q.  If that value is rounded in -- in every
20 statement and there are rounding errors in favor
21 of EQT, where would that extra money go?
22   A.  There is no extra money.  This has --
23 that net price has no impact on our records.
24   Q.  So you've divided the owner revenue by

Page 76

1  everybody in the well and made sure that everybody
2  gets down to the penny what they're entitled to?
3    A.  Correct.
4    Q.  Even though the statement differs as far
5  as what that -- that value would be?
6    A.  Correct.
7    Q.  Now, there is -- again, we have owner
8  taxes --
9    A.  Yes.
10   Q.  -- that are taken from that; is that
11 right?
12   A.  Yes.
13   Q.  And then we have owner deducts.
14   A.  Yes.
15   Q.  What are those owner deducts?
16   A.  That would be the -- any charges relating
17 to gathering to get that gas to the interstate
18 pipeline.
19   Q.  And how -- that -- that gathering rate is
20 determined how?
21   A.  The Midstream Planning, they take the
22 cost of services, operating costs from the prior
23 year, and then provide us a rate to use for the
24 following year.

ARNOLD K. RICHARDS, ET AL. v.
EQT PRODUCTION COMPANY

KRISTY TOIA
November 30, 2017

Page 77

1    Q. What operating costs are included in that
2 gathering rate that they look at for the previous
3 year?
4    A. I do not know.
5    Q. Who would know that answer?
6    A. I believe that would be Joe Piccirilli.
7    Q. Okay. And what's Joe's position?
8    A. I believe his title is director of
9 planning, and that would be for Midstream.
10    Q. EQT Midstream?
11    A. EQT Midstream, correct.
12    Q. And would you agree with me that this
13 $1.34 net price had $940 of gathering taken out
14 when you figured in the volumes on that first
15 well, the H1?
16    A. I can't say that, because the -- like I
17 said, this price is backed into.
18    Q. Okay. But -- but whatever -- however you
19 back into it, you had an owner volume of
20 2,085.79 --
21    A. Uh-huh.
22    Q. -- Mcf?
23    A. Correct.
24    Q. And then the owner revenue was

Page 78

1 $2,787.72 --
2    A. Correct.
3    Q. -- for the first well?
4    A. Correct.
5    Q. And then out of that, EQT Production
6 deducted $940.15?
7    A. Correct.
8    Q. So if someone from EQT would say that
9 Mr. and Mrs. Richards did not have deductions
10 taken from the royalty, that would be incorrect;
11 is that right?
12    A. Well --
13        MR. HENDRICKSON: Object to the form
14 of the question, but go ahead and answer if you
15 can.
16    A. From my understanding, this is a market
17 value lease so -- which means that the gas
18 purchase agreement -- the market value is the
19 first of month index price less any gathering
20 related charges.
21    Q. Okay. When you say "market value lease,"
22 what are you meaning there?
23    A. That's all I know, that the owners should
24 be paid with the -- at market value.

Page 79

1    Q. And who determines that market value?
2    A. The actual price?
3    Q. Well --
4        MR. HENDRICKSON: You mean who
5 determines it's a market value lease?
6    Q. Who --
7        MR. WINDOM: No.
8    Q. Who determines what the market value of
9 the gas is?
10    A. It would be the value that EE is paid by
11 the gas -- the interstate pipeline less any of the
12 gathering charges related to getting the gas
13 there.
14    Q. Okay. Now, you're talking about the
15 value that EE is paid by TETCO or whomever the
16 purchaser is down the line --
17    A. Yeah.
18    Q. -- third party?
19    A. The first of month price, yeah.
20    Q. Now, if -- EQT is the original seller of
21 the gas to EE; is that right?
22    A. EPC.
23    Q. EQT Production Company?
24    A. Yes.

Page 80

1    Q. Okay. So at that first point of sale,
2 there's a meter somewhere down the line that --
3 that is a first point of sale between EQT and
4 EE; is that right?
5    A. The gas is purchased by EE at the
6 wellhead, and they're paying us on a dekatherm
7 price, or MMbtu price, which is dictated by
8 wherever the gas is delivered to from that
9 interstate pipeline.
10    Q. Okay. Where would I find what that price
11 was?
12    A. IFERC is where we get the pricing from.
13    Q. IFERC?
14    A. Yeah.
15    Q. What does that mean?
16    A. It is a publication -- actually, it's --
17 Platts is the -- you have to subscribe to get
18 the --
19    A. Uh-huh.
20    A. -- that pricing information.
21    Q. Okay. And if I asked for EQT to provide
22 me with that price every month since 11 of 2016,
23 that could be done, right?
24    A. I'm not sure we're allowed to do that.

ARNOLD R. RICHARDS, ET AL. v.
EQT PRODUCTION COMPANY

KRISTY TOIA
November 30, 2017

Page 81

1  We could give you the price that we were paid, but
2  I don't know if I could give you that pricing of
3  that -- what was published.
4      Q.  Well, if it was -- if it was published,
5  it's public information, is it not?
6      A.  Well, it's not public information.
7          MR. HENDRICKSON:  It's a
8  subscription, and --
9      A.  It's a subscription.
10     Q.  Well --
11         MR. HENDRICKSON:  -- and I'm not
12 sure that they're allowed to share subscribed
13 stuff.  I -- I don't know.  We'll check.
14     Q.  If I -- if I got a subscription to Time
15 Magazine, I'm allowed to let you read it, right?
16     A.  Platts is very --
17         MR. HENDRICKSON:  I don't know.
18 Maybe not.
19     A.  They -- yeah.
20     Q.  Well, I mean --
21     A.  They have really -- very stringent --
22         MR. HENDRICKSON:  We can --
23     A.  -- stringent rules.
24         MR. WINDOM:  I've asked --

Page 82

1          MR. HENDRICKSON:  We'll check.
2  We'll check.
3          MR. WINDOM:  I've asked for that
4  information in discovery and got some rather --
5          MR. HENDRICKSON:  Okay.
6          MR. WINDOM:  -- convoluted answers
7  without actually giving me the prices that were
8  paid for the gas, and that's what I'm trying to
9  get to.  If I haven't asked the question --
10         MR. HENDRICKSON:  Let's go off the
11 record.
12         MR. WINDOM:  -- properly --
13         MR. HASTINGS:  Let's go off the
14 record.
15         MR. HENDRICKSON:  Let's go off the
16 record for a second.
17         THE VIDEOGRAPHER:  The time is
18 12:33.  We will now go off the record.
19         (A recess was taken, after which the
20 proceedings continued as follows:)
21         P R O C E E D I N G S
22         THE VIDEOGRAPHER:  The time is
23 12:41.  We are now back on the record.
24 BY MR. WINDOM:

Page 83

1      Q.  Okay.  Ms. Toia, before we went off the
2  record, we were talking about the calculations and
3  market value.  Now, you indicated that this was,
4  to your knowledge, a market value lease.
5      A.  That's what I was told, yes.
6      Q.  Okay.  Who told you this was a market
7  value lease?
8          MR. HENDRICKSON:  Object to the --
9  the form of the question.  Go ahead and answer.
10     A.  I honestly can't remember.
11     Q.  Okay.  When were you told this was a
12 market value lease?
13     A.  It might have been during some of the
14 initial gathering of data I did earlier this year.
15     Q.  Specifically in planning for this
16 Litigation?
17     A.  Yes.
18     Q.  Now, let's go back to the -- the front
19 page of Exhibit 1, and you would agree with me
20 that -- that there were no owner deducts taken for
21 -- for these five wells listed on the front?
22     A.  Correct.
23     Q.  And if this -- if these wells were
24 drilled pursuant to the same oil and gas lease,

Page 84

1  which I -- you don't know that, do you?
2      A.  I don't know.
3      Q.  Okay.  If they were drilled pursuant to
4  the same oil and gas lease and this were also a
5  market value lease, would you expect that the
6  owner deducts would be included in that one?
7      A.  Yes.
8      Q.  And I will submit to you that -- that
9  this lease is -- or these leases were first made
10 in the 1950s --
11     A.  Okay.
12     Q.  -- okay?  That there were no deducts
13 taken from the royalties from 1955 until these
14 horizontal wells were drilled.
15     A.  Is that a question?
16     Q.  Does that surprise you?
17     A.  Yes.
18     Q.  And I know you said that you're not
19 familiar with the leases, but I -- I do want to
20 get them as exhibits to your deposition here
21 today, because we --
22         We have talked about market value
23 leases and everything, and I just want to make
24 sure that -- that we don't have any issues going

ARNOLD K. RICHARDS, ET AL. v.
EQT PRODUCTION COMPANY

KRISTY TOIA
November 30, 2017

---

Page 85

1 forward and that we have these leases in there --
2    A.  Okay.
3    Q.  -- okay?  So I'm going to have this
4 marked as --
5         MR. HENDRICKSON:  2.
6    DEPOSITION EXHIBIT NO. 2
7         (Lease Agreement between Pearl
8         Hutchinson and D.C. Hutchinson, Her
9         Husband; Ruby Dotson and J.E.
10        Richards was marked for
11        identification purposes as
12        Deposition Exhibit No. 2.)
13    DEPOSITION EXHIBIT NO. 3
14        (Lease Agreement between Pearl
15        Hutchinson and D.C. Hutchinson, Her
16        Husband; Archie C. Richards and
17        Elsie M. Richards, His Wife, and
18        J.E. Richards was marked for
19        identification purposes as
20        Deposition Exhibit No. 3.)
21    DEPOSITION EXHIBIT NO. 4
22        (Lease Agreement between A.H. Hodge
23        and Ona Hodge, His Wife, and J.E.
24        Richards was marked for

---

Page 86

1        identification purposes as
2        Deposition Exhibit No. 4.)
3    Q.  This is Exhibit 2.  2.  This'll be
4 Exhibit 3, and this'll be Exhibit 4.
5         MR. HENDRICKSON:  Which one's 3 and
6 which one's 4?
7         MR. WINDOM:  Okay.  They go in
8 order, so 445 is 2, 447 is 3, and 449 is 4.
9         MR. HENDRICKSON:  Thanks.
10        MR. WINDOM:  Okay.
11    Q.  So Ms. Toia, I'm going to hand you three
12 exhibits.  They are marked as Deposition Exhibits
13 2, 3, and 4 to your deposition here today, okay?
14        And you can look at those and -- and
15 let me know when you've had a chance to review
16 them.
17    A.  I honestly wouldn't know what I'm looking
18 at because I'm not familiar with -- with leases.
19    Q.  Understood.
20        MR. HENDRICKSON:  If you want us to
21 stipulate that these are the leases in that -- in
22 question, we can do that.
23        MR. WINDOM:  Okay.
24        MR. HENDRICKSON:  I mean, and you

---

Page 87

1 can attach them to her deposition.
2         MR. HASTINGS:  I think we can do it.
3 I don't know.
4         MR. HENDRICKSON:  Yeah.  Well, I
5 don't know either, but I mean, unless -- if you
6 let us verify --
7         MR. HASTINGS:  We can --
8         MR. WINDOM:  Well --
9         MR. HASTINGS:  We can attach --
10        MR. WINDOM:  Let's go off the record
11 for just a minute.
12        THE VIDEOGRAPHER:  The time is
13 12:46.  We are now going off the record.
14        (A discussion was had off the record,
15 after which the proceedings continued as follows:)
16        P R O C E E D I N G S
17        THE VIDEOGRAPHER:  The time is
18 12:50.  We are now back on the record.
19 BY MR. WINDOM:
20    Q.  Okay.  Ms. Toia, while we were off the
21 record, I've had a chance to consult with counsel
22 for EQT, and -- and we've made some stipulations,
23 and I just want to get those on the record during
24 your deposition here today.

---

Page 88

1        And those are that the leases which I
2 have provided you as Exhibits 2, 3, and 4 to your
3 deposition here today are the controlling leases
4 for the plaintiff and EQT in this Matter, okay?
5    A.  Okay.
6    Q.  And I'll let --
7         MR. HENDRICKSON:  So -- so
8 stipulate.
9         MR. WINDOM:  Okay.
10    DEPOSITION EXHIBIT NO. 5
11        (Amendment and Ratification of Oil
12        and Gas Lease, Lease No. 919996, was
13        marked for identification purposes
14        as Deposition Exhibit No. 5.)
15    DEPOSITION EXHIBIT NO. 6
16        (Amendment and Ratification of Oil
17        and Gas Lease, Lease No. 919997, was
18        marked for identification purposes
19        as Deposition Exhibit No. 6.)
20    DEPOSITION EXHIBIT NO. 7
21        (Amendment and Ratification of Oil
22        and Gas Lease, Lease No. 919987, was
23        marked for identification purposes
24        as Deposition Exhibit No. 7.)

---

Page 89

1     Q. Now, with regards to Deposition Exhibits
2  5, 6, and 7, that those would be the modifications
3  that would allow for the pooling and unitization
4  of these leases for horizontal wells that were
5  drilled by EQT.
6           MR. HENDRICKSON:  So stipulate.
7           MR. WINDOM:  Okay.
8     Q. And I believe it's your testimony that --
9  that this lease language means absolutely nothing
10 to you?
11    A. Means nothing to me.
12    Q. Okay.  And when you're talking about
13 market price, that's not your reading of the
14 lease.  That's just what someone told you?
15    A. That's correct.
16    Q. And you don't know who buys the gas for
17 the shallow wells on these leases --
18    A. No.
19    Q. -- is that right?
20    A. No, I don't know.
21    Q. Would those statements come through your
22 accounting department, though?
23    A. It would come through in the same
24 statement or wire that we would receive from EE to

Page 90

1  EPC.
2     Q. Would it state on that wire who the
3  purchaser of the gas was?
4     A. I don't believe we get that information.
5     Q. You would just get the dekatherm
6  calculation and the price and --
7     A. Correct.
8     Q. -- the Mcf?
9     A. Correct.  Dekatherms.  Mcf is not on
10 those statements.
11    Q. Okay.  You -- you have to calculate that
12 back from the flow chart?
13    A. Correct.
14    Q. Or is it flow chart?
15    A. FlowCal.
16    Q. FlowCal, thank you.  But we can agree
17 that -- that the price that is listed on these
18 royalty statements, which are identified as
19 Exhibit 1, is a net price?
20    A. It says net price, and again, I would say
21 it's more of just kind of backed in, calculated
22 price.
23    Q. How would I be able to determine the
24 gross price if that is the net price?

Page 91

1     A. I don't know how to answer that.
2     Q. Who at EQT could tell me the -- the gross
3  price?
4     A. We would get a price from EE and that it
5  would have the gathering-related charges deducted
6  out of it, so we wouldn't know that --
7     Q. Okay.  So --
8     A. -- from those wire statements.
9     Q. So this net price would already have the
10 gathering deductions taken out of it?
11    A. It does not.  I don't believe it does the
12 way it's calculating on this statement.
13    Q. Okay.  So I guess my question is:  How --
14 this is called a net price on the -- on the
15 remittent statement?
16    A. Yes.
17    Q. And that's not a gross price.  That is --
18 that is intentionally there.  The word "net price"
19 is there intentionally?
20    A. I don't know how to answer.
21    Q. Okay.  You're an accountant.  You've
22 been --
23    A. Yes.
24    Q. -- an accountant for a number of years.

Page 92

1     A. Correct.
2     Q. What to you does net price mean?
3     A. It would be a price that was after --
4  taking the gross less any expenses gets you a net.
5     Q. Okay.  But you -- as you sit here today
6  as the -- I want to make sure I get the -- the
7  title right -- as the director --
8     A. Director.
9     Q. -- of revenue accounting for EQT and the
10 person that's in charge of making sure that the
11 Enertia system prints this out and gets it to
12 Mellon Bank, you can't tell me what that net price
13 means on the remittent statement?
14    A. No.  I was not involved in creating these
15 statements and what the column headings should
16 mean.
17         We are responsible more on the volume
18 and revenue and any of the taxes, deducting and
19 making sure that the actual payment to the royalty
20 owner is correct.
21    Q. Okay.  But you can't make sure that the
22 payment to the royalty owner's correct unless you
23 know what that -- that price is, right?
24    A. Correct, which we --

ARNOLD R. RICHARDS, ET AL. v.
EQT PRODUCTION COMPANY

KRISTY TOIA
November 30, 2017

Page 93

1    Q. Okay.
2    A. -- get from EE.
3    Q. So -- so that net price that's listed on
4 that -- that royalty statement, as you sit here
5 today, you don't know what that means?
6    A. It looks like, again, it's a backed in
7 price.
8    Q. But you don't know what calculations were
9 made to back into that price?
10    A. There's conversions. So we get paid on a
11 dekatherm.
12    Q. Right.
13    A. And we have to convert that into an Mcf.
14    Q. Right.
15    A. Which then calculates into a price.
16    Q. Which would be a gross price?
17    A. It would be -- depending on how you're
18 looking at it. If you're -- if what -- the price
19 that we receive from EE is a net price. We then
20 have to back out -- or put back in, I should say,
21 any of the gathering-related charges to get to a
22 gross price.
23    Q. Okay. So EE pays you a net price. So
24 the price that EE pays you already has gathering

Page 94

1 taken out of it?
2    A. Correct.
3    Q. And that net price from EE, you then have
4 to back out of that to re-calculate the expenses?
5    A. Correct.
6    Q. Can we agree on the front page of Exhibit
7 1 that calculation was not made and there were no
8 deductions shown?
9    A. There are no deductions, correct.
10    Q. But the net price is strikingly similar
11 to the net price on Page 2 of that exhibit. You
12 would agree with that?
13    A. I can't say why -- I mean, I don't know
14 what they were priced at, where that gas went to
15 on -- on the first page. I know where the gas
16 went to on the second page.
17        So for all I know, it could have been
18 the same pricing but a different sales point. I
19 don't know.
20    Q. So my -- my point here is that the net
21 price on the front page of Exhibit 1 and the net
22 price on the second page of Exhibit 1 is within a
23 penny or two of -- per volume.
24    A. Yes.

Page 95

1    Q. And that there was no -- none of this
2 back calculating the expensing that you just
3 testified about with regards to the wells that are
4 identified on the front page of the remittent
5 statement.
6    A. Yes.
7    Q. But for some reason, EQT has done this
8 back calculation of expenses to the net price on
9 Page 2 of Exhibit 1.
10    A. The same calculation that was performed
11 to get from -- you take your revenue over your --
12 or your volume over -- your revenue over your
13 volume to get back into that price that's listed
14 or presented on the statement.
15    Q. Okay. But -- but somehow there are
16 deductions now taken out on -- on the second page.
17    A. Yes. They're presented on the page.
18    Q. Okay. But I guess I'm confused by your
19 testimony, and I'm not an accountant and I
20 apologize.
21        But you had indicated that you have
22 to re-do this calculation from EE because it
23 already includes the deductions in it.
24    A. We get a net price from EE. We know what

Page 96

1 the gatherings charges are --
2    Q. Uh-huh.
3    A. -- so we add those back in to calculate
4 what that price is.
5    Q. And that would be the gross price?
6    A. The gross price, right.
7    Q. Okay. But this statement shows a net
8 price.
9    A. Yes.
10    Q. And is it your testimony here today that
11 that is a gross price or that that is a net price?
12    A. I mean, I personally would call it a
13 gross price, because if you're taking your -- your
14 gross revenue over your gross volumes, it backs
15 into that price.
16        But I'm saying this is not
17 technically the price that EE pays us, because
18 again, they're paying us on dekatherms and this is
19 a per-Mcf price.
20    Q. Okay.
21    A. So there's quite a few conversions that
22 happened after --
23    Q. Many conversions. So you have to -- I
24 understand you have to convert it to Mcf from

ARNOLD R. RICHARDS, ET AL. v.
EQT PRODUCTION COMPANY

KRISTY TOIA
November 30, 2017

Page 97

1  dekatherms, and I understand that you have to back
2  into these deductions.  But if EE is paying you a
3  net price, why do you even show deductions?
4          Why don't you just show:  Here's the
5  net price, here's your royalty percentage, and
6  make your calculation?  Why -- why do you have to
7  do this finagling or backing in to get these
8  deductions?
9      A.  I would say it's just to be more
10  transparent so the owner knows how much out of
11  that pricing was pertaining to the gathering
12  charges.
13      Q.  Now, what is -- you had indicated that --
14  that there was IFERC?
15      A.  Uh-huh.
16      Q.  What does --
17      A.  Yes.
18      Q.  -- IFERC mean?  Is it the Federal Energy
19  Regulatory Committee's Internet site?
20      A.  Yes.  Yes.
21      Q.  Okay.  And -- and that is -- that is a
22  government agency, right?
23      A.  I -- yes.
24      Q.  Now, when you're talking about index

Page 98

1  pricing, when you -- when you look at an index
2  price, there are -- are numerous indexes; is that
3  right?
4      A.  Yes.
5      Q.  Okay.  You can have Dominion South?
6      A.  Yes.
7      Q.  Do you know what Dominion South is?
8      A.  Yes.
9      Q.  Okay.  Henry Hub, do you know what the
10  Henry Hub is?
11      A.  Yes.
12      Q.  And you can have TCO?
13      A.  Uh-huh.  Yes.
14      Q.  Okay.  Are there any other index prices
15  that --
16          And I'm not saying that you look at
17  any of these, but are there any index prices which
18  in the accounting department you rely on in
19  determining prices or values or checking that EE
20  is paying properly?
21          MR. HENDRICKSON:  I'm going to
22  object to the question.  It's assuming that she
23  does that.  I think she testified she doesn't do
24  that, but go ahead and answer the question.

Page 99

1      A.  Yeah.  I can't say that for sure.
2      Q.  Okay.  Does anybody at EQT verify the
3  volumes or the index pricing that is used by
4  EQT Energy, LLC?
5      A.  I would imagine someone at EE would do
6  that.
7      Q.  Right.  But checks and balances, is there
8  anyone at EQT that's checking EE's work?
9          MR. HENDRICKSON:  Again, if you
10  know.
11      A.  We do an accrual so -- on a monthly
12  basis, so we take -- which we basically have pools
13  of the wells, and we say, "This is the volume, and
14  this is" -- we price it at what the index price
15  should be in that area.  That's part of our
16  accrual process.
17      Q.  Okay.  You say "accrual"?
18      A.  Accrual, yeah.
19      Q.  Okay.  And what index price do you use?
20  Whatever EE says they're selling this at?
21      A.  Yes.  That's provided to us from EE, and
22  we do -- they do provide us what that pricing is
23  on a monthly basis, that first of the month price
24  to use.

Page 100

1          And we apply that to the volumes that
2  we're estimating for the month to come up with the
3  value that we accrue.
4      Q.  Okay.  And what index price, if you know,
5  does EE use?
6      A.  There's -- it depends on the area, but we
7  -- as you mentioned, there's the Dominion, there
8  is the M2, there's an M3.
9      Q.  So is it -- is it your understanding that
10  these wells go through the M2 system and would use
11  the M2 index?
12      A.  I know these do, yes, on the second page.
13      Q.  Okay.  And where would I find that M2
14  index?
15      A.  Again, from the Platts publication --
16      Q.  Okay.
17      A.  -- that would be in.
18      Q.  Do you know if it's -- if it's anywhere
19  else for public consumption?
20      A.  I don't think it is.
21      Q.  Okay.  And when you say Platts,
22  P-L-A-T-Z?
23      A.  P-L-A-T-T-S.
24      Q.  P-L-A-T-T-S, okay.  Who at EQT could tell

Page 101

1 me the information contained on Exhibit 1, if
2 that's a gross price or a net price that is shown?
3     A. I can't say for sure.
4     Q. Somebody's putting that calculation in
5 there, right?
6     A. It's a calculation. Like I said, it's a
7 backed in price.
8     Q. Okay. But -- and who makes that
9 calculation, is my question?
10     A. Oh, the system does; Enertia does.
11     Q. Okay. Who enters the data into Enertia
12 for that?
13     A. So we get the information from EE on a
14 value --
15     Q. Right.
16     A. -- and we have the volumes. That
17 information is loaded, and it backs into that
18 price.
19     Q. Okay. Can you provide me with the EE --
20 and I'm not asking for the entire EQT system, but
21 I specifically want the EE values for these wells
22 that were used to back into this number in Enertia
23 from November 2016 to present.
24         Can you provide that to me?

Page 102

1     A. We have the information. I'm not sure if
2 it can be provided.
3         MR. WINDOM: I'm asking for that. I
4 mean, do you want me to do a formal request or --
5         MR. HASTINGS: Can we go off the
6 record again?
7         THE VIDEOGRAPHER: The time is 1:04.
8 We are now going off the record.
9         (A discussion was had off the record,
10 after which the proceedings continued as follows:)
11         P R O C E E D I N G S
12         THE VIDEOGRAPHER: The time is 1:06.
13 We are now back on the record.
14         MR. WINDOM: Okay. And we are
15 stipulating that you all -- that EQT will provide
16 the wire file from EE for these particular wells
17 in some form.
18         MR. HENDRICKSON: Yes. If we can,
19 yes.
20         MR. HASTINGS: Yeah, we will.
21         MR. WINDOM: I get a "we will" from
22 -- from your co-counsel over here.
23         MR. HENDRICKSON: I --
24         MR. HASTINGS: Not co-counsel.

Page 103

1 BY MR. WINDOM:
2     Q. So let me ask you this: When -- when
3 you're talking about wells that -- that had
4 straight zeros coming out for deductions for a
5 number of years, as shown on the front page of
6 Exhibit 1, and then all of a sudden, for the
7 horizontal wells, they start taking deductions,
8 how is that determination made to start taking
9 deductions from these owners of oil and gas?
10     A. My group, revenue accounting, does not
11 make that determination. That's done through land
12 administration.
13     Q. So land administration would make the
14 decision: "Hey, you can start taking deductions
15 here"?
16     A. Based on, I guess, the review of leases,
17 yes.
18     Q. Okay. And would that come to you all via
19 email, would it come to you all via an internal
20 memo? How would you get the go ahead to take
21 deductions?
22     A. It is an email.
23     Q. Do you recall in this Matter receiving an
24 email from land administration regarding the

Page 104

1 deductions for the Richardses?
2     A. I would not have received that
3 personally, because I don't handle that.
4     Q. Who would have received that email?
5     A. I'm going to say Shawn Madey.
6     Q. Okay. Is that a man or a woman?
7     A. A man. Shawn.
8     Q. Okay. S-E-A-N?
9     A. S-H-A-W-N.
10     Q. Of course.
11     A. M-A-D-E-Y.
12     Q. M-A-D-E-Y.
13     A. Yeah.
14     Q. And somebody in land administration would
15 have sent Shawn Madey an email and told him:
16 "Hey, on the Richards' leases," and then given him
17 the numbers, "take deductions"?
18     A. As wells turn in line, we get a
19 spreadsheet from land administration for all the
20 owners in that -- that are part of that well, and
21 it'll say whether take deductions or do not.
22     Q. Is that an electronic spreadsheet --
23     A. It's a spreadsheet.
24     Q. -- like Excel?

ARNOLD K. RICHARDS, ET AL. V.
EQT PRODUCTION COMPANY

KRISTY TOIA
November 30, 2017

Page 105

1  A. Yes.
2  Q. Okay. And you would have a copy of that?
3  A. Yes.
4  Q. Can you provide that to -- to counsel?
5  A. Yes.
6  Q. Okay.
7  MR. WINDOM: And Dave, I'm going to
8 ask you to provide -- I don't want information on
9 any other owners. I just want it isolated for --
10 for my folks. Would you be able to do that for
11 me?
12 MR. HENDRICKSON: Yeah, if we can.
13 Again, it's probably going to have to be redacted.
14 I doubt they get just one for your particular
15 clients' wells. It probably has a number of them
16 on there --
17 THE DEPONENT: Yes.
18 MR. HENDRICKSON: -- but sure.
19 Whatever we got, we'll get to you.
20 MR. WINDOM: All I'm looking for
21 is --
22 MR. HENDRICKSON: Yeah.
23 MR. WINDOM: -- is the Richards' on
24 -- on --

Page 106

1  MR. HENDRICKSON: Got it.
2  MR. WINDOM: -- the Pullman 96 pad.
3  MR. HENDRICKSON: Got it.
4 BY MR. WINDOM:
5  Q. And you did not -- you say you did not
6 receive the email from Shawn Madey?
7  A. I did not see those personally. My group
8 does.
9  Q. Okay. Who in your group would have seen
10 that email?
11 A. That was Shawn. He would have
12 received --
13 Q. Oh, Shawn's --
14 A. Shawn's in --
15 Q. -- your group?
16 A. -- my group. He would have received it
17 from someone in land administration.
18 Q. Okay. Now, is Shawn one of the -- the
19 five people --
20 A. Yes.
21 Q. Okay. Now, you gave me a different name
22 earlier that handles the Marcellus district.
23 A. Yeah. She handles the revenue
24 distribution.

Page 107

1  Q. Okay.
2  A. The -- at the time that these wells were
3 turning line, Shawn had handled the revenue
4 distribution for Marcellus. So he would have been
5 the one to have received that file at that time.
6  Q. And Shawn still works there?
7  A. Yes.
8  Q. Okay.
9  MR. WINDOM: Dave, I'm going to ask
10 for -- for that email as well. Can you provide
11 that to me, the email from the land administration
12 to Shawn Madey?
13 MR. HENDRICKSON: Yeah. I thought
14 that's what you wanted.
15 MR. WINDOM: I wanted the email and
16 then I wanted the spreadsheet that she got.
17 You --
18 A. I'm sure we can produce the spreadsheet.
19 I'm not sure about the emails. I'm not sure we
20 would keep every single email --
21 Q. Okay.
22 A. -- going back that far.
23 MR. HENDRICKSON: We'll check and
24 see.

Page 108

1  MR. WINDOM: Okay.
2  Q. I'm guessing you're not familiar with
3 declarations of pooling?
4  A. No.
5  Q. Okay. I'm not going to ask you any
6 questions about them, then.
7  A. Okay. Thank you.
8  MR. WINDOM: Is this 8?
9  THE COURT REPORTER: I think so,
10 yeah.
11 MR. HENDRICKSON: Thank you.
12 MR. WINDOM: Yeah.
13 DEPOSITION EXHIBIT NO. 8
14 (Remittance Statement, Owner No.
15 258485, Check No. 1847379, was
16 marked for identification purposes
17 as Deposition Exhibit No. 8.)
18 Q. Okay. Ms. Toia, I'm going to hand you
19 what has been marked for identification as Exhibit
20 8 to your deposition here today and ask that you
21 review that document.
22 A. Okay.
23 Q. Now, would you agree with me that that
24 would be the same oil and gas owners as we have on

ARNOLD K. RICHARDS, ET AL. v.
EQT PRODUCTION COMPANY

KRISTY TOIA
November 30, 2017

1 Page 2 of Exhibit 1?
2     A. Yes.
3     Q. And would you agree with me that those
4 are the same Pullman 96H1 through H6 wells that
5 are identified on that exhibit?
6     A. Yes.
7     Q. Again, we have a net price identified on
8 these, and we have oil shown on these as well?
9     A. Yes.
10    Q. Whereas we didn't have oil shown on -- on
11 Exhibit --
12    A. Correct.
13    Q. Now, when we're talking oil, that's not
14 NGLs or liquids or anything. That's specifically
15 crude oil; is that right?
16    A. Either crude oil -- oil or could be
17 condensate.
18    Q. Now, I'm just going to -- you can check
19 any of these you want, but again, we talked about
20 rounding on the -- on the one statement that I
21 showed you on Page 2 of Exhibit 1.
22    A. Yes.
23    Q. I will submit to you that there are
24 similar rounding issues on each and every one of

1 these wells where they have been rounded, and my
2 clients have been shown to have an owner revenue
3 which is less than if you would calculate those
4 numbers out again.
5     A. Okay. On oil as well?
6     Q. No. I --
7     A. Or just gas.
8     Q. -- I did not check the oil. I just -- I
9 was looking at the gas --
10    A. Okay.
11    Q. -- okay? Again, it's your testimony here
12 today that if those numbers were not consistently
13 calculated out, that that would be a rounding
14 issue?
15    A. Correct.
16    Q. Okay. And that would be based on the --
17 the net price?
18    A. Correct.
19    Q. And I'm going to come back to that in
20 just a minute --
21    A. Okay.
22    Q. -- but I just wanted to double check and
23 make sure that that was -- that was your
24 testimony --

1     A. Yes.
2     Q. -- as well. Okay. Are you familiar with
3 the gas purchase contract between EQT Production
4 and EQT Energy, LLC?
5     A. All I know, that there is one. I don't
6 know the details behind it.
7     Q. Okay. Do you know who Pat O'Brien is?
8     A. Yes.
9     Q. Who is Pat O'Brien?
10    A. He was the former controller of
11 production.
12    Q. Is he still --
13    A. EQT Production Company.
14    Q. I'm sorry. Is he still with EQT?
15    A. Yes.
16    Q. What's he do now?
17    A. He's in the risk department.
18    Q. Okay. What's he do in the risk
19 department, if you know?
20    A. I actually do not know.
21    Q. Who has his job now?
22    A. Jeff Mitchell.
23    Q. And who is Robert Hovanec?
24    A. I've heard the name, but I'm not exactly

1 sure.
2     Q. Do you know if he works for EQT or some
3 subsidiary affiliate?
4     A. He's an affiliate, but I'm not sure if
5 he's a current employee.
6     Q. And if -- if that contract mentioned
7 index price, it's your testimony that that would
8 be the M2 price?
9     A. For --
10        MR. HENDRICKSON: Well, again, I'm
11 going to object. She doesn't know anything
12 about --
13        MR. WINDOM: Okay.
14        MR. HENDRICKSON: -- the contract.
15    A. No. I know that these wells are -- go
16 through M2.
17    Q. Okay. Do you know what retainage is?
18    A. No.
19    Q. Do any of the statements that you see
20 reference retainage?
21    A. No.
22    Q. And as you sit here today, you -- you
23 would not be able to offer any kind of testimony
24 about EQT or EE having retainage?

Page 113

1    A. No, I can't.
2    Q. Okay. And you don't handle retainage in
3  any of your accounting functions at EQT?
4    A. That's not a term we use. I'm not sure.
5    Q. With regards to the -- the gathering
6  charges, I'm -- you -- you had said that there was
7  -- or there were a number of different charges put
8  into the gathering charges; is that right?
9    A. There's some factors that play into it.
10  I don't know the intricacies of that calculation,
11  but it's a --
12    Q. And --
13    A. -- on a rate that we get provided from
14  Midstream Planning on an annual basis.
15    Q. But -- but you can't tell me any of the
16  individual charges or expenses that go into that
17  gathering?
18    A. I do -- the only thing I do know is that
19  for royalty owners, they get charged a rate less
20  than what EPC is charged. The royalty owners
21  would not get charged for depreciation, income
22  tax, and return on investment.
23    Q. No charge for income tax, depreciation,
24  or return on investment.

Page 114

1    A. Correct.
2    Q. Okay. And when we talk about income tax,
3  that's income tax -- Corporate income tax that EQT
4  would pay on the -- on their income from the sale
5  of the gas?
6    A. I can't say for sure.
7    Q. Okay. As an accountant, you don't know
8  what that income tax is?
9    A. No, I do not know.
10    Q. Okay. So the depreciation, is that
11  depreciation on the equipment or the pipelines?
12    A. I can't say for sure.
13    Q. You just know that the royalty owners
14  aren't charged with the depreciation?
15    A. Correct.
16    Q. Okay. And return on investment, what is
17  that?
18    A. I can't say for sure how that's
19  calculated either. I'm not part of that
20  calculation. I just know that those pieces are --
21  of the rate are stripped out of what's taken from
22  -- or part of the royalty owners' rate.
23    Q. Okay. And when you were doing general
24  accounting for EQT back -- I think when you said

Page 115

1  that you were working with --
2    A. As the assistant controller?
3    Q. -- as the assistant controller for -- for
4  the production side --
5    A. Correct.
6    Q. -- and managing the wells and -- and all
7  the money that went into them, did you ever deal
8  with income tax?
9    A. No.
10    Q. Do you ever deal with depreciation?
11    A. No.
12    Q. Okay. Do you ever deal with return on
13  investment?
14    A. No.
15    Q. And you're probably also not familiar
16  with the base contract for the sale and purchase
17  of natural gas that is used between EPC and EE or
18  any other parties?
19    A. No.
20    Q. Okay. You -- you've never been privy to
21  those documents?
22    A. Correct.
23    Q. You're not going to offer testimony down
24  the road about the contents of any of those

Page 116

1  documents or anything --
2    A. No.
3    Q. -- from EQT?
4    A. No.
5    Q. There's a term here that -- that bothers
6  me. I want to see if it bothers you. Maybe you
7  think it's perfectly fine.
8        There is a term that -- in the gas
9  purchase contract that says that they can take out
10  any other agreed applicable fees or charges.
11        MR. HENDRICKSON: Again, I'm going
12  to object. She doesn't know anything about those
13  contracts. I mean --
14        MR. WINDOM: Okay.
15        MR. HENDRICKSON: -- I don't know
16  why you're asking her a question about something
17  she hasn't even read or --
18        MR. WINDOM: I'm just asking her, in
19  general accounting purposes, if she has ever seen
20  any charges come across your desk for -- for
21  royalty owners that were agreed upon applicable
22  fees or charges?
23    A. I have not seen that term.
24    Q. Okay. In your experience --

ARNOLD K. RICHARDS, ET AL. v.
EQT PRODUCTION COMPANY

KRISTY TOIA
November 30, 2017

Page 117

1  MR. WINDOM: Strike that.
2     Q. If you have a net price that you're
3  dealing with from EQT Energy, LLC, you would --
4  you have this where you back into -- to these
5  calculations.
6        You would not expect, then, to have a
7  negative royalty under any circumstances, would
8  you?
9     A. Correct.
10    Q. Okay. Are you aware of any instances
11 where there has been a negative royalty on EQT
12 wells?
13       MR. HENDRICKSON: For this -- for
14 your -- your people?
15       MR. WINDOM: In general.
16       MR. HASTINGS: It's not relevant.
17       MR. HENDRICKSON: I'll object to it.
18 She can go ahead and answer.
19    Q. Do you know if there have been negative
20 royalties paid -- or not -- not paid, but actually
21 charged to royalty owners?
22    A. There -- yes.
23    Q. Well -- and you just said that under this
24 circumstance, there should never been a negative

Page 118

1  royalty, though, right?
2     A. There was an instance last October where
3  the prices were very low.
4     Q. And if the prices are low and all you're
5  taking out is the gathering fees, the gathering
6  fees can exceed the price of the gas?
7     A. They did at that point in time.
8     Q. Okay. So the gathering fees then -- at
9  that point, why are the wells produced? Do you
10 know?
11    A. I can't answer that.
12    Q. So if -- if there is a negative royalty,
13 EQT Energy, LLC, would still charge a gathering
14 rate to -- to move that gas; is that right?
15    A. Yes.
16    Q. Would EQT Energy, LLC, still profit if
17 that gas were sold at a low price?
18    A. I can't answer that.
19    Q. You don't do --
20    A. I don't do their --
21    Q. -- EQT --
22    A. -- accounting.
23    Q. -- Energy, LLC's, accounting, right?
24    A. Right.

Page 119

1     Q. And do you know if --
2        MR. WINDOM: Strike that.
3     Q. Do you know what wet gas is?
4     A. Yes.
5     Q. Do you know from the statements that you
6  get on the Richards' wells if there's wet gas from
7  these wells, the Pullman 96 wells?
8     A. I can't see that from these statements,
9  no.
10    Q. And the Richardses wouldn't be able to
11 determine that from this statement either, then?
12    A. No.
13    Q. Is there any kind of a statement that EQT
14 would get that would show whether or not this was
15 wet gas?
16    A. We could look at wells and see what the
17 Btu content is. If it's a higher Btu, then it
18 would be more of a wet gas.
19    Q. And as you sit here today, you can't tell
20 me what the Btu content is on -- on these
21 particular wells?
22    A. No, I can't tell that.
23    Q. Because it's not included on the
24 statement?

Page 120

1     A. Correct.
2        MR. WINDOM: Dave, do you know if
3  they have a statement that shows what the Btu
4  content is from these wells?
5        MR. HENDRICKSON: I'm sure they do.
6        MR. HASTINGS: These particular
7  wells?
8        MR. WINDOM: Yeah. A gas analytical
9  report or anything?
10       MR. HASTINGS: Let me look into that
11 for you. We'll -- we'll tell you after this.
12       MR. WINDOM: Okay.
13       MR. HASTINGS: We'll tell you the
14 ultimate question, whether we think --
15       MR. WINDOM: What's that?
16       MR. HASTINGS: We'll tell you the
17 ultimate question, whether we think there's liquid
18 or not.
19       MR. WINDOM: I'd like -- I'd like to
20 know what the Btu content is --
21       MR. HASTINGS: We should have --
22       MR. WINDOM: -- so I can --
23       MR. HASTINGS: -- we should have it
24 but -- I mean, I think, but I haven't seen it

ARNOLD K. RICHARDS, ET AL. v.
EQT PRODUCTION COMPANY

KRISTY TOIA
November 30, 2017

Page 121

1  so --
2          MR. WINDOM:  Okay.
3  BY MR. WINDOM:
4      Q.  Do you know if EQT pays any oil and gas
5  owners for NGLs?
6      A.  Not separately.
7      Q.  Okay.  When you say "not separately," how
8  are they paid?
9      A.  They are paid at the higher Btu content,
10  so it's the richer, the wetter gas.  So it's not
11  broken out as a separate product.
12      Q.  Okay.  So if the value of the NGLs
13  exceeds the value as a gas on a -- on a thermal
14  unit basis, then EQT just profits down the line
15  selling the NGLs?
16      A.  EPC does not profit.
17      Q.  Okay.  Who -- who sells the NGLs?  EE?
18      A.  EE.
19      Q.  Okay.  So EE would profit?
20      A.  I can't answer that.
21      Q.  Okay.  Indirectly, EQT would profit
22  because they wholly own EE --
23      A.  Yes.
24      Q.  -- correct?  I'm sorry, correct?

Page 122

1      A.  Yes.
2      Q.  With regards to the deductions, does
3  EQT reimburse EE for the deductions, or does EE
4  just take the deductions out and -- and pay that
5  price to EQT?
6      A.  EE nets it out of the price that pays
7  EPC.
8      Q.  Okay.  So there's never any -- any
9  payment back for the deductions or anything?
10      A.  Correct.
11      Q.  Okay.  Just wanted to make sure I -- I
12  had that.  I thought that was the --
13      A.  Uh-huh.
14      Q.  -- case, but I wasn't clear.  Now, EQT
15  has claimed that they're -- in -- in your
16  discovery responses.  You remember the discovery
17  responses in this --
18      A.  Yes.
19      Q.  -- Case, right?
20      A.  Yes.
21      Q.  You signed the verification?
22      A.  Yes.
23      Q.  EQT has claimed that there are no actual
24  deductions charged to the -- the lessor.  Is --

Page 123

1      A.  Yes.
2      Q.  -- is that your understanding?
3      A.  Yes.
4      Q.  Okay.  But there are deductions taken out
5  of the royalty?
6      A.  It's shown as -- as -- to be more
7  transparent, but it's taken out of the price.
8      Q.  It's taken out of the price --
9      A.  Right.
10      Q.  -- that's paid?  So the -- the price that
11  is paid is a market price or an index price less
12  these deductions in some sort of a calculation
13  that EE makes?
14      A.  Correct.
15      Q.  Do you know who EQT Energy 2, LLC, is?
16      A.  Doesn't sound familiar to me.
17      Q.  Okay.  You never worked for them when --
18      A.  Unh-unh.  No.
19      Q.  -- you were doing overall work for the
20  EQT companies or anything?
21      A.  No, not that I'm aware of.
22      Q.  Okay.  What about EQT Midstream Partners?
23      A.  Yes.
24      Q.  Okay.  What does EQT Midstream Partners

Page 124

1  do?
2      A.  I can't say for sure.  They do the
3  gathering.
4      Q.  Okay.  So --
5      A.  They're more of the downstream.
6      Q.  -- the -- the gathering charges that --
7  that are taken out by EE, would those be paid to
8  EQT Midstream Partners?
9      A.  Yes.  Midstream Partners bills EE.
10      Q.  Okay.  And then that's a wholly-owned
11  subsidiary as well?
12          MR. HASTINGS:  Unh-unh.
13          MR. HENDRICKSON:  If you don't know,
14  don't answer.
15      A.  Yeah, I can't answer.
16      Q.  Okay.  What about EQT -- there's an EQT
17  Gathering, LLC, and an EQT Gathering, Inc., and
18  then an EQT Gathering of West Virginia, Inc.  Do
19  you know --
20      A.  NO, I've never heard of those either --
21      Q.  -- any of those companies?  You just know
22  there's one company called EQT Gathering.
23      A.  Yes.
24      Q.  Okay.  Fair enough.  And do you do any

**Page 125**

```
 1  work in accounting for any of these other
 2  companies besides EPC?
 3     A.  Only EPC.
 4     Q.  Who is EQM Gathering Opco?
 5     A.  Another subsidiary, but I can't say for
 6  sure what --
 7     Q.  Obviously they have gathering in their
 8  name.  Do they -- do they charge gathering prices
 9  or gathering charges to EE as well?  Do you know?
10     A.  I am not quite sure.
11     Q.  Do you know who would be able to tell me
12  that?
13     A.  I would say maybe Brian Pietrandria.
14     Q.  I'm sorry?
15     A.  P-I-E-T-R-A-D-R-I -- R-I-A.
16     Q.  Pietradria?
17     A.  Pietrandria.
18     Q.  Pietrandria?  I don't have an N in there.
19  Is there supposed to be an N?
20     A.  Oh, yeah.  It's T-R-A-N-D.
21     Q.  Okay.  Okay.  Pietrandria.  All right.
22  And that -- but you don't get any statements from
23  EQ -- EQM Gathering Opco, LLC, in your office?
24     A.  No.
```

**Page 126**

```
 1        MR. WINDOM:  This is that Exhibit A
 2  that you provided.  I think you said you were
 3  going to provide me with an updated version, that
 4  spreadsheet.
 5        DEPOSITION EXHIBIT NO. 9
 6        (EQT Production Company Spreadsheet
 7         was marked for identification
 8         purposes as Deposition Exhibit No.
 9         9.)
10     Q.  Okay.  I'm going to hand you, Ms. Toia,
11  what has been marked as Exhibit 9 to your
12  deposition today.
13     A.  Okay.
14     Q.  That was provided to me in the discovery
15  responses.
16     A.  Yes.
17     Q.  Have you seen that document before?
18     A.  Yes.
19     Q.  Did you prepare that?
20     A.  Yes.
21     Q.  And what information did you use to
22  prepare this spreadsheet?
23     A.  I just ran an inquiry out of Enertia
24  based on these three owner numbers.
```

**Page 127**

```
 1     Q.  And those three owner numbers relate to
 2  Arnold K. Richards and Mary L. Richards?
 3     A.  Correct.
 4     Q.  And they're the plaintiffs in this Case?
 5     A.  Yes.
 6     Q.  Now, it indicates there that -- that, I
 7  believe, some of these wells have been sold; is
 8  that right?
 9     A.  It says that, but I can't say that for
10  sure.
11     Q.  Okay.  And these values are from 2014
12  through 2017 in June; is that right?
13     A.  Correct.
14     Q.  Now -- I should say July of 2014.
15     A.  Oh, correct.  July 2014.
16     Q.  Okay.  The only wells there where it
17  indicates that any deductions have been taken are
18  the Pullman 96 wells, right?
19     A.  I see deduction amounts for those wells,
20  yes.
21     Q.  Okay.  And those would be the deduction
22  amounts -- deduction amounts that would correlate
23  with the owner deducts that were shown on Exhibit
24  1, Page 2, and Exhibit 8?
```

**Page 128**

```
 1     A.  Yes.
 2     Q.  And any other royalty statements that
 3  they would have during this time period?
 4     A.  Correct.
 5     Q.  So if I look at -- if I look at each
 6  royalty statement that they have, they should add
 7  up to -- to these same several used on deducts
 8  that are shown on Exhibit A?
 9     A.  Correct.
10     Q.  And at least in June of 2017, can we
11  agree that the deducts that were shown on the
12  royalty statements for the Richards was
13  $77,716.20?
14     A.  Yes.
15     Q.  And then they had taxes that were taken
16  out of that as well?
17     A.  Yes.
18     Q.  And -- and that is severance tax?
19     A.  Severance tax, correct.
20     Q.  And that is $22,863.92?
21     A.  Yes.
22     Q.  And you believe that information to be
23  true and accurate as well?
24     A.  Yes.
```

ARNOLD K. RICHARDS, ET AL. v.
EQT PRODUCTION COMPANY

KRISTY TOIA
November 30, 2017

Page 129

1    Q. At least as far as up until June --
2    A. June of 2017 --
3    Q. -- of 2017?
4    A. -- correct.
5         MR. WINDOM: This is 10.
6         THE COURT REPORTER: Okay.
7         MR. WINDOM: Actually, let me get --
8 let me get her verification. Mark that as 11.
9         THE COURT REPORTER: There's 11 and
10 there's 10.
11        DEPOSITION EXHIBIT NO. 10
12        (EQT Production Company's Responses
13        to Plaintiffs' First Set of Combined
14        Discovery Requests to Defendant were
15        marked for identification purposes
16        as Deposition Exhibit No. 10.)
17        DEPOSITION EXHIBIT NO. 11
18        (Verification was marked for
19        identification purposes as
20        Deposition Exhibit No. 11.)
21    Q. Ms. Toia, I'm going to hand you what has
22 been marked for identification as Exhibits 10 and
23 11 to your deposition --
24    A. Uh-huh.

Page 130

1    Q. -- today, okay, and ask you if you
2 recognize those documents?
3    A. I do.
4    Q. Okay. And -- and what are those
5 documents?
6    A. The No. 10 is the EPC's responses to the
7 plaintiffs' discovery requests.
8    Q. Uh-huh.
9    A. And 11 is the verification that I had
10 signed and notarized.
11    Q. Okay. And I got the verification by
12 email a few days after I got the -- the discovery
13 responses, but -- but that is your signature?
14    A. Yes.
15    Q. And it was notarized?
16    A. Yes.
17    Q. Okay. Now -- and you're, in that
18 document, verifying that the information contained
19 in these discovery responses are true except that
20 it is stated that they're upon information and
21 belief; is that right?
22    A. I'm sorry. Say that again.
23    Q. Yeah. You -- you were verifying that the
24 answers in these discovery exhibits as Exhibit

Page 131

1 10 --
2    A. Yes.
3    Q. -- are true and accurate, except insofar
4 as you believe that the answers are true, and then
5 you said that they're upon information and belief.
6    A. Correct.
7    Q. Okay. Now, I want to ask you a few
8 questions here. Did you prepare each and every
9 one of these or help prepare each and every one of
10 these?
11    A. No.
12    Q. Okay. Were there other people involved
13 in preparing these answers that you know of?
14    A. I don't know who that is, but yes.
15    Q. Okay. So it would have been -- you don't
16 know if it was people at EQT or who would have
17 assisted?
18    A. Yeah, I'm not sure who assisted. This
19 was sent to me by Steve Hastings.
20    Q. Okay. I would like for you to turn to
21 Page 5, okay? There's a Subsection E there, and
22 then it is small numbers --
23    A. Uh-huh. Yes.
24    Q. -- 1 through 5.

Page 132

1    A. Yes, I see that.
2    Q. Do you see that?
3    A. Yes.
4    Q. Okay. And I had asked there -- for each
5 payment to the plaintiff/lessor for each pay
6 period, I had asked for some certain information
7 there, including the price of the natural gas,
8 casinghead gas, byproducts received for the pay
9 periods.
10        And it's my understanding from your
11 testimony here today that that price would have
12 had to have been backed into and that you are
13 going to provide documentation on that price in
14 the form of a spreadsheet that -- that you have
15 from EE; is that right?
16    A. Yes.
17    Q. Okay. So I -- I can expect to receive
18 that information?
19    A. Yes.
20    Q. Okay. Because that -- that wasn't
21 stated. It says see B and D above. It really
22 wasn't stated in -- in your responses, and I just
23 want to make sure that -- that we have complete
24 answers to those questions.

ARNOLD K. RICHARDS, ET AL. V.
EQT PRODUCTION COMPANY

KRISTY TOIA
November 30, 2017

Page 133

1     A. Yes.
2     Q. And then in little No. 3, it says: State
3  whether the defendant, EQT, determined the market
4  value of the natural gas, oil, casinghead gas,
5  and/or byproducts for the plaintiffs for each pay
6  period, and if so, state the market value for the
7  natural gas, oil, casinghead gas, or byproducts
8  for the plaintiffs and the basis for the amount
9  the defendant established as the market value.
10       And it's my understanding that you're
11  going to provide that as well in terms of what
12  that market price is based on the index; is that
13  correct?
14     A. Yes.
15     Q. Okay. Now, I had asked: State whether
16  the defendant paid the plaintiffs the market
17  value, and if not, explain why. And -- and the
18  response there says see B and D above.
19       Now, if we go to B, it says see
20  Exhibit A, and the Exhibit A that we had is the
21  spreadsheet, which is identified as Exhibit 9.
22     A. Yes.
23     Q. And -- and that was part of the response,
24  and then the other response, it says see D above,

Page 134

1  and there there is an explanation.
2       It says: EQT Production Company -
3  I'm on Page 4 - does not actually take deductions
4  from the royalties due and pay to the plaintiffs.
5  The royalty is based upon a price slightly more
6  than the price EQT Energy pays EQT. Is that -- is
7  that true?
8     A. Yes.
9     Q. Okay. So how much -- how much more is
10  slightly more?
11     A. I can't say that for sure --
12     Q. Okay. Who --
13     A. -- right here.
14     Q. I'm sorry?
15     A. I can't say that here. If I had the
16  information back in the office, I could get that.
17     Q. Okay. But you can provide that to me?
18     A. Yes.
19     Q. Okay. Will -- would you be willing to do
20  that, provide that to me.
21       MR. HASTINGS: Same information.
22       THE DEPONENT: Yeah.
23       MR. WINDOM: It's the same --
24       THE DEPONENT: It —

Page 135

1       MR. WINDOM: -- stuff you already
2  have.
3       MR. HASTINGS: No. Same --
4       MR. HENDRICKSON: Yeah. It -- we'll
5  get them to you.
6       THE DEPONENT: It'll be --
7       MR. HENDRICKSON: We'll get them to
8  you.
9       MR. WINDOM: Okay.
10       MR. HENDRICKSON: We'll get them to
11  you.
12       MR. WINDOM: It is in -- in this
13  spreadsheet? Is that what it is?
14       MR. HENDRICKSON: No. We're going
15  to give you the -- we're going to give you some
16  additional information.
17       MR. WINDOM: Okay.
18       THE DEPONENT: He wants to know the
19  differential between the price that we get paid
20  versus this higher price we pay.
21       MR. WINDOM: Right. And you -- you
22  have that information and can --
23       MR. HENDRICKSON: Yeah.
24       THE DEPONENT: Yeah.

Page 136

1       MR. WINDOM: -- provide that to
2  counsel.
3       THE DEPONENT: Yeah.
4       MR. WINDOM: Okay.
5  BY MR. WINDOM:
6     Q. You can't answer that sitting here, but
7  you will provide that?
8     A. Yes.
9     Q. Okay. Now, I'm looking at the answer to
10  Interrogatory No. 4. Interrogatory No. 4 is on
11  Page 7. The answer begins on Page 7 and then
12  continues onto Page 8, and specifically I'm
13  looking at the -- the last sentence.
14       It says: EQT relies upon the
15  language in the leases at issue for the payment of
16  royalty based upon the market value of gas.
17       Is that your answer?
18     A. I see that, yes.
19     Q. Okay. Did -- did you provide that
20  answer?
21     A. I did not type that answer, but it's a
22  true answer.
23     Q. Okay. Explain to me what that means, how
24  EQT relies upon the language in the leases.

**Page 137**

1 MR. HENDRICKSON: Well, we object to
2 it first of all, in that it's calling for a legal
3 conclusion --
4 MR. WINDOM: Okay.
5 MR. HENDRICKSON: -- in the first
6 line or number. So I don't think she can answer
7 that. She's not a lawyer.
8 MR. WINDOM: Well, you've gone on --
9 she's gone on to answer it, and if -- if she
10 knows, then I think she can answer.
11 I mean, she went on -- she objected
12 or you all objected and she went on to explain it,
13 and I'm just asking her to explain what that
14 sentence means.
15 MR. HENDRICKSON: The last sentence?
16 THE DEPONENT: Yeah.
17 MR. WINDOM: The last sentence,
18 yeah.
19 MR. HENDRICKSON: Okay.
20 BY MR. WINDOM:
21 Q. So tell me what that means, that EQT
22 relies upon language in the leases at issue for
23 the payment of royalty.
24 A. I was just going to say that land

**Page 138**

1 administration would make that determination and
2 provide that to revenue accounting.
3 Q. Okay. And that would be this email that
4 -- that came to Shawn Madey; is that right?
5 A. No. Actually that email -- it may be
6 part of it, but then there's also the -- the deck
7 that gets set up at the time that the wells are
8 turning in line that the land administration --
9 with the division order.
10 Q. Okay. Can you provide the division order
11 and the deck for -- for these particular wells to
12 your counsel?
13 A. I can give you a print screen of what it
14 looks like in Enertia, but I don't have -- land
15 administration enters all that --
16 Q. Okay.
17 A. -- information.
18 Q. I would -- I would have to get that from
19 land administration, or they would have to get
20 that from land administration?
21 A. Yes.
22 MR. HENDRICKSON: Yes.
23 MR. WINDOM: Okay. I'm -- I'm
24 requesting that as well. Would you be willing to

**Page 139**

1 provide that, the deck and the -- and the --
2 MR. HENDRICKSON: Yes.
3 MR. WINDOM: Okay.
4 Q. I'm sorry. You said the deck and the
5 division order; is that right?
6 A. The division order is the --
7 Q. Okay.
8 A. -- same as the deck.
9 Q. Okay.
10 A. Yeah.
11 Q. Now, you had indicated that the -- the
12 gathering cost included some specific charges but
13 did not include a number of things, including
14 depreciation in tax -- income tax?
15 A. For royalty owners --
16 Q. Right.
17 A. -- correct.
18 Q. Your -- your discovery response here to
19 No. 5 lists two points. It says a separate
20 gathering charge rate is calculated for each
21 system. The royalty gathering deduct is composed
22 of two components: A gathering and compression
23 cost component, O&M.
24 What is the compression cost, because

**Page 140**

1 that's -- that's not necessarily gathering, I
2 don't think, is it?
3 A. I can't really answer that. Again, that
4 comes through as a component of that rate that is
5 -- we receive from Midstream Planning.
6 Q. Okay. What -- what's O&M?
7 A. Operating and maintenance.
8 Q. And then it says: An allocated general
9 and administrative cost component. What is that?
10 A. That would be on a -- if I can explain,
11 the SG&A, that's going to be your -- just the
12 accounting, the engineering, all the -- the
13 planning groups. That's their labor costs and any
14 costs associated with them.
15 Q. Okay. So the royalty owner has to pay
16 for their share of the allocated general
17 administrative costs?
18 A. I can't answer that.
19 Q. Well, you -- you signed the verification
20 that this is true and accurate, though.
21 A. This is -- that would be more of a
22 question that would go back to how that -- that
23 rate is calculated.
24 Q. Okay. But that rate, to your knowledge,

Case 1:17-cv-00050-IMK-MJA   Document 31-3   Filed 01/12/18   Page 36 of 38   PageID #: 340
ARNOLD v. RICHARDS, ET AL. v.                                                    KRISTY TOIA
EQT PRODUCTION COMPANY                                                       November 30, 2017

Page 141

1 includes an allocated general and administrative
2 cost component?
3    A. Yes.
4    Q. And -- and I'm -- I'm a little confused.
5 Can you tell me exactly what is in that allocated
6 general administrative cost component that you
7 know of?
8    A. I can't say exactly, but I would --
9 probably part of it would be salaries.
10       Administrative costs would probably
11 be -- in my accounting world, I would interpret
12 that as expenses that you would have associated
13 with having an office or, you know, just in
14 general labor.
15    Q. Do you know if it includes uniforms?
16    A. I can't say that for sure.
17    Q. Meals?
18    A. I don't know.
19    Q. Entertainment?
20    A. I don't know.
21    Q. I think if you -- you look down, it says
22 all planned operating costs, and -- and planned
23 operating costs are included in that gathering; is
24 that right?

Page 142

1    A. Yes.
2    Q. Okay. And that includes field personnel,
3 it says. Does that include salaries?
4    A. I can't say for sure.
5    Q. Retirement?
6    A. I can't say that for sure either.
7    Q. Okay. It says pipeline repairs; is that
8 correct?
9    A. I see that it says pipeline repairs,
10 right.
11    Q. Who owns the pipelines?
12    A. I can't say for sure.
13    Q. Maintenance?
14    A. I see that, yes.
15    Q. And -- and you would agree that -- that
16 those costs are passed onto the royalty owner?
17    A. To the extent of it's part of what rate
18 we are received by from administrative planning, I
19 see.
20    Q. Compressor repairs?
21    A. I see that.
22    Q. You -- you would agree that those are
23 passed onto the royalty owners?
24    A. It's part of the rate.

Page 143

1    Q. Compressor maintenance is passed onto the
2 royalty owners?
3    A. It's part of the rate.
4    Q. And property taxes are passed onto the
5 royalty owners?
6    A. Yes.
7    Q. And then it says: General and
8 administrative costs for the gathering system are
9 divided by the planned total throughput on the
10 system.
11       What is the planned total throughput?
12    A. I can't answer that.
13    Q. Who can tell me who -- what the planned
14 total throughput is?
15    A. This rate is calculated by Midstream
16 Planning, which is Joe Piccirilli --
17    Q. Okay.
18    A. -- so he would be the person to answer
19 that.
20    Q. Joe -- Joe Piccirili can -- can explain
21 all of that information for me?
22    A. Yes.
23    Q. Okay. Do you know who Jimmi Sue Smith
24 is?

Page 144

1    A. Yes.
2    Q. Who's Jimmi Sue Smith?
3    A. She is the chief accounting officer.
4    Q. And what does Jimmi Sue Smith do for EQT?
5    A. Chief accounting office --
6    Q. I mean --
7    A. -- officer.
8    Q. -- what -- what are her job duties as
9 chief accounting officer, is what I should say?
10    A. I can't say for sure.
11    Q. Okay. Do you know who Justin Friend is?
12    A. I've heard his name, but I'm not sure who
13 he is.
14    Q. Okay. John Damato?
15    A. I've heard his name, but I don't think
16 he's with EQT any longer.
17    Q. Do you know what an NAESB base contract
18 is?
19    A. No.
20    Q. Never heard of that?
21    A. I've heard, but I don't know what it is.
22    Q. Okay. Do you know who buys the oil from
23 EQT wells in West Virginia?
24    A. It could either be EnLink or Ergon.

Page 145

1    Q. Okay. EnLink?
2    A. E-N-L-I-N-K.
3    Q. Uh-huh.
4    A. Or Ergon.
5    Q. And do you know, specifically with
6 regards to the Richards' wells on the Pullman 96
7 pad, who buys the oil there?
8    A. I can't say from the statement.
9    Q. Would you have that information back at
10 your office?
11    A. Yes.
12    Q. And could you provide that to me as well?
13    A. Yes.
14    Q. And could you provide me the statements
15 where either EnLink or Ergon purchased oil from
16 the Pullman 96 wells?
17    A. Yes.
18    Q. And you'll provide those to -- to
19 counsel?
20    A. Yes.
21    Q. Thank you. Do you know if EQT is paid
22 for their oil based upon the specific gravity,
23 grade, or density?
24    A. I don't know the details behind how we're

Page 146

1 getting paid.
2    Q. Okay. You sell it, of course, by the
3 barrel.
4    A. Yes.
5    Q. But like gas has different thermal
6 components, oil has different qualities as well?
7    A. Yes.
8    Q. And -- and there's some sort of a
9 statement that'll show what the quality of the oil
10 is and so forth and -- and how you're paid?
11    A. I can't say for sure. I just know that
12 there is the volume and a value --
13    Q. Okay.
14    A. -- and a location.
15    Q. But you don't know how that value
16 necessarily is determined?
17    A. No.
18    Q. Okay.
19       MR. WINDOM: Can we go off the
20 record?
21       THE VIDEOGRAPHER: The time is --
22       MR. HENDRICKSON: We can do whatever
23 you want to do.
24       THE VIDEOGRAPHER: -- 1:56. We are

Page 147

1 now going off the record.
2       (A recess was taken, after which the
3 proceedings continued as follows:)
4       P R O C E E D I N G S
5       THE VIDEOGRAPHER: The time is 2:02.
6 We are now back on the record.
7 BY MR. WINDOM:
8    Q. Ms. Toia, you indicated that you had
9 provided deposition testimony in -- in some other
10 cases. Did you review those depositions prior to
11 being here today?
12    A. No.
13    Q. Okay. Do you have those depositions?
14    A. No.
15    Q. Transcripts?
16    A. No.
17    Q. Okay.
18       MR. WINDOM: That's all the
19 questions I have.
20       MR. HENDRICKSON: I have just a
21 couple follow-up questions.
22       EXAMINATION
23 BY MR. HENDRICKSON:
24    Q. Earlier you were asked about market value

Page 148

1 leases. The market value that -- that you -- you
2 receive is the price at the wellhead less the
3 charges from the other company, correct?
4    A. Correct.
5    Q. Okay. And the market value could have a
6 meeting a lot of different places down the line,
7 correct?
8    A. Correct.
9    Q. So it could be at the interstate
10 pipeline, it could be where gas is sold in New
11 York, a lot of different market values?
12    A. Correct.
13    Q. Okay. One last thing: The charge that
14 you're given by this -- the other company --
15    A. Yes.
16    Q. -- it includes not just gathering, but
17 also compression, correct?
18    A. Correct.
19       MR. HENDRICKSON: All right. That's
20 all I have. Just wanted to clear that up.
21       MR. WINDOM: We're done.
22       MR. HENDRICKSON: We'll read.
23       THE VIDEOGRAPHER: The time is 2:04.
24 We are now going off the record. This concludes

Page 149

```
 1   the deposition.
 2                (Having indicated she would like to
 3   read her deposition before filing, further this
 4   deponent saith not.)
 5                ---oOo---
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 150

```
 1   STATE OF WEST VIRGINIA,
 2   COUNTY OF RITCHIE, to wit:
 3
 4        I, David A. Absher, a Notary Public
     within and for the County and State aforesaid,
 5   duly commissioned and qualified, do hereby certify
     that the foregoing deposition of KRISTY TOIA was
 6   duly taken by me and before me at the time and
     place and for the purpose specified in the caption
 7   hereof, the said witness having been by me first
     duly sworn.
 8
          I do further certify that the said
 9   deposition was correctly taken by me in shorthand
     notes, and that the same were accurately written
10   out in full and reduced to typewriting and that
     the witness did request to read her transcript.
11
          I further certify that I am neither
12   attorney or counsel for, nor related to or
     employed by, any of the parties to the action in
13   which this deposition is taken, and further that I
     am not a relative or employee of any attorney or
14   counsel employed by the parties or financially
     interested in the action and that the attached
15   transcript meets the requirements set forth within
     article twenty-seven, chapter forty-seven of the
16   West Virginia Code.
17        My commission expires April 9, 2024.
     Given under my hand this 30th day of November,
18   2017.
19   [signature]
20   David A. Absher
21
22
23
24
```

Official Seal
Notary Public, State Of West Virginia
David Absher
Realtime Reporters
536 7th Street
Huntington WV 25701
My commission expires April 9, 2024

Page 151

```
 1                ERRATA SHEET
 2
          I, KRISTY TOIA, do hereby certify that
 3   the foregoing is a true and correct transcript of
     my deposition with the exception of the following
 4   corrections:
 5   PAGE  LINE   CORRECTION
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17
18        _____
               DEPONENT'S SIGNATURE
19   STATE OF _____,
     COUNTY OF _____,
20
21     Sworn to before me, _____,
     Notary Public, this ____ day of _____,
22   2017.
23
24        _____
               NOTARY PUBLIC
```