

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

* * * * * * * * * * * * * * * * * * * *

ARNOLD K. RICHARDS and
MARY L. RICHARDS, his wife,
          Plaintiffs,

vs.          CIVIL ACTION NO. 1:17-CV-50-IMK

EQT PRODUCTION COMPANY,
a Pennsylvania Corporation,

          Defendant.

* * * * * * * * * * * * * * * * * * * *

          Deposition of JOHN BERGONZI taken by the
Plaintiffs under the West Virginia Rules of Civil
Procedure in the above-entitled action, pursuant
to notice, before David A. Absher, a Notary
Public, at Hampton Inn & Suites, 474 Johnson Road,
Washington, Pennsylvania 15301, on the 30th day of
November, 2017.

          REALTIME REPORTERS, LLC
          David A. Absher
          713 Lee Street
          Charleston, WV  25271
          (304) 344-8463
          realtimereporters.net

**Page 2**

1    APPEARANCES:

APPEARING FOR THE PLAINTIFFS:

     Scott A. Windom, Esquire
     WINDOM LAW OFFICES, PLLC
     101 East Main Street
     Harrisville, WV 26362

APPEARING FOR THE DEFENDANT:

     David K. Hendrickson, Esquire
     HENDRICKSON & LONG, PLLC
     214 Capitol Street
     Charleston, WV 25301
     Stephen E. Hastings, Esquire
     EQT CORPORATION
     625 Liberty Avenue, Suite 1700
     Pittsburgh, PA 15222

# EXHIBIT
# 5

**Page 3**

EXHIBIT INDEX

1   Lease Agreement between Pearl        43
    Hutchinson and D.C. Hutchinson, Her
    Husband; Ruby Dotson and J.E. Richards

2   Lease Agreement between Pearl        43
    Hutchinson and D.C. Hutchinson, Her
    Husband; Archie C. Richards and Elsie
    M. Richards, His Wife, and J.E. Richards

3   Lease Agreement between A.H. Hodge and   43
    Ona Hodge, His Wife, and J.E. Richards

4   Transaction Confirmation No. 07012012.0  63
    (Confidential)

5   Base Contract for Sale and Purchase of   66
    Natural Gas (Confidential)

6   Remittance Statement, Owner No.          80
    255953, Check No. 1772696

**Page 4**

1    P R O C E E D I N G S
2        THE VIDEOGRAPHER:  The time is 2:14
3    P.M.  We are now on the record.  This is the video
4    deposition of John Bergonzi taken in the Matter of
5    Arnold Richards and Mary Richards versus EQT
6    Production Company, Case No. 1:17-CV-0 – 50-IMK,
7    held Washington, Pennsylvania, taken on this 30th
8    day of November, 2017.
9        My name is Justin Ebeling.  I'm the
10   legal video specialist.  The court reporter is
11   David Absher.  We are associated with Realtime
12   Reporters.
13       Will counsel please introduce
14   themselves and whom they represent?
15       MR. WINDOM:  Scott Windom
16   representing the plaintiffs.
17       MR. HENDRICKSON:  David Hendrickson
18   on behalf of EQT.
19       THE VIDEOGRAPHER:  Will the court
20   reporter please swear in the witness?
21       J O H N   B E R G O N Z I
22   was called as a witness by the Plaintiffs,
23   pursuant to notice, and having been first duly
24   sworn, testified as follows:

Page 5

1          EXAMINATION
2   BY MR. WINDOM:
3      Q. Will you please state your full name for
4   the record?
5      A. Sure. It's John, J-O-H-N, Bergonzi,
6   B-E-R-G-O-N-Z-I.
7      Q. And Mr. Bergonzi, my name is Scott
8   Windom. I'm a lawyer from West Virginia, and I
9   represent the plaintiffs in this Case, Mr. and
10  Mrs. Richards. Do you understand who I am?
11     A. I do.
12     Q. Okay. And -- and do you understand why
13  we're here today?
14     A. Yes.
15     Q. Okay. This is not your first deposition,
16  as I understand it.
17     A. It is not.
18     Q. Okay. And we are here because of a
19  royalty dispute with EQT. Are you currently
20  employed by EQT?
21     A. I am not.
22     Q. Okay. Who are you employed by?
23     A. I -- I am retired. I do --
24     Q. Congratulations.

Page 6

1      A. Thank you. I do some consulting for me
2   -- for EQT from time to time.
3      Q. And how many hours a month would you
4   spend consulting with EQT?
5      A. It's episodic, but not very many.
6      Q. Do they pay you a per job or per hour --
7      A. Per hour.
8      Q. Now, can you briefly just tell me about
9   your educational background?
10     A. Sure. I have a college degree from
11  Duquesne University, a BS in business
12  administration; I have a master's in business
13  administration; and I have a law degree.
14     Q. Where did you go to law school?
15     A. Duquesne University.
16     Q. Do you practice law?
17     A. I do not.
18     Q. Okay.
19     A. I --
20     Q. Did you ever practice law?
21     A. I did not practice at all when I worked
22  for EQT. I do do some pro bono work now.
23     Q. Okay. So you are licensed?
24     A. I am licensed in Pennsylvania.

Page 7

1      Q. What kind of pro bono work do you do?
2      A. PFA work, protection from abuse orders.
3      Q. Domestic violence?
4      A. Domestic violence, yes.
5      Q. Good for you. You're going the Lord's
6   work.
7      A. It's a chance to give back after
8   retiring.
9      Q. Especially pro bono. Okay. Let me talk
10  about your -- your employment history and -- and
11  how long did you work for EQT?
12     A. Well, I started with EQT in 1977, and I
13  worked until 2010.
14     Q. So from '77 to 2010?
15     A. Yes.
16     Q. Okay. When you started with EQT, what
17  was your job position?
18     A. I was a staff auditor.
19     Q. What did you do as staff auditor with
20  EQT?
21     A. I did internal audit work.
22     Q. Were you auditing payroll? Were you
23  auditing expenses? What was your --
24     A. A lot of different functions. Any

Page 8

1   function within the EQT family.
2      Q. Royalty payments, did you audit those?
3      A. I don't think I did any audit -- internal
4   audit work in royalty payments, no.
5      Q. Then after you were -- how long were you
6   staff auditor?
7      A. A year or two.
8      Q. Okay. So that takes us up to the '78,
9   '79 range?
10     A. Yes.
11     Q. Okay. Then what you did do at EQT?
12     A. I was a staff accountant.
13     Q. What did you do as a staff accountant for
14  EQT?
15     A. I did accounting, mostly financial
16  reporting, mostly external financial reporting.
17     Q. Okay. What is --
18     A. But some management reporting.
19     Q. What is external financial reporting?
20     A. Well, EQT is a public company, and so it
21  has an annual report requirement and quarterly
22  filing requirements. It files a 10-K with the
23  SEC.
24     Q. Right. So -- so you were in charge of

Page 9

1 the SEC filings?
2      A. Not when I was an -- a staff accountant,
3 but I --
4      Q. Okay.
5      A. -- participated in that.
6      Q. Okay. So you participated in the --
7      A. Uh-huh.
8      Q. -- in the SEC filings?
9      A. And those preparations, yes.
10     Q. Okay. And then you said you did some
11 management accounting; is that right? Or
12 management --
13     A. Right. In addition to the external
14 reporting, there -- there was a management package
15 that was prepared every month.
16     Q. Okay. What was contained within that
17 management package?
18     A. A variety of information and -- and
19 statistics and financial information that the
20 management used to monitor the performance of the
21 Company.
22     Q. Was it basically a balance sheet
23 showing --
24     A. There would have been a balance sheet,

Page 10

1 there would have been some income statements,
2 there would have been some non-gap measures, a
3 variety of different information.
4      Q. Okay. When you were a staff accountant,
5 did you look at royalty payments for oil and gas
6 owners?
7      A. I did not.
8      Q. Okay. And how long were you staff
9 accountant for EQT?
10     A. Several years.
11     Q. When were you promoted from staff
12 accountant?
13     A. I can't give you the exact date, but I
14 was promoted to a supervisor and then to
15 manager --
16     Q. Okay.
17     A. -- and --
18     Q. How long were you supervisor?
19     A. Several years. Each of these positions
20 we're going to talk about I'm going to have been
21 in for several years until we get to the
22 controller, which I was from about 1995 until
23 2009.
24     Q. Okay. So you were supervisor, and that

Page 11

1 was in --
2      A. That's --
3      Q. Supervisor of what?
4      A. Supervisor of financial reporting.
5      Q. Okay. So basically were you just
6 supervising the folks that you were working
7 with --
8      A. Yes.
9      Q. -- previously? Okay.
10     A. Yes.
11     Q. And then as manager, you were --
12     A. Same thing.
13     Q. Same thing. You just went up a step in
14 the same department?
15     A. Right.
16     Q. Okay. And do you know roughly what year
17 it was that you were --
18     A. I -- I would have to refresh my
19 recollection. Several years later. Each of these
20 positions I would have been in for a few years and
21 then moved on to the next position.
22     Q. All right. So after management -- after
23 manager of financial reporting, where did you go?
24     A. Yeah. I was the director of accounting

Page 12

1 for the Company, and at that point, I would have
2 had more responsibilities for other areas of
3 accounting outside of external reporting.
4      Q. And would you have, at that time, been in
5 charge of like the senior financial analyst or the
6 staff accountants at EQT, those different
7 individuals?
8      A. Well, some of them.
9      Q. Okay. So as director of accounting, all
10 of those folks wouldn't fall under your umbrella?
11     A. No.
12     Q. Okay. Who would fall under your umbrella
13 as people that you would oversee as the director
14 of accounting?
15     A. Well, when I was director of accounting,
16 I -- I was overseeing people that were at the EQT
17 Corporate level, which would have been at external
18 reporting, payroll, some property records, the tax
19 function, those type of items.
20     Q. Okay. Was there another director of
21 accounting that took care of other aspects of the
22 accounting paperwork at EQT?
23     A. There probably was a controller at some
24 of the various subsidiary levels.

**Page 13**

1    Q. Okay. Subsidiary levels, you're talking
2  about the -- the different LLCs, wholly owned
3  subsidiary companies of EQT?
4    A. Yes.
5    Q. Okay. But within the EQT -- EQT -- what
6  is EQT Production Company now was probably
7  Equitable at that time; is that right?
8    A. Right.
9    Q. Okay. So when you were the director of
10  accounting at Equitable, would you have been over
11  the folks who paid royalties for Equitable?
12    A. No.
13    Q. Okay. Who would have been over the folks
14  who paid the royalties at Equitable at that time?
15    A. I don't really remember.
16    Q. Okay. But you --
17    A. That's a long time ago.
18    Q. Okay. All right. Go ahead. What was
19  your next position then?
20    A. I was the controller at EQT, and as I
21  said, at that point, that was 1995, and I remained
22  the controller and vice -- and ultimately vice
23  president and controller through 2009.
24        And with that, any responsibilities

**Page 14**

1  would have been for all accounting across all
2  organizations.
3    Q. When you say "across all organizations,"
4  you're talking about EQT Gathering?
5    A. Yes.
6    Q. EQT Energy, LLC?
7    A. Yes.
8    Q. All these different subsidiary companies?
9    A. Yes.
10    Q. Did you retire in 2009?
11    A. I retired sometime in 2010. I stepped
12  down as controller in late 2009.
13    Q. Okay. And what was your position with
14  EQT after you stepped down as controller?
15    A. Vice president of finance.
16    Q. Okay. So when you're in charge of -- of
17  all accounting over all the different subsidiary
18  companies, would you get balance statements from
19  all these companies?
20    A. I -- I would have seen those management
21  reports, as I discussed earlier.
22    Q. Okay. Now, ultimately, if EQT Energy,
23  LLC, is a subsidiary of EQT and EQT Energy, LLC,
24  makes a profit, that means EQT gets that profit;

**Page 15**

1  am -- am I correct in that statement?
2    A. That's probably a little overly
3  simplified, but yes.
4    Q. I'm a simple guy.
5    A. Okay.
6    Q. I'm willing to -- to let you elaborate on
7  that if you want to, I mean, as far as I'm sure
8  there's depreciation or a lot of different things
9  that are taken into consideration.
10        But obviously, when you're talking
11  about EQT Energy, LLC, there aren't other
12  shareholders out there besides EQT, I think --
13    A. Not while I was at -- at EQT.
14    Q. Okay. Now, what other affiliated
15  companies that you can recall did you oversee or
16  would you have had information for?
17    A. Well, the main --
18        MR. HENDRICKSON: Because, I mean --
19    Q. In --
20        MR. HENDRICKSON: -- this --
21    Q. -- 2009.
22        MR. HENDRICKSON: Okay.
23    Q. 2009.
24    A. In 2009, basically the Company was

**Page 16**

1  operated as three performance areas and three
2  segments, and that was the -- the production, the
3  gathering, and -- and the distribution company.
4        And there was multiple companies that
5  folded up into those management areas of
6  operation.
7    Q. Okay. And -- and these companies all had
8  different CEOs, or did it -- if there were
9  corporations or --
10    A. Yes.
11    Q. Okay.
12    A. They had somebody in charge, yes.
13    Q. So a director or a president or somebody
14  who was --
15    A. Somebody.
16    Q. -- operating the company?
17    A. Yes.
18    Q. Okay. And did they all report to the
19  same vice president at EQT at some point? I mean,
20  when you go up the -- the listed hierarchy or
21  the --
22    A. Yes, I -- I believe they did.
23    Q. Okay. Do you know who they reported to?
24    A. My recollection is they reported to the

Page 17

1 CEO of the Company.
2    Q. Okay. And you say the CEO of the Company
3 is EQT or Equitable?
4    A. EQT Corporation, yes.
5    Q. Okay. And what company did you actually
6 retire from?
7    A. EQT Corporation.
8    Q. Does EQT Corporation still exist?
9    A. Yes.
10    Q. Okay. There -- there are a number of
11 other companies. I think there's an EQM --
12    A. Uh-huh. Yes.
13    Q. Do you know who EQM is?
14    A. I'm -- I'm aware of them, yes.
15    Q. Okay. Did -- was EQM in existence at the
16 time that you were with EQT in 2009?
17    A. It was not.
18    Q. Okay. At any point in -- in your career
19 with EQT, did -- did you handle the distribution
20 of royalties?
21    A. No. Personally, no.
22    Q. You, at some point, probably oversaw --
23 as the VP, oversaw people who -- who did the
24 royalty distributions, though, right?

Page 18

1    A. Yes. I would have overseen people that
2 oversaw people, yes.
3    Q. Okay. Fair enough. Fair enough. But
4 I'm guessing day-to-day work, you probably never
5 sat there and entered data for a royalty check to
6 be issued?
7    A. Absolutely not.
8    Q. Congratulations. Are you familiar with
9 oil and gas leases just in general?
10    A. In general, yes.
11    Q. Okay. Did you ever work in the land
12 department at all?
13    A. I did not.
14    Q. Okay. Did you ever negotiate oil and gas
15 leases?
16    A. I did not.
17    Q. You are familiar, however, with certain
18 terms in leases, such as "royalty"?
19    A. Yes.
20    Q. Okay. It's my understanding that you did
21 negotiate or -- or signed off on gas purchase
22 contracts; is that right?
23    A. I would have -- I signed off on some,
24 yes.

Page 19

1    Q. Okay. And who would that have been for,
2 what company?
3    A. Either EQT Production or EQT Energy, one
4 or the other.
5    Q. And what was your title at EQT
6 Production?
7    A. Either assistant secretary or assistant
8 treasurer. I don't really remember. We'd have to
9 look at the documents.
10    Q. And with EQT Production?
11    A. Same.
12    Q. Did you hold any similar offices with any
13 other EQT or equitable company?
14    A. I -- I was an officer in every company
15 that was within the EQT Corporation.
16    Q. And when you were paid your salary, was
17 your check issued by EQT, EQT Corporation?
18    A. EQT Corporation.
19    Q. Okay. So you would have been an officer
20 of EQT Gathering?
21    A. Yes.
22    Q. You would have been -- was EQT Energy,
23 LLC, in existence at the time that you worked for
24 EQT?

Page 20

1    A. Yes.
2    Q. Okay. And you would have been an officer
3 with EQT Energy, LLC?
4    A. Yes. It -- it might have had a different
5 name at that point, but yes.
6    Q. And -- and a lot of these companies are
7 -- affiliated companies are midstream companies;
8 is that right?
9    A. Yes.
10    Q. And as midstream companies, they offer
11 services to EQT after the well has been produced
12 from the well site downstream; is that right?
13    A. Yes.
14    Q. And the -- the production side, actually
15 getting the oil and gas out of the ground to the
16 -- to the well pad to be distributed, is
17 Production's job?
18    A. Yes.
19    Q. So would you have, in your job,
20 negotiated any agreements on the production side
21 with any of the production companies?
22    A. No.
23    Q. So you would not have worked with
24 drilling contractors or safety personnel for

Page 21

1 drilling operations?
2    A. No.
3    Q. Your -- your sole job, then, I --
4        MR. WINDOM: Strike that.
5    Q. You would have been affiliated with the
6 point of the meter coming out of the well and
7 working downstream from that point?
8    A. I -- I don't quite understand the
9 question.
10   Q. Yeah. It wasn't a very good one.
11       Let me ask it this way: Tell me
12 where you would get involved with the sale or the
13 purchase of natural gas from an EQT well.
14   A. I -- I would not have been involved in
15 the operations of either of those sides.
16   Q. Okay. So where would EQT Energy, LLC, be
17 involved with the -- either the sale or the
18 purchase of natural gas from an EQT well?
19   A. EQT Production sell -- sells gas to EQT
20 Energy at the wellhead.
21   Q. Okay. You say "at the wellhead." That's
22 -- that's sort of a term of art. Can you explain
23 to me what "at the wellhead" means?
24   A. Well, as it's brought -- at -- where it's

Page 22

1 brought out of the ground.
2    Q. Okay. On the lease?
3    A. Yes.
4    Q. Okay. And are there meters that you know
5 of that are set close to those wells that measure
6 the gas coming outside of the wells?
7    A. Yes.
8    Q. And I'm guessing since you were involved
9 with EQT since 1977, you're familiar with the
10 traditional vertical wells?
11   A. Yes.
12   Q. Okay. And were you involved with EQT at
13 the time that they were drilling horizontal wells?
14   A. Yes.
15   Q. Now, when you're drilling a vertical well
16 or a horizontal well, those -- on the same lease,
17 those wells may sell gas at different points; is
18 that right?
19   A. Yes.
20   Q. Okay. Is it -- is it common for EQT to
21 sell gas directly to third parties, or does EQT
22 usually sell it to an affiliate?
23   A. I'm sorry. Ask me that question again.
24 I --

Page 23

1    Q. Yeah. Does EQT normally sell its gas at
2 the wellhead to an EQT-affiliated company, or do
3 they sell it more often to independent third
4 parties?
5    A. Well, if I understand your question
6 correctly, EQT Production Company sells its
7 production to EQT Energy at the wellhead, and then
8 EQT Energy arranges for its transportation and
9 ultimate sale.
10   Q. So is it safe to say, then, that EQT
11 Energy, LLC, is the exclusive purchaser of gas
12 from EQT Production wells?
13   A. I -- I think that's safe to say. There
14 may be a small amount of gas that's not sold to
15 EQT Energy, but I don't believe there is. If it
16 is, it's a very immature -- immaterial amount.
17   Q. Okay. Now, when -- when gas is sold to
18 EQT Energy, LLC, where does it go? And I'm
19 talking just in general terms.
20   A. Well, E -- it's -- I think it varies
21 depending on where the well is, where the wellhead
22 is, but EQT Energy arranges through a company
23 called EQT Gathering to have that moved to an
24 interstate pipeline connection, and then it would

Page 24

1 vary depending on where the well is, where the gas
2 would go.
3        It's typically -- ultimately ends up
4 getting blended with other wells and moved to one
5 or two or three different interstate pipelines.
6    Q. Okay. So if I understand the process,
7 then, it -- the gas is produced by EQT Production?
8    A. Yes.
9    Q. It goes to EQT Energy, LLC, at the
10 wellhead?
11   A. Yes.
12   Q. EQT Energy, LLC, moves it downstream to
13 EQT Gathering?
14   A. No.
15   Q. Okay.
16   A. EQT Energy has -- has an agreement with
17 EQT Gathering to move the gas on its behalf from
18 EQT -- or from where it buys it from EQT
19 Production to a liquid trading point, which is
20 going to be some interstate pipeline.
21   Q. Okay. Liquid trading point, is that
22 your --
23   A. Well, that -- yes. That's a term of
24 typically where the gas goes into an interstate

Page 25

1 pipeline. Those are published prices and very
2 transparent.
3     Q. Okay. Can you give me an example of one
4 of those liquid trading points?
5     A. Well, TCO would be one, and TCO -- once
6 the gas moves to TCO, then EQT Energy could
7 arrange for its transportation anywhere in the
8 country.
9     Q. And at this point, it's sort of like
10 electricity. It's in the grid, it's in the
11 pipeline, and the gas that gets transported down
12 the pipeline, if you --
13          If you put in, let's say, a million
14 cubic feet of gas and you're moving that gas, it
15 gets blended with gas maybe from Antero or
16 Chesapeake or one of the other companies. And
17 then you can take out a million cubic feet of gas
18 down the line.
19     A. That sounds right, although it gets
20 blended with other wells even before it enters
21 that interstate pipeline connection.
22     Q. So -- so you've got a million cubic feet
23 of gas, but your gas isn't separated out in a
24 separate compartment within the pipeline.

Page 26

1          It's just all blended together, and
2 then you're allotted that amount of gas down the
3 line to sell to whomever the end user might be
4 or --
5     A. Right. I think that sounds right.
6     Q. And that's very simplified, I understand,
7 but I'm going to have to simplify this for a Jury
8 so --
9     A. Uh-huh. I understand.
10     Q. Now, EQT Gathering, then, does not
11 actually purchase the gas. They are just paid a
12 fee to transport the gas that EQT Energy, LLC,
13 purchases from EQT Production?
14     A. Yes.
15     Q. And how is -- the rate that EQT Gathering
16 is paid, how is that determined?
17     A. Annually, the gathering company prepares
18 a budget proposal based on their costs and -- and
19 the volumes expected.
20          And there's a budgeting process where
21 each of the business units participate in that to
22 determine what a fair contract rate will be for
23 that next year, and then that rate is used for the
24 next year.

Page 27

1          And -- and we're talking these are --
2 that's the way it's done for the more traditional,
3 older vertical wells. The -- the Marcellus wells
4 are higher pressure lines now, and actually those
5 lines were built after I've left.
6          So I'm not the best to answer
7 questions about those rates.
8     Q. About the particular rates, I understand,
9 but you can, just in general, speak about the
10 costs and -- and the way that these -- these
11 calculations are made?
12     A. I -- I can.
13     Q. Okay.
14     A. I can. Like I say, that's the way the
15 non-high pressure lines would have been. I never
16 participated in the negotiations back and forth on
17 the higher pressure lines. They're all much less
18 than the lower pressure lines.
19     Q. When you say they're much less, what do
20 you mean?
21     A. The -- the cost per dekatherm is less.
22 They're much more -- they're newer, they're more
23 efficient.
24     Q. Who would be the person, if you know, at

Page 28

1 EQT that would be able to give me the information
2 regarding the -- the Marcellus side of that now?
3     A. I don't remember offhand.
4     Q. What office would they hold?
5     A. They're -- I believe it's somebody in the
6 planning group that would have been the
7 participant in the negotiation of those rates.
8     Q. And the planning group would have been
9 EQT Production planning group, or would that be
10 one of the affiliate companies?
11     A. I think it's one of the affiliate
12 companies, somewhere in the midstream operation.
13     Q. Now, you say that -- that there's a rate
14 that is based on an annual budget proposal?
15     A. Right.
16     Q. And that -- that rate is then spread out
17 over a 12-month period?
18     A. Yes.
19     Q. What kind of costs are included in the
20 budget proposal? What -- what costs do they take
21 into consideration?
22     A. The gathering and compression operations.
23     Q. Anything else?
24     A. I don't think so.

Page 29

1    Q.  Do you know what costs are considered in
2  the gathering portion of the gathering and
3  compression operation?
4    A.  Well, in -- in general, I do.  I -- not
5  specifically.  But the gathering is the pipelines
6  that go from the wellhead typically to the
7  interstate pipeline, and so those costs are the
8  maintenance of those lines.
9        The compression is the --
10  particularly on these older wells, the -- the
11  pressure coming out of the well is low, and so
12  these enormous compressors are put in place to
13  bring the gas not only from the wellhead to the
14  interstate pipeline connection, but also to bring
15  it up to a pressure that it can go into the
16  interstate pipeline.
17    Q.  Now, with regards to -- to the different
18  fees and -- and charges, there's -- there are also
19  labor costs that are included; is that right?
20    A.  Sure.  Those compressors are manned.  The
21  gathering lines are -- are maintained.  The right-
22  of-ways are cut and cleaned.  There's oversight of
23  those people.  There's planning that's done.
24  There's determinations of whether gas is being

Page 30

1  lost along the way and fixing those leases.
2        There's -- there's an awful lot of
3  costs involved, especially on these older lower
4  pressure lines to -- to keep the system running.
5    Q.  And -- and those are all, I guess,
6  considered planned operating costs that are in
7  this budget?
8    A.  Yes.
9    Q.  That includes the salaries for field
10  personnel?
11    A.  Yes.
12    Q.  You said repairs and maintenance to the
13  pipeline itself?
14    A.  Yes.
15    Q.  Repairs -- and -- and I'm guessing a new
16  line would take less repairs and maintenance than
17  an old line?
18    A.  Yes.
19    Q.  So moving down the line time-wise in 15
20  -- 10, 15, 20 years when gathering does their
21  budget, the costs for the maintenance and repairs
22  of these new pipelines may increase?
23    A.  Right.
24    Q.  Okay.  And that's -- that's why these are

Page 31

1  re-done on an annual basis, I'm guessing?
2    A.  Well, right.  And to -- for planning
3  purposes, you know, there are a number of issues
4  that are important to address, and if there's a
5  lot of gas being produced in a field and there's
6  constraints on the -- the take away available for
7  that, there might be new lines built to make sure
8  that the gas isn't curtailed.
9        If -- if a well only can go to one
10  interstate pipeline and that pipeline goes down,
11  or nobody has enough capacity reserved on that
12  pipeline, then the gas isn't -- isn't sold.
13        And so the idea is to make the system
14  redundant enough that gas can move in -- in any
15  direction, and you know, that was one of the
16  focuses of that gathering group in the planning
17  processes, to make sure that as much gas as
18  possible moved all the time.
19        Those gas in those old vertical wells
20  is -- you know, those wells produce for over 50
21  years.  As a matter of fact, some of them produce
22  for over 100 years.
23        And so any gas not sold today, the
24  net present value of that on the back end is -- is

Page 32

1  very small, and so it's important to get as much
2  of that gas to market as possible.
3    Q.  Well, if gas is selling for less than a
4  dollar an Mcf, it wouldn't be real profitable,
5  though.
6    A.  Well, but all I'm saying to you is that
7  some money today is better than -- if you
8  calculate the net present value of money 50 years
9  down the road, that's not going to be very much,
10  and so --
11    Q.  Well, let must ask you this --
12    A.  You -- you don't want to lose money on
13  producing the gas, but any money that you make is
14  -- is going to be profit.
15    Q.  Let me agree with you right there, that
16  you do not want to lose money on producing gas.
17        But -- and -- and you left EQT.  You
18  probably don't know this, but I've had clients
19  with negative royalties.  Do you believe that that
20  would be proper?
21    A.  Well, it's possible, yes.
22    Q.  I didn't -- I didn't say if it was
23  possible.  I said do you believe it's proper?
24    A.  Well, I don't know what -- I mean, are

Page 33

1  you trying --
2         MR. HENDRICKSON: Object to the form
3  of the question. Go ahead and answer.
4      A. I -- I don't want to make a moral
5  judgment on the -- the fact that a particular well
6  is not making money today doesn't mean that it's
7  most efficient to go back and shut it in.
8         You know, those are operational
9  issues that's beyond my --
10     Q. Well, if -- let's say that you --
11     A. I can tell you this --
12     Q. Uh-huh.
13     A. -- the -- and typically in those older
14  wells, the Company owns 7/8ths of the well and the
15  royalty owner owns 1/8th of the well, and the
16  Company doesn't -- is going to lose 7/8th on the
17  same well that that owner is going to lose 1/8th.
18  So in general, the Company is not interested in
19  losing money.
20         Now, they will make an operational
21  determination based on things that are beyond the
22  -- just the mere financial realities of a
23  particular sale: The actual costs to shut a well
24  in, the cost of having the line down, operational

Page 34

1  things that you'd have to discuss with somebody
2  that -- that was in operations.
3         But it does happen, it does make
4  sense, it's not immoral.
5      Q. Property taxes are also taken out or
6  considered in the use?
7      A. I -- I don't remember. In some states
8  they are and -- but usually they are.
9      Q. Workers --
10     A. I'd have to --
11     Q. -- premiums?
12     A. Yes. All the costs involved --
13     Q. Un -- unemployment?
14     A. Yeah. And I'm not sure how exactly
15  there'd be unemployment, but I -- the cost of
16  operating those -- those pipelines, those
17  gathering lines, and those compressors, all of
18  those costs to run an operation would be included.
19     Q. Okay. And then those prices or those
20  fees or expenses would then be either deducted
21  from the price that was paid to the oil and gas
22  owner or taken out of their royalty in -- in the
23  form of a deduction; is that right?
24     A. Right. Yes.

Page 35

1      Q. Okay. Now, you mentioned that the
2  royalty owner owns 1/8th of the well. That's not
3  exactly accurate, though, right? I mean, they
4  don't own the well?
5      A. No. They -- they -- I think the Company
6  has always looked at it as a partnership between a
7  royalty owner and a -- and the Company.
8         The Company, in most cases, is the
9  operator of the well, and they -- and we say 1/8th
10  and 7/8th. Every well is -- every lease is
11  different. They can more, they can be less. But
12  in general, the idea is that it's a partnership,
13  and -- and both participate.
14         The Company, because it's the
15  operator, holds some of the costs back that -- and
16  doesn't charge them quite as much. So EQT Energy
17  may charge an amount to EQT Production that is
18  actually greater than the amount that they pass
19  onto the royalty owner.
20         But in general, they're partners in
21  the well and they both participate.
22     Q. Let me ask you this: Parties to a lease
23  are known as a lessor and a lessee; is that right?
24     A. Yes.

Page 36

1      Q. And the oil and gas owner is the lessor;
2  is that your understanding?
3      A. Yes.
4      Q. And the oil and gas owner owns the oil
5  and gas in the ground whether or not EQT is
6  anywhere around --
7      A. Yes.
8      Q. -- correct?
9      A. Yes.
10     Q. Or Antero or Noble or any of the other
11  companies.
12     A. Yes.
13     Q. And if that oil and gas owner wants to go
14  out and drill the well, they can certainly do it,
15  and they would have 8/8ths?
16     A. Yes.
17     Q. Because they would put the money into the
18  ground to get the well out -- or to get the oil
19  and gas out?
20     A. Yes.
21     Q. Okay. Now, most people -- not all
22  people, but most people don't have the wherewithal
23  to spend the money to go out and -- and drill a
24  well on their farm; you would agree with that?

Page 37

1    A. Yes.

2    Q. And EQT is known in -- in these types of

3 transactions typically as the lessee?

4    A. Uh-huh. Yes.

5    Q. And -- and they would own what is known

6 as the working interest?

7    A. Yes.

8    Q. What is a working interest?

9    A. Well, the working interest is somebody

10 that participates not only in the royalties after

11 production, but the costs to drill the well.

12    Q. Okay. Now, you used the term that, as a

13 lawyer, I -- I -- when I refer to royalties,

14 that's what I am paid for my oil and gas in an oil

15 and gas lease.

16       The -- the working interest owner

17 doesn't actually get a royalty, though, do they?

18 They get the -- the 7/8ths of the gross proceeds?

19    A. They get -- right. They get whatever the

20 -- the lease is a negotiation between the lessee

21 and the lessor. They get what they're

22 contractually entitled to.

23    Q. And it may be -- with newer leases, it

24 may be 20 and -- and 80 percent but --

Page 38

1    A. And there's other terms --

2    Q. Right.

3    A. -- that could or could not be in the --

4 in any specific lease.

5    Q. Right.

6    A. You'd have to look at each lease

7 individually.

8    Q. But -- but certainly the -- the terms of

9 the lease control the agreement between the lessor

10 and the lessee?

11    A. Uh-huh. Yes.

12    Q. And the oil and gas owner, as the lessor

13 in a 1/8th lease or a 12-and-a-1/2 percent lease,

14 is entitled to the -- the 1/8th or 12-and-a-1/2

15 percent royalty?

16    A. Yes.

17    Q. And then EQT, as the lessee in that same

18 lease, understanding that there are many variables

19 and farm-out agreements and overriding royalties,

20 but generally speaking, is entitled to 7/8ths?

21    A. Right.

22    Q. And EQT is entitled to that 7/8ths

23 because EQT is the one that pays the money to put

24 the hole in the ground to get the oil and gas out

Page 39

1 of the ground?

2    A. And it takes the risks.

3    Q. Absolutely. Because that oil and gas

4 owner has absolutely no risk if EQT drills a dry

5 hole?

6    A. Right.

7    Q. All they've done is signed their name to

8 a piece of paper that's recorded in the

9 courthouse?

10    A. Right.

11    Q. Okay. Now, EQT takes the risk, they

12 contract or they own the rigs, they -- they drill

13 the well, they produce the oil and gas with that

14 working interest proceeds being 87-and-a-1/2

15 percent coming to them?

16    A. Right.

17    Q. Okay. And -- and that 87-and-a-1/2

18 percent would be the -- what's referred to as the

19 net revenue interest; is that your understanding?

20    A. Yes, that sounds right.

21    Q. Okay. You seemed a little bit hesitant.

22 Is there another term that you used to refer to

23 that 87-and-a-1/2 percent?

24    A. That's as fine -- it's a fine term.

Page 40

1    Q. Okay. Now, what does -- what does net

2 revenue interest mean or -- or if I say someone

3 has a net revenue interest, what -- what do you

4 equate that with, or what do you relate that to?

5    A. Well, I -- I'm not sure exactly what

6 you're asking, but EQT -- as I said, the -- there

7 -- if we look at the well as a pie, there --

8 there's a sliver that EQT doesn't own.

9    Q. Well, they own all the well, right? They

10 just don't get all the proceeds?

11    A. Okay.

12    Q. Is that fair?

13    A. Well, I -- I guess that's right. They

14 own -- they have drilled the well. I'm not really

15 -- I guess that's a legal question as to who

16 actually owns the well.

17       But they have the right to produce

18 it, and they already have the right to 7/8ths of

19 -- in general, 7/8th of the proceeds.

20    Q. Right. Now, I mean, the oil and gas

21 owner doesn't have the right to go plug that well?

22    A. He does not.

23    Q. The oil and gas owner doesn't have the

24 right to -- to move a tank on there and -- and

**Page 41**

1 start producing oil into his own tank necessarily?
2      A.  No.  But in -- in some leases, the -- the
3 royalty owner has the right to take his gas or oil
4 in kind.  So --
5      Q.  Right.
6      A.  -- he does have the right to some
7 production.
8           In fact, some have a farm -- what
9 they call farm taps, where the lease has -- has an
10 agreement that the owner of the property has the
11 right to burn gas in their house or barn or
12 whatever they have on the property.
13      Q.  Yeah.  I think we call that free gas in
14 West Virginia.  Is that --
15      A.  Okay.
16      Q.  -- your understanding as well?
17      A.  Yeah.  That sounds right.
18      Q.  Okay.  And -- and the oil and gas -- or
19 the -- I'm going to say the oil and gas owner --
20 some people refer to the royalty owner.  I don't
21 like that term, but we can use that term as well.
22           But the -- the royalty owner doesn't
23 have the right to go out and -- and shut in the
24 well and -- and lay a line to some other

**Page 42**

1 purchaser, right?
2      A.  He does not.
3      Q.  Okay.  That's all contractually to the --
4 the lessee.  They're -- they're -- they are
5 charged with being able to do that?
6      A.  Yeah.  Typically, the -- the deal is that
7 you own that gas under the ground, and when you
8 signed up with a company like EQT, you agreed that
9 -- for taking the risk that they got the rights
10 for a period of time or in -- in perpetuity, as
11 long as that well is producing.
12      Q.  Now, are you familiar with the oil and
13 gas leases in this Case?
14      A.  I am not.
15      Q.  Okay.  Have you seen them?
16      A.  I have not.
17      Q.  Okay.  Are you familiar with the lease
18 terms in oil and gas leases in general?
19      A.  I think so, yes.
20      Q.  Okay.  I'm going to show you these oil
21 and gas leases, and I'm just going to ask you a
22 couple questions about the terms.  If you don't
23 know, that's fine, but -- but I'm going to at
24 least mark them as exhibits to your deposition

**Page 43**

1 here today.
2           They've been stipulated to as being
3 the -- the leases in this Case.
4           MR. HENDRICKSON:  I mean, he can
5 look at those, Scott, but I mean, he's not here to
6 testify about what the leases say.  They speak for
7 themselves.  He's not here to interpret them.
8           MR. WINDOM:  That's fine.
9           THE DEPONENT:  And in fact, no one
10 in accounting gets to make the determination of
11 the lease terms.  That's done in the lease
12 administration.
13           MR. HENDRICKSON:  Yeah.  I mean,
14 that wouldn't have been his daily work.  He
15 wouldn't have ever done as part of his job.
16           MR. WINDOM:  Okay.  This'll be No.
17 1.  This'll be marked as No. 2.
18           MR. HENDRICKSON:  Yeah.  Why don't
19 you use the same ones?
20           MR. WINDOM:  I've got -- I've got
21 copies here, and that way he's got separate copies
22 for -- because these are numbered differently than
23 they're numbered on that one.
24           MR. HENDRICKSON:  Okay.  Okay.

**Page 44**

1           DEPOSITION EXHIBIT NO. 1
2           (Lease Agreement between Pearl
3           Hutchinson and D.C. Hutchinson, Her
4           Husband; Ruby Dotson and J.E.
5           Richards was marked for
6           identification purposes as
7           Deposition Exhibit No. 1.)
8           DEPOSITION EXHIBIT NO. 2
9           (Lease Agreement between Pearl
10          Hutchinson and D.C. Hutchinson, Her
11          Husband; Archie C. Richards and
12          Elsie M. Richards, His Wife, and
13          J.E. Richards was marked for
14          identification purposes as
15          Deposition Exhibit No. 2.)
16          DEPOSITION EXHIBIT NO. 3
17          (Lease Agreement between A.H. Hodge
18          and Ona Hodge, His Wife, and J.E.
19          Richards was marked for
20          identification purposes as
21          Deposition Exhibit No. 3.)
22 BY MR. WINDOM:
23      Q.  And Mr. Bergonzi, I'm going to hand you
24 what has been marked for identification as your

Page 45

1 Deposition Exhibits 1, 2, and 3.
2        And I can tell you that counsel for
3 EQT has stipulated that these are the leases that
4 control the oil and gas wells for -- or the leases
5 for which we are here for this Litigation today,
6 all right?
7    A. Okay.
8    Q. And when you've had a chance to review
9 those, let me know.
10    A. Well, what -- what am I reviewing for?
11        MR. HENDRICKSON: Yeah, why don't
12 you ask him the question, and then --
13        MR. WINDOM: Okay.
14        MR. HENDRICKSON: -- let's see if he
15 can answer it, I mean, rather than waste a lot of
16 time having him read documents that he wouldn't
17 have read ever in his career?
18        MR. WINDOM: Okay.
19    Q. Mr. Bergonzi, with regards to Exhibit No.
20 1, that is Lease Book 80, Page 445. Do you see
21 the 445 in the upper-right-hand corner?
22    A. Yes, I do.
23    Q. Okay. The lessor and the lessee in this
24 lease are -- are -- nowhere is EQT identified.

Page 46

1 Would you -- can we stipulate to that or agree --
2    A. Yeah.
3    Q. -- to that?
4    A. Yes, I --
5    Q. Okay.
6    A. -- I agree.
7    Q. Now, this lease was -- was in effect in
8 December of 1951. Do you see that date in the
9 upper sentence?
10    A. I do.
11    Q. Okay. The royalty here, if you look down
12 in the middle of the first page, it says that the
13 royalty will be 1/8th part of the oil.
14    A. 1/8th --
15    Q. I can tell you that that's right here,
16 1/8th part of the oil.
17    A. Yes.
18    Q. Okay. And then it also pays 1/8th of the
19 market price of the gas from each and every well
20 drilled.
21    A. Yes.
22    Q. And it says that it's marketed and sold
23 off the premises and measured by a meter --
24    A. Yes.

Page 47

1    Q. -- do you agree to that? Now -- so this
2 would be an 87-and-a-1/2 percent net revenue lease
3 to the lessee; is that correct?
4    A. Okay. Yes.
5    Q. Okay. That the -- the 1/8th is equal to
6 12-and-a-1/2 percent, and that's the royalty that
7 is paid to the oil and gas owner?
8    A. Yes.
9    Q. And then it also talks about -- about
10 byproducts. In the next sentence down, it says
11 1/8th part of the market price of the gas and
12 other byproducts so marketed and sold.
13    A. Okay.
14    Q. Do you see that?
15    A. Yes.
16    Q. Okay. And -- and in your experience,
17 what are the types of byproducts that are marketed
18 and sold from oil and gas leases?
19        MR. HENDRICKSON: Again, I'm going
20 to object to the question. That's not what he's
21 here for. He's not -- he's an accountant.
22        But go ahead. If you can answer, go
23 ahead.
24    A. Ask the question again.

Page 48

1    Q. Sure. What kind of byproducts are
2 marketed and sold from oil and gas leases, to --
3 to your knowledge and information?
4    A. Well, the -- in addition to -- to oil,
5 sometimes gas is -- is -- got some heavier
6 hydrocarbons in, and in some cases, those are just
7 left in the stream.
8        In other cases, they're extracted
9 from the stream and sold separately to make the
10 gas eligible for interstate pipeline.
11    Q. So the -- the processing to remove those
12 heavy hydrocarbons or other products, are those
13 calculated -- those prices calculated into the
14 gathering charge that is charged off to the -- the
15 oil and gas owner?
16    A. Ask me that question again.
17    Q. Sure. The -- the process by which the
18 heavy hydrocarbons are removed from the gas, that
19 process -- I'm sure there are expenses with that
20 process?
21    A. Yes.
22    Q. Are any of those expenses included in the
23 gathering rate or in the calculation, the annual
24 calculation for the gathering rate, which is then

**Page 49**

1 charged off in part to the oil and gas owner?
2    A.  Typically, they are not.
3    Q.  Okay.  So who does the separation of the
4 heavy hydrocarbons?
5    A.  Well, normally my -- my recollection is
6 that EQT Energy or EQT Gathering - I'm not really
7 sure which - has a third party process the -- the
8 gas and exact some of those heavier hydrocarbons
9 and sell those separately.
10    Q.  Okay.  When you say heavy hydrocarbons,
11 what are you talking about?
12    A.  Well, natural gas -- what we think of as
13 natural gas is methane --
14    Q.  Uh-huh.
15    A.  -- which -- and I certainly am not a
16 chemist or scientist, but those have -- are a
17 lighter hydrocarbon.
18        And there are other hydrocarbon
19 streams in there that have more -- that are
20 heavier and more liquid - ethane, butane, propane
21 - and those can be extracted out and sold
22 separately, sometimes for more, sometimes for
23 less.
24    Q.  And you know -- for instance, MarkWest,

**Page 50**

1 is that one of the companies that --
2    A.  I think it is, yes.
3    Q.  -- separates out?
4    A.  Yes.
5    Q.  But EQT itself does not -- or any of the
6 affiliated don't have any processing plant to
7 separate those liquids that you know of?
8    A.  I don't think they have any in West
9 Virginia, and they probably don't have any at all
10 at this point.
11    Q.  Now, let me ask you just a general
12 question based on your accounting:  What is a spot
13 price?
14    A.  Well, typically when we talk about spot
15 price, we're talking about what the price at an
16 interstate pipeline connection would be.  Those
17 are prices that are published and available.
18        I talked about liquid trading points,
19 and these liquid trading points will always have a
20 spot price where you can determine what a willing
21 buyer and seller would pay for the gas.
22    Q.  Okay.  So it's a willing buyer, willing
23 seller, third party arm's length transaction?
24    A.  Right.

**Page 51**

1    Q.  And you can choose to sell to that person
2 or not choose to sell to that -- or that company?
3    A.  Yes.
4    Q.  And --
5    A.  As you said, there's more gas than just
6 EQT gas and your clients' gas at those spots.
7    Q.  Right.
8    A.  It's all sold on a dekatherm basis.
9 One's the same as another one.  Nobody really
10 knows who got which molecule.
11    Q.  So if -- if, for instance, Dominion is
12 buying gas or -- or there's gas going into the TCO
13 pipeline, you can choose, perhaps.  If you're
14 getting a better price with one company or
15 another, you might be able to switch and go with
16 the higher price?
17    A.  You might, although for operational
18 purposes, a lot of this gas ends up being maxed
19 out into certain locations and has to go to other
20 locations.  There's -- I have no idea where this
21 gas goes or where it -- what it mixes with.
22        But some places you can -- you can
23 direct the gas, and other places you cannot.
24    Q.  And there are opportunities for you to

**Page 52**

1 lock in prices; is that right?  Or for EQT to lock
2 in prices?
3    A.  EQT Energy?
4    Q.  Yes.
5    A.  Yes.
6    Q.  And they base that on the Nimex price?
7    A.  They could base it on time of year,
8 length of contract, willing buyer, willing seller.
9    Q.  And -- and some companies, like Antero,
10 hedge some of their -- their gas prices and lock
11 those in, and -- and EQT is, I think, one of the
12 companies that sort of hedges and locks some of
13 their prices in; is that right?
14    A.  Yes.
15    Q.  Do you know what percentage EQT normally
16 locks in?
17    A.  I don't.  And it's varied over the years,
18 and EQT takes the risk for that.
19    Q.  Sure.  It's like buying stock.  You can
20 -- you can --
21    A.  It can go up, it can go down, yes.
22    Q.  Right.  You may --
23    A.  Uh-huh.
24    Q.  You may lock the price in at 3, and if

Page 53

1 gas goes to 5, you're losing $2.00?
2    A. Right.
3    Q. And if gas goes to 1, you're gaining
4 $2.00?
5    A. Right.
6    Q. So when EQT locks in a price based on --
7 on Nimex --
8    A. Uh-huh.
9    Q. -- or any other index, do they then
10 spread that price out amongst all the oil and gas
11 owners, or do they attribute that locked-in price
12 to certain wells in a certain field, or how does
13 that work?
14    A. When they lock in a price -- well, let me
15 step back a second. EQT Corporation takes any
16 risk above what the published price is.
17       The production company sells that gas
18 at -- at -- at the market price on the well, which
19 is determined by taking the price at the -- at the
20 interstate pipeline connection and reduced by the
21 -- the cost to get it from the wellhead to the
22 interstate pipeline connection.
23       So that's how the wellhead price --
24 market price is determined, and then E -- EQT

Page 54

1 Energy pays EQT Production that amount, and EQT
2 Production uses that to pay the royalty owners.
3    Q. So if EQT Energy locks in a price and the
4 price goes up, they -- they pay EQT for the
5 locked-in price?
6    A. Right.
7    Q. If the price goes down, they pay EQT for
8 the locked-in price?
9    A. Right. The -- the production company and
10 the royalty owner doesn't take the risk for the
11 ups and downs.
12    Q. And they also don't get the benefit for
13 the up?
14    A. Right.
15    Q. Now -- and the oil and gas owner, as the
16 royalty owner, does not have any say in what price
17 is being negotiated for that oil and gas, do they?
18    A. I think typically they do not. There may
19 be contracts that -- that specify specifically.
20 Each -- each contract is -- is different, but
21 typically they do not.
22    Q. So if EQT Energy, LLC, locks in a price
23 at just, for argument's sake, say $2.00 an Mcf --
24    A. Yes.

Page 55

1    Q. -- they will pay EQT Production for $2.00
2 an Mcf gas?
3    A. They will pay EQT Production whatever
4 that monthly price is, whether it's up or down
5 from locked-in price.
6    Q. So if they lock in a price at $2.00 and
7 it goes to 3, they're paying EQT Production the 3?
8    A. Right.
9    Q. -- if the price goes to 1, they're
10 paying EQT Production for the 1?
11    A. Yes.
12    Q. Even though they're getting 2?
13    A. Right. Yes.
14    Q. And then let's say they lock in a price
15 and the -- it goes --
16       MR. WINDOM: Strike that.
17    Q. If EQT Energy locks in a -- a price for
18 gas and that price goes considerably higher, would
19 EQT Energy, LLC, lose money? I mean, because --
20    A. Yes.
21    Q. -- because they're going to pay EQT
22 Production a higher rate --
23    A. Yes.
24    Q. -- even though they're only going to get

Page 56

1 $2.00 for the gas?
2    A. Yes.
3    Q. And is that information -- is the
4 locked-in price versus the -- the actual price
5 paid, is that on some sort of an accounting
6 software somewhere? Where would I find that at
7 EQT?
8    A. What EQT Energy actually sold it for?
9    Q. Yeah. I'm wondering: Does EQT Energy or
10 EQT Production have a spreadsheet or a database or
11 software that shows the locked-in price, the sale
12 price, and the difference?
13    A. I don't think so. How -- how it works is
14 EQT Production Company is paid off of spreadsheet
15 and a wire transfer information that takes the
16 price as determined in the gas purchase contract,
17 which is typically an Inside FERC at that liquid
18 trading point.
19       And it pays that times the -- the
20 sold -- the gas sold into that pipeline. So that
21 number never really shows up in the production
22 company's calculation. It shows up in EQT
23 Energy's calculation --
24    Q. Okay.

Page 57

1    A. -- of what they pay for the gas versus
2 what they sold it for.
3    Q. So if EQT Energy locks in a price at 5,
4 gas goes to 2, EQT Energy, LLC, will get paid 5
5 but the royalty owner will be paid on the 2?
6    A. Right.
7    Q. Okay. This -- what is the difference
8 between the spot price and the index price?
9    A. Well, the index price is going to be a
10 price that -- and we'd have to -- I -- I don't
11 recall exactly the technical term for this but --
12 or description of this.
13        But one -- once a month, the price is
14 set and it's posted as the -- and published as the
15 price for that month. The spot price can change
16 on a day-to-day basis.
17    Q. And does EQT Energy, LLC, sell more of
18 its gas based on an index or based on a spot
19 price? Do you know?
20    A. I don't know.
21    Q. When you were working there, do you know?
22    A. I -- I probably did.
23    Q. Okay. Is -- who at EQT would be able to
24 tell me that?

Page 58

1    A. I -- I would guess somebody at EQT Energy
2 can tell you how much is sold at spot and how much
3 is sold at a fixed price and how many con -- I'm
4 not sure who would be able to tell you how many
5 financial contracts were in place.
6    Q. Okay.
7    A. That might be a different group.
8    Q. So gas that is sold at an index price, do
9 you know what indexes they typically use?
10    A. It would be the index where that pipe --
11 where that gas is delivered. So if -- if it's TCO
12 or -- or Tennessee or whoever, there's a posted
13 price for those interstate pipelines. Whatever it
14 is, it is.
15        So if 1/3 of the gas went to TCO and
16 1/3 went to somebody else, they would blend it out
17 at those calculations.
18    Q. All right. Now, where is that price
19 posted? You said it's posted.
20    A. Well, I -- we always saw it at Inside
21 FERC. I -- I -- I'm sure that there's better
22 places today than Inside FERC.
23        MR. WINDOM: And Steve, I think
24 that's in the information you're going to provide

Page 59

1 to me, right, that IFERC information? You said
2 you're not going to --
3        MR. HENDRICKSON: We're going to
4 provide to you the index price where this gas
5 went.
6        MR. WINDOM: All right.
7    Q. Let me ask you this: The -- the -- is
8 all the gas in West Virginia sold to one point or
9 based on one index? Do you know?
10    A. It is not.
11    Q. Okay. So the -- the Richards' leases in
12 Ritchie County, what index would they be based on?
13    A. I have no idea.
14    Q. Okay. Do you know if it would be more
15 than one?
16    A. Probably, yes.
17    Q. It would probably be more than one?
18    A. I'm going to guess yes. Most -- most of
19 the gases can go to more than one pipeline or does
20 go to more -- more than one pipeline.
21        MR. WINDOM: Hold on for just a
22 second. Let's go off the record.
23        THE VIDEOGRAPHER: The time is 3:12.
24 We are now going off the record.

Page 60

1        (A discussion was had off the record,
2 after which the proceedings continued as follows:)
3        P R O C E E D I N G S
4        THE VIDEOGRAPHER: The time is 3:13.
5 We are now back on the record.
6 BY MR. WINDOM:
7    Q. Okay. Now, I'd asked you about the spot
8 price and the index price, and you had also
9 indicated that there is a market price which is
10 paid at the well.
11    A. Right.
12    Q. Okay. What is market price?
13    A. Well, we -- EQT calculates it by
14 determining what the market price at the most
15 transparent place is, and that's the liquid
16 trading point less the cost to get it to that
17 point.
18        So if you're, in fact, buying the gas
19 at the wellhead and you're selling it at an
20 interstate pipeline connection, you're not going
21 to -- you're going to want to recoup those costs
22 to get it to that pipeline.
23        And so that's the most transparent
24 way for the Company to -- to calculate the -- the

Page 61

1  market price at the wellhead.
2      Q. And looking at these leases, do you see
3  the term "at the wellhead" anywhere in that
4  royalty clause?
5      A. It says market price on said premises.
6  It says market price of the gas from each and
7  every well drilled on said premises.
8      Q. Uh-huh.
9      A. That's --
10     Q. But then the next part of that sentence
11  says: The product from which is marketed and sold
12  off the premises --
13     A. Uh-huh.
14     Q. -- and said gas to be measured by meter.
15     A. Right.
16     Q. But it -- nowhere in there does it say
17  "at the wellhead." Am I --
18     A. I don't --
19     Q. -- am I right?
20     A. -- see the words "at the wellhead," yeah.
21     Q. Okay. Would you agree with me that gas
22  purchase contracts are binding contracts?
23     A. Yes.
24     Q. Between the -- the parties that are

Page 62

1  buying and selling the gas?
2      A. Yes.
3      Q. And you would also agree that a lease is
4  a binding contract between a lessor and a lessee?
5      A. Yes.
6      Q. And you would agree that gas purchase
7  contracts, like the kind that you entered into,
8  would be even binding on successor companies if
9  EQT were to be bought out by somebody else?
10         MR. HENDRICKSON: Yeah --
11     A. Probably.
12         MR. HENDRICKSON: -- I would object
13  to that. I don't know if he knows that.
14         MR. WINDOM: Okay.
15         MR. HENDRICKSON: It's -- it's hard
16  to say. Depends on what the language is.
17     Q. Okay. Would you agree that it is
18  improper for a gas purchaser in a gas purchase
19  contract to pay the seller a purchase price that
20  is less than what the gas purchase agreement
21  specifies?
22         MR. HENDRICKSON: Object to the form
23  of the question. Go ahead and answer it if you
24  can.

Page 63

1      A. Ask me again.
2      Q. Sure. Would you agree that it is
3  improper for a gas purchaser in a gas purchase
4  contract to pay the seller of the gas a price
5  which is less than what was contracted for?
6         MR. HENDRICKSON: Same objection.
7      A. I -- the word "improper," I -- I don't
8  know. I guess there's -- I have no idea exactly
9  what you mean by "improper" and what the terms of
10  the agreement are, but I guess, in general, people
11  follow the contracts.
12         EQT tries to follow the -- the
13  language of -- of its contracts, whether it be
14  leases or purchase --
15     Q. Well --
16     A. -- agreements.
17     Q. -- okay. And -- grab the gas purchase
18  contract here. Hold on for a second.
19     DEPOSITION EXHIBIT NO. 4 (Confidential)
20         (Transaction Confirmation No.
21         07012012.0 was marked for
22         identification purposes as
23         Deposition Exhibit No. 4.)
24         MR. WINDOM: We'll mark this Exhibit

Page 64

1  4, please.
2         MR. HENDRICKSON: Thank you.
3      Q. Okay. Mr. Bergonzi, I'm going to hand
4  you what has been marked for identification as
5  Exhibit 4 to your deposition.
6         Have -- have you had a chance to
7  review that document?
8      A. I see it, yes. I --
9      Q. Have you ever seen it before?
10     A. I may have. This is signed after I left
11  the Company. I probably have seen it in passing.
12     Q. Okay. Had you seen similar documents
13  while you worked at EQT up until 2009?
14     A. Yes.
15     Q. Okay. And are these typical base
16  contracts or -- or contracts between EQT
17  Production and EQT Energy that you're aware of?
18     A. They look like it, yes.
19     Q. Okay. And as far as you know, would --
20  would this be the basis for the sale of natural
21  gas from EQT Production to EQT Energy, LLC, during
22  the time that -- that you were employed there?
23     A. Well, we --
24         MR. HENDRICKSON: Well, hold on.

ARNOLD L. RICHARDS, ET AL vs.
EQT PRODUCTION COMPANY

Case 1:17-cv-00050-IMK-MJA   Document 31-4   Filed 01/12/18   Page 17 of 27   PageID #: 859

JOHN BERGONZI
November 30, 2017

---

**Page 65**

1  This --
2       MR. WINDOM:  Okay.
3       MR. HENDRICKSON:  -- this contract
4  isn't.  I mean, he wasn't -- this is from 2012.  I
5  mean --
6       MR. WINDOM:  Right.  I'm asking him
7  if -- if these terms are -- are similar in -- in
8  the type of contract which would have been in
9  place at that time.
10      MR. HENDRICKSON:  If -- if he knows.
11 I mean --
12      MR. WINDOM:  If he knows.
13      MR. HENDRICKSON:  If you know.
14   A.  Well, without actually comparing them, I
15 see its applicable first of the month index price
16 to the interstate pipeline into which the gas is
17 delivered.
18      So you know, that's within what my
19 recollection of how it was done.
20   Q.  Okay.  Now, I will submit to you that
21 this has been delivered to me as the contract for
22 the gas purchased in this Case, okay, by EQT.
23   A.  From July 1st, 2012, on --
24   Q.  Right.  Yeah.

---

**Page 66**

1   A.  Uh-huh.
2   Q.  All right.
3       DEPOSITION EXHIBIT NO. 5 (Confidential)
4       (Base Contract for Sale and Purchase
5       of Natural Gas was marked for
6       identification purposes as
7       Deposition Exhibit No. 5.)
8       MR. WINDOM:  Now then, this'll be
9  Exhibit 5, please.
10      MR. HENDRICKSON:  Thank you.
11   Q.  And Mr. Bergonzi, I'm going to hand you
12 what has been marked for identification as Exhibit
13 5 to your deposition.
14   A.  Okay.
15   Q.  Have you reviewed that document?
16   A.  Yes.
17   Q.  Do you recognize that document?
18   A.  Well, yes, I do.
19   Q.  Okay.  Is your signature on that one?
20   A.  It is.
21   Q.  And when is that one dated?
22   A.  It is dated January 1st of 2005.
23   Q.  Now, there is a handwritten note at the
24 top of that that says Weston Equity; is that

---

**Page 67**

1  right?
2   A.  Okay.  Yes.
3   Q.  Is that your handwriting?
4   A.  It is not.
5   Q.  Okay.  I will submit to you that that was
6  provided in the documents that Weston Equity was
7  on the document that was provided to me.
8   A.  Okay.
9   Q.  That's not my handwriting either so --
10   A.  Yeah.
11   Q.  Do -- do you know what Weston Equity
12 might mean?
13   A.  I have a good idea, yes.
14   Q.  Okay.  What -- what do you believe it to
15 be?
16   A.  Well, I think -- I think that -- I'm
17 going to guess that's a sticky that was put on
18 this.  There were new agreements signed January
19 1st, 2005, for the different districts involved in
20 West Virginia.
21      In addition to Weston, there was a --
22 and probably still is a Brenton and a -- and a
23 Madison district.  And the gathering pipelines, at
24 one point, there was some discussion of separating

---

**Page 68**

1  pipelines, the gathering lines into equity
2  pipelines and non-equity pipelines.
3       I'm not sure that that separation
4  ever really exists today, but at least that was
5  the thought at the beginning.
6   Q.  Now, you had signed this document as the
7  assistant treasurer; is that right?
8   A.  Yes.
9   Q.  Of which EQT company?
10   A.  EQT Production Company.
11   Q.  Okay.  Now, that says Equitable
12 Production Company.  Was that the company that
13 then has evolved into EQT Production?
14   A.  I believe it is, yes.
15   Q.  Okay.  And then it has an Equitable
16 Energy, LLC, as the other party to that contract?
17   A.  Yes.
18   Q.  Is that the same as what is now EQT
19 Energy, LLC, to the best of your knowledge?
20   A.  Yes.
21   Q.  And who signed on behalf of Equitable
22 Energy, LLC?
23   A.  Phil Conti.
24   Q.  Is Phil Conti someone you worked with?

---

Page 69

1   A. Yes.
2   Q. And it says he is the assistant treasurer
3 for Equitable Energy, LLC.
4   A. Yes.
5   Q. What would your position have been with
6 Equitable Energy, LLC, in January 1st, 2005?
7   A. I -- I might have been an assistant
8 treasurer, an assistant secretary.
9   Q. Okay. And would Philip Conti have been
10 an assistant treasurer, an assistant secretary
11 with Equitable Production Company as well?
12   A. Yes.
13   Q. Now, this is a base contract for the sale
14 and purchase of natural gas. Is that what the
15 document is?
16   A. Yes.
17   Q. And what is -- what is this document
18 based upon? I mean, is -- is there -- is this the
19 only part of the contract, or is there more out
20 there?
21   A. Well, this is -- if you look at the very
22 bottom of this agreement, it says NAESB Standard
23 6.3.1, April 19, 2002. This is a standard gas
24 purchase contract as promulgated by this

Page 70

1 National --
2     I can't -- I can't tell you exactly
3 what the National Association stands for but -- or
4 what the NAESB stands for at this point, but it's
5 a standard setting organization.
6   Q. And the -- the NAESB -- the standard
7 NAESB agreement would then be incorporated herein
8 by reference?
9   A. Probably.
10   Q. Okay. Because it refers to special
11 provisions to the NAESB base contract on Page 2.
12   A. Uh-huh.
13   Q. And -- and that base contract is the base
14 contract for the purchase and sale of the natural
15 gas?
16   A. Yes.
17   Q. And then these provisions would alter
18 that base contract in some way?
19   A. Right.
20   Q. If you look at -- on Page -- it's EPC
21 Page 3. It's Page 2 of the -- the exhibit, but
22 it's Bates stamped down at the bottom --
23   A. Okay.
24   Q. -- EPC3. There's a Paragraph No. 5. Do

Page 71

1 you see that?
2   A. Yes.
3   Q. And it says: In Section 14 add as a new
4 section 14.12.
5   A. Yes.
6   Q. Can you tell me what was intended or --
7 or what you intended to be the basis for adding or
8 the purpose for adding that Section 14.12 to the
9 NAESB base contract?
10   A. I believe I can.
11   Q. Okay. What would -- what would that be?
12   A. EQT Corporation had a utility operation.
13 Utility operation sold gas at the retail level.
14 To maintain its status as an independent producer,
15 the gas sold between these companies couldn't be
16 sold to Equitable Gas and -- and sold to the
17 retail customers.
18     It had to go out of the system, and
19 that's the -- that's just an indication that --
20 that that was part of the terms of the agreement.
21   Q. Okay. So who was the -- the party that
22 was considered the utility, was it EQT Production
23 or EQT Energy?
24   A. Well, it -- this is EQT Corporation.

Page 72

1   Q. Okay. Just the Corporation --
2   A. If --
3   Q. -- in general?
4   A. Right. They file a consolidated return.
5 Everybody's a participant in that. The big value
6 to this is -- is to the production Company and --
7 and the Corporation as a whole.
8   Q. So -- and public service commissioner,
9 are they the ones that require this, or is it --
10 who -- I'm sorry. Who is the governmental entity
11 that --
12   A. The -- the --
13   Q. -- requires this?
14   A. Nobody requires it.
15   Q. Okay.
16   A. It's just to fulfill the -- this internal
17 revenue section to --
18   Q. Okay.
19   A. -- make sure that the Company stays in
20 compliance with that.
21   Q. Okay. And what is the internal revenue
22 code provision?
23   A. I --
24   Q. Do you have any idea about that?

1  A. Basically -- and again, this -- I mean, I
2  left the Company in 2010, but basically the
3  concept is that the Corporation couldn't sell the
4  gas it produced to the re -- at -- at the retail
5  level.
6       So EQT Energy needed to sell the gas
7  that was produced by EQT Production into the
8  stream of commerce. It could not go to EQT or
9  Equitable Gas Company.
10      And in fact, there were reasons --
11 other reasons for not wanting that gas to go to
12 Equitable Gas because of related party concerns at
13 the Public Utility Commission level.
14  Q. Okay. So -- so there were PSC -- we call
15 it PSC in West Virginia.
16  A. Uh-huh.
17  Q. Public Service Commission. So there were
18 PSC considerations in there as well?
19  A. Well, yeah. But this specific paragraph
20 is just addressing this section of the code.
21  Q. Now, if you go to EPC Page 7 --
22  A. Yes.
23  Q. -- okay, there's an Attachment 1 that
24 talks about the contract price.

1  A. Okay.
2  Q. It says applicable first of the month
3  index price, and is that the -- the price that you
4  were saying that was published out there in
5  various --
6  A. Yes.
7  Q. -- locations where you could find out
8  who's buying gas at what price?
9  A. Yes.
10  Q. And then it says: Less prevailing
11 gathering related charges. Do you see that?
12  A. Yes.
13  Q. And those are the gathering related
14 charges that you told me about before with
15 maintenance and -- and salaries and so forth?
16  A. Yes.
17  Q. Okay. And then it says retainage. What
18 is retainage?
19  A. Well, typically retainage is when gas is
20 delivered into an interstate pipeline.
21      Some of the pipelines say that,
22 because gas is lost in the -- in the pipeline,
23 that they will -- that if you put 100 Mcf -- or
24 100 dekatherms into that pipeline, you may only

1  have 98 dekatherms to sell because the movement of
2  that gas into the pipeline causes some retainage
3  amount.
4       And so the amount that somebody can
5  sell from the delivery into a pipeline isn't 100.
6  It's 98 or some -- some number.
7  Q. Now, if you look at the next portion
8  there, the last word is "seller."
9  A. Yes. I --
10  Q. And then it just ends.
11  A. Yes. I'm -- I'm not sure why that is.
12  Q. Okay.
13  A. I -- I don't know.
14  Q. You signed it but don't know why it was
15 -- why it was like that? Is there --
16  A. No, I don't.
17  Q. -- is there part of it missing?
18  A. I don't -- I don't -- I don't know.
19  Q. Okay.
20  A. I -- I don't know.
21      MR. WINDOM: Let's go off the
22 record. I need to use the restroom.
23      THE VIDEOGRAPHER: The time is 3:31.
24 We are now going off the record.

1       (A recess was taken, after which the
2  proceedings continued as follows:)
3           P R O C E E D I N G S
4       THE VIDEOGRAPHER: The time is 3:38.
5  We are now back on the record.
6  BY MR. WINDOM:
7  Q. Okay. Mr. Bergonzi, we're back on the
8  record now, and I'd like for you to look at
9  Exhibit 4. And I know that -- that that was
10 executed after you left EQT, but there's a term in
11 there I want to ask you about.
12      And if you look at the -- the
13 contract prices on the first page there --
14  A. Yes.
15  Q. -- in the middle --
16      MR. HENDRICKSON: Excuse me.
17  Q. -- it says -- it talks about the
18 gathering related charges and retainage. And then
19 it says: Less any other agreed applicable fees or
20 charges.
21      Do you remember in any agreements
22 that you signed having similar language?
23  A. I -- I can't say. I -- I -- not
24 specifically.

Page 77

1    Q. Okay. So you wouldn't know what those
2 applicable -- other applicable fees or charges
3 would even be, do you?
4    A. I mean, I -- no.
5    Q. Okay. I don't either so -- now, with
6 regards to these -- these particular contracts,
7 you would agree that -- that whatever that
8 contract price is set forth in these agreements --
9         And the contract price is based at
10 the gathering and so forth, but I think contract
11 price is set forth on -- on the agreement that you
12 signed on Page 7, EPC7. It's on Exhibit 5.
13    A. Yes.
14    Q. Okay. It's got that same other agreed
15 applicable fees or charges --
16    A. Okay.
17    Q. -- there. And do you know what those
18 applicable fees and charges would have been when
19 you signed that agreement?
20    A. No.
21    Q. Okay. That's pretty ambiguous. I don't
22 know if -- if there's a spreadsheet that would
23 show what those fees and charges would be.
24    A. Well, again, there's a -- a payment

Page 78

1 schedule, a wire transfer worksheet that EQT
2 prepares that it sends to the production Company
3 that would have any and all calculations on it.
4         So it would -- they would show up on
5 there.
6    Q. Who at EQT or EQT Production would have
7 to agree to those applicable fees or charges?
8    A. At the production Company?
9    Q. Yeah.
10    A. I'm -- I'm not sure. I'm going to guess
11 that would be at a fairly high level in the
12 production Company.
13    Q. And based upon this contract, you would
14 not expect that EQT Energy, LLC, would charge any
15 fees other than -- than what are agreed to in this
16 -- this contract price term on Page 7?
17    A. Yeah. This -- this contract that was
18 signed on January 1st of -- for January 1st of
19 2005 was not intended to change the calculation of
20 the proceeds that the production had gotten
21 previously, so this -- this would have been a
22 continuation of how the process was going prior to
23 that.
24         And you ask who would approve that.

Page 79

1 I -- I'm going to guess that -- that at -- back at
2 -- at some point in time, the head of those two
3 business units would have agreed upon it, because
4 basically their compensation would be based on the
5 performance of their business unit, and so, you
6 know, both would want to make sure they understood
7 how the calculation worked.
8         And again, this contract, when it was
9 signed in '05 - and I have no reason to think it
10 was different in '12 - was not intended to change
11 the process that was in place in December of 2004.
12         So it was already resolved at that
13 point what those costs were.
14    Q. But here -- nevertheless, there is this
15 term in there that says any other charges that we
16 want to add --
17    A. Yes.
18    Q. -- to it --
19    A. Right.
20    Q. -- as -- as long as they're agreed upon?
21    A. Right.
22    Q. Okay.
23         MR. WINDOM: Where are we, 6?
24         THE COURT REPORTER: 6.

Page 80

1         DEPOSITION EXHIBIT NO. 6
2         (Remittance Statement, Owner No.
3         255953, Check No. 1772696, was
4         marked for identification purposes
5         as Deposition Exhibit No. 6.)
6    Q. This is the November 16 royalty
7 statement. Okay. Mr. Bergonzi, I'm going to hand
8 you what has been marked for identification as
9 Exhibit 6 to your deposition here today.
10    A. Okay.
11    Q. And have you seen not that particular
12 document, but -- but a similar document before in
13 your tenure with EQT?
14    A. Yes.
15    Q. Okay. And -- and you recognize that as a
16 remittent statement for a royalty check?
17    A. Yes.
18    Q. And if you look at Page 2, that is
19 another remittent statement?
20    A. Yes.
21    Q. Okay. And I will submit to you that --
22 that the payees on those, Arnold R. Richards and
23 Mary L. Richards on -- on Page 2 and then Arnold
24 K. Richards on Page 1, are the plaintiffs in this

**Page 81**

1 Case.
2     A. Okay.
3     Q. Now, they have separate owner numbers,
4 but I understand from Kristy Toia that they just
5 sort of randomly assign owner numbers on leases
6 based upon the division orders.
7     A. She'd know.
8     Q. Okay. Now, these -- these royalty
9 statements are from the same month of production,
10 November of 2016.
11     A. Okay.
12     Q. Would you agree with that?
13     A. Yes.
14     Q. And I will submit to you that -- that
15 these leases -- and counsel for EQT has stipulated
16 this. These leases control the --
17     A. These leases.
18     Q. -- the terms -- these leases.
19     A. Uh-huh.
20     Q. They -- they control the -- the terms for
21 the horizontal wells, which are shown on Page 2 of
22 that exhibit, and those leases are held by the --
23 the wells that are identified on Page 1.
24     A. Okay.

**Page 82**

1     Q. Okay. That -- that these leases, of
2 course, are -- are more than 50 years old. Now, I
3 have some questions, and maybe as -- as someone
4 who was over top or over accountants at EQT, maybe
5 you can answer these for me.
6         What does net price mean, which is in
7 the third or fourth box over from of the left --
8         MR. HENDRICKSON: Again, I'm --
9     Q. -- on that remittent statement?
10        MR. HENDRICKSON: -- going to -- I'm
11 sorry. Go ahead and finish. Finish your
12 question. I apologize.
13        MR. WINDOM: I'm finished.
14        MR. HENDRICKSON: I'm going to
15 object to the question. He stated earlier that he
16 didn't deal with royalties or royalty statements.
17 He can look at it. If he can answer it, fine. I
18 don't think he probably knows.
19     A. Ask me the question again.
20     Q. Okay. This remittent statement, when --
21 when you worked at EQT in accounting --
22     A. Uh-huh.
23     Q. -- okay, you were familiar with the way
24 that these are prepared --

**Page 83**

1     A. Yes.
2     Q. -- is that correct?
3     A. Yes.
4     Q. And you're familiar with the data that is
5 included on this remittent statement, at least in
6 -- in general form?
7     A. Yes.
8     Q. Okay. And you understand the production
9 date, what that means?
10     A. Yes.
11     Q. And what does that mean?
12     A. That's the month that the gas was
13 produced from a particular well.
14     Q. Okay. And production type, what does
15 that mean?
16     A. Well, it -- it's gas. That's the --
17 apparently there's no oil in this well.
18     Q. Right. And if there was oil, then it
19 would say oil or --
20     A. I believe so.
21     Q. Okay. And then interest type, what does
22 -- or INT type. What does that mean?
23     A. Yeah. I think that stands for royalty
24 interest in this Case.

**Page 84**

1     Q. Okay. And then if it was perhaps a
2 non-participating royalty interest or an override,
3 it would have a different code, to your knowledge?
4     A. Yes.
5     Q. Okay. And then "net price," what does
6 that mean?
7     A. Yeah. I believe that's the price that --
8 that the -- that's calculated based on what the
9 proceeds that the production Company got related
10 to this well.
11     Q. Okay. So that net price would already
12 have the deductions taken out of it --
13        MR. HENDRICKSON: Object --
14     Q. -- correct?
15        MR. HENDRICKSON: If you know.
16     A. No.
17     Q. Okay. That would be -- what does "net
18 price" mean?
19     A. Well, I think some of the confusion on
20 this ends up being that -- that the -- the reason
21 that deducts show on here, even though we've
22 discussed the fact that, again, this is all at the
23 wellhead and there -- there are really no
24 deductions from the production Company.

Page 85

1    The reason you see deducts in -- in
2 some - and you don't see any on the first page,
3 but you do see them on the second page - is those
4 are the -- the deductions for gathering and
5 compression or for taxes.
6    The net price is -- I believe is the
7 -- the -- the revenues that are generated off of
8 that calculation at the -- at the interstate
9 pipeline connection -- connection.
10    But again, I think for a more precise
11 answer on that and a much fresher recollection,
12 Kristy would have been the person to ask that.
13    Q.  Okay.  So it's your belief, then, that --
14 that -- for instance, on the first page of that
15 exhibit, the $1.31, which is the top well --
16    A.  Yes.
17    Q.  -- that would be the -- either the spot
18 market price or the market price or the index
19 price for the gas that was sold from these wells?
20    A.  Yeah.  Yes.  That's -- I don't think
21 that's exactly right, because when -- you have to
22 take that price times the gas that's delivered
23 into that pipeline.
24    And if they're -- if they're getting

Page 86

1 paid for less than the total volumes, that's not
2 going to show up as the exact same number.
3    Q.  Okay.  When you say "if they're getting
4 paid for less than the total volumes" --
5    A.  Well, my recollection is -- and again,
6 this would be a better question for Kristy,
7 because I'd have to refresh my recollection
8 exactly how this works.
9    But my vague recollection is that in
10 a case like this - let's say we talked about 100
11 dekatherms being delivered to the pipeline - you
12 can only sell some other number.  Let's say 98
13 dekatherms.
14    So if you took the -- the -- to
15 calculate the -- the amount that they're going to
16 get, you're going to take the proceeds at the spot
17 price, and then you're going to push that back to
18 the wellhead volume, which is going to be a
19 different number.
20    Q.  Okay.  So -- so the $1.31 price, which is
21 listed here, is the net price?
22    A.  Right.
23    Q.  Okay.  What does "net" mean?  Explain to
24 me, because I'm -- I'm concerned -- that doesn't

Page 87

1 say gross price.  It says net price.  What does
2 "net" mean?
3    A.  Yeah.
4    MR. HENDRICKSON:  I'm going to
5 object to the question.  Go ahead and answer.
6    THE DEPONENT:  Go ahead.
7    A.  As I -- as I said, I think at this point,
8 I'm a little hazy on this.  I think it's a more
9 appropriate question for Kristy.
10    But basically you're going to take
11 the production from each well, and you're going to
12 add all those productions together.  And then
13 you're going to take the proceeds of all the gas
14 that's delivered to the pipeline, and you're going
15 to take the spot price of that times what's
16 sellable at that -- at that pipeline.
17    And then you're going to prorate it
18 back to each individual well, and just because
19 they produced a dekatherm at the wellhead, or an
20 Mcf at the wellhead, doesn't mean that that's
21 going to make it --
22    If I take all of the wells that are
23 behind that delivery point to the interstate
24 pipeline connection, I'm not going to be able to

Page 88

1 take all those numbers and add them up to the same
2 number that got delivered into the pipeline, and
3 then that's available to sell at the pipeline.
4    Q.  Because there -- there's a loss factor.
5    A.  There's loss, and so that number's being
6 pushed back to their proportion share of the
7 proceeds that were determined at the inter --
8 interstate pipeline connection.
9    So their -- that's a calculation of
10 their portion of that number that was bought by
11 EQT -- or sold by EQT Energy at that spot price.
12    Q.  Okay.  And does that also count for the
13 volumes, then, if the volume would be decreased,
14 because we got a gross volume and an owner volume?
15    A.  Well, the gross volume, I think, is -- is
16 the well's volume, and the owner -- or the royalty
17 volume is their portion of that.  So I think if
18 you take the 1,832 and multiply it by .125, you'll
19 get 229, although I can't do that in my head.
20    Q.  Right.  I understand.  Neither can I.
21    So the -- the volumes, though, would
22 be what was shown -- the -- the 229 there on the
23 owner volume, that would be the volume that was
24 sold at the liquid point, or would that be the

Page 89

1 volume that was sold at the meter?
2    A. That's the volume at the wellhead.
3    Q. That's the volume at the wellhead?
4    A. Right. That -- that's, again, my
5 recollection.
6    Q. Okay. Now then, these are -- are older
7 wells, the vertical wells, and it was your
8 testimony earlier, I believe, that the older wells
9 sort of have --
10       And a price per Mcf deduction would
11 be higher, because they're older lines and more
12 maintenance and so forth; is that right?
13    A. Right. But I was talking about the --
14 the numbers that show up on this other remittance
15 advice.
16    Q. Okay. But -- but --
17    A. Because I don't see them on -- on this
18 first one.
19    Q. Right. There are -- you would agree that
20 there are no deductions shown here?
21    A. Right.
22    Q. Okay. And they're from the same lease?
23 The -- the same lease controls all these wells?
24    A. Okay. I -- I'm -- I don't know.

Page 90

1    Q. Okay.
2    A. I don't know anything about this specific
3 lease --
4    Q. Okay.
5    A. -- why one would have deductions and one
6 doesn't.
7    Q. Does that seem odd?
8    A. It's -- I --
9       MR. HENDRICKSON: I'm going to
10 object to that. I mean, he -- again, we told you
11 before you took his deposition he -- he hasn't
12 done any work to prep for this.
13       MR. WINDOM: That's fine.
14       MR. HENDRICKSON: We offer --
15       MR. WINDOM: If he doesn't know, he
16 can say he doesn't know.
17       MR. HENDRICKSON: Well, let me
18 finish my objection.
19       We offered to let him prep and look
20 at the information before you took his deposition.
21 I don't think it's fair to come in here and ask
22 him a bunch of questions about stuff that he
23 obviously hasn't looked at or reviewed --
24       MR. WINDOM: And --

Page 91

1       MR. HENDRICKSON: -- prior to this,
2 but go ahead.
3       MR. WINDOM: And my statement to you
4 was: If he says he doesn't know, then he doesn't
5 know and --
6       MR. HENDRICKSON: Okay.
7 BY MR. WINDOM:
8    Q. Okay.
9    A. It -- yeah. I -- I don't know.
10    Q. Okay. Would you expect all wells on a
11 lease, if they say they're market price, to
12 be treated the same as -- in terms of how the gas
13 is sold, how the -- it's measured, and then what
14 the deductions are?
15    A. Well, absent some other agreement, I -- I
16 would normally expect that. Again, this was -- a
17 question like this would have been more
18 appropriate to Kristy. She might be able to give
19 some insight into why that would happen.
20       Somebody in land admin is -- is going
21 to be the person that determines which wells get
22 deductions and which don't, which owners get
23 deductions and which don't. I'm assuming there's
24 some kind of reason for that --

Page 92

1    Q. Okay.
2    A. -- some agreement here somewhere for
3 that.
4    Q. So in -- in the first page of Exhibit 6
5 here, if for the last 50 years there were no
6 deductions taken from the oil and gas royalties
7 and then all of a sudden there were, you would
8 expect some writing from the oil and gas owner?
9       Or would you expect some sort of an
10 agreement from the oil and gas owner to be in
11 place to allow for that?
12    A. Well, somebody made a change or felt that
13 there was something different going on there, but
14 somebody needs to look at this file, whether that
15 be somebody in -- excuse me, in Kristy's group,
16 which is gas revenue, or over in land admin.
17       I'm assuming there's -- if this were
18 researched, somebody would have an explanation for
19 that.
20    Q. Okay. And you say someone needs to look
21 at this file. Should there be a separate file for
22 that particular either owner or lease in -- in
23 your experience working at EQT?
24    A. There's information -- any document

**Page 93**

1 that's generated from -- for any lease or any well
2 is going to show up in a -- in a file somewhere.
3    Q. Okay. Electronic file or paper file?
4    A. Well, all files are electronic now,
5 although some of them are back -- still backed up
6 by paper.
7    Q. But you would expect there to be a file
8 for this -- these wells or these owners?
9    A. I would expect that somebody would have
10 an explanation for that.
11    Q. Do you know the -- the software system
12 which contains the files to which you reference?
13    A. DocuSphere.
14    Q. DocuSphere?
15    A. DocuSphere or Enertia. Enertia's the
16 system that revenue accounting is generated
17 through, and DocuSphere is a repository for all
18 the paper documents.
19    Q. Okay. Does that include emails and
20 things like that as well?
21    A. Yes.
22    Q. Would they be in DocuSphere?
23    A. Yes. They should be.
24    Q. Do you know what the -- the retention

**Page 94**

1 policy is for EQT with regards to Corporate
2 emails?
3    A. I don't.
4    Q. Do you know if they're saved somewhere on
5 -- on a server or if they are somehow preserved?
6    A. I believe they are. I -- I don't really
7 know. Again, I -- I left in 2010, so what they've
8 done since then -- some of it I've reviewed for
9 different things that I've done for them, and
10 other things I have not.
11    Q. Can we agree that it is improper for an
12 oil and gas company as a lessee to pay the oil and
13 gas owner as a lessor a royalty that is less than
14 the lease specifies?
15    MR. HENDRICKSON: Object to the
16 question. Go ahead and answer if you can.
17    A. Yeah, I -- I wouldn't say the -- the way
18 you use the word "improper." The Company tries to
19 follow the language of leases to the best of its
20 ability.
21    Q. When you say they try to follow the --
22 the language of the leases, is there somebody that
23 interprets these leases?
24    A. Somebody looks at them in land admin, and

**Page 95**

1 I think they get some guidance from the -- the
2 legal group as to what is appropriate and makes --
3    Q. How often -- okay, I'm sorry. I didn't
4 mean to interrupt.
5    A. Well, go ahead.
6    Q. How often do they review these files?
7    A. Well, I think that the files -- the
8 leases are reviewed as they're entered. Some of
9 these files -- and -- and as you pointed out, EQT
10 is not the -- isn't a named party on any of these
11 leases.
12    Some of these leases go back a way
13 and were -- I'm going to guess all these leases
14 came to EQT through the acquisition of Eastern
15 States Oil and Gas Company, and EQT would have
16 followed the process that was in place when --
17 when they were acquired, absent some reason to
18 review them.
19    And -- and some are reviewed at
20 random periodically. Others are reviewed because
21 a landowner will call in and ask for it. Others
22 are reviewed on a random basis.
23    I don't know that there's any -- to
24 my knowledge, there's no prescribed period that a

**Page 96**

1 release be reviewed or every document be reviewed
2 on a periodic basis. There are a lot of leases.
3    Q. I'm sure, and they're getting more and
4 more everyday, right?
5    A. Well, in particular, again, if you look
6 at a lease -- and I don't know this lease from
7 Adam, but this -- this lease is, what, 60, 70
8 years old?
9    Typically in a circumstance like
10 this, it gets passed onto the next generation, and
11 two or three owners own that 1/8th and then two or
12 three owners own that 1/8th. And so these files
13 get pretty -- can -- can get pretty voluminous as
14 to who the owners are and the ownership percentage
15 is smaller and smaller.
16    So it's -- it can be difficult.
17    Q. In this Case, I think if you look at the
18 -- the royalty statement, my clients actually own
19 the entire 1/8th, though.
20    A. Yeah, it -- it looks like it.
21    Q. Okay. So the -- the gas that is sold is
22 sold based on the thermal content; is that right?
23    A. Yes.
24    Q. And -- and I know that you don't have any

Page 97

1 working knowledge as to what the thermal content
2 is on -- on these particular wells.
3          But my question is:  When you look at
4 the -- the price, which is on Exhibit 6, and it
5 shows $1.31, $1.32, $1.33, that would be a -- a
6 price which is based upon what?
7          Is it based on the thermal content,
8 or is it based on volume?
9     A.  Well, the original calculation's going to
10 be based on the thermal content, because it's --
11 that's how EQT Energy pays it.  I can't recall
12 whether this number is actually a volumetric
13 number or a dekatherm number.  I -- I just don't
14 remember off the top of my head.
15          But basically, either way, it's --
16 it's corrected for that.
17     Q.  Okay.  And it would be the same with Page
18 2 where the prices are a straight $1.34 down the
19 page?
20     A.  I believe so.
21     Q.  Okay.  And those -- those prices are two
22 or three pennies apart from the price that was
23 paid for the wells on the first page of that
24 exhibit?

Page 98

1     A.  Yes.
2     Q.  Okay.  And if these are horizontal wells
3 on Page 2, which they show as H1, H2 through H6,
4 we would believe that and the volumes to be
5 horizontal wells, correct?
6     A.  Okay.
7     Q.  The -- the horizontal wells would not be
8 sold through the same pipeline or through the same
9 meters as the vertical wells; is that correct?
10     A.  Right.  Typically the Marcellus gas is --
11 goes into a separate high pressure pipeline and
12 may actually be a different liquid trading point.
13     Q.  And the price that is paid on -- on Page
14 2 has deductions -- owner deductions which are set
15 forth -- the -- the -- total, I believe, on -- on
16 that check, the owner deducts are $4,847.27; does
17 that sound right?
18     A.  Yes.
19     Q.  Okay.  But there were no deductions for
20 that same time period at all on -- on Page 1?
21     A.  Yeah.  And again, the -- the fact that
22 it's a Marcellus well versus a horizontal, I'm
23 just not familiar enough with the -- with what
24 kind of agreements may be in place for that.

Page 99

1     Q.  Let me ask you this:  In your experience,
2 there's a lot of money in these -- these Marcellus
3 wells?
4     A.  Yes, there is.
5     Q.  And when there's a lot of money versus
6 when there's just a little bit of money on the
7 ones on the front, I mean, relatively speaking, it
8 is easier to recoup expenses from a royalty owner
9 who's getting a large check?
10          MR. HENDRICKSON:  I'll object to the
11 question.
12     Q.  You would agree?
13     A.  I don't even -- and I don't quite
14 understand what you're saying --
15     Q.  Well --
16     A.  -- there.
17     Q.  -- if -- if an oil and gas owner is
18 getting a small check and gets a portion of it
19 taken out for expenses, they can sometimes raise
20 Cain.
21          But when you're getting a $9,000
22 check and they take a little bit out, it's a
23 little bit easier maybe for the oil and gas owner
24 to swallow?

Page 100

1          MR. HENDRICKSON:  Object to the
2 question.  You can answer if you can.
3     A.  My experience in the time that I worked
4 at EQT is that we didn't make a determination
5 based on whether the -- the person would object or
6 not.  We would -- it was the Company's policy to
7 follow what the lease language said.
8     Q.  And that -- and that's the Company -- as
9 you know, that would be the Company policy when
10 you left in 2010?
11     A.  Right.
12     Q.  Okay.  Do you know if that's still the
13 Company policy today?
14     A.  I suspect that it is.
15     Q.  And it's important to follow what the
16 lease says?  I mean, right?  It's a legal --
17 legally binding contract, correct?
18     A.  Somebody's made a determination.  I -- I
19 can't say -- I'm not sure what you're asking me.
20 The -- the Company --
21     Q.  It -- let me put it this way:  It's
22 important to follow the terms of a legally binding
23 contract.  You would agree with that?
24     A.  I would agree that the Company will

Page 101

1 follow what it believes is the appropriate law in
2 the matter.
3      Q. I'm sorry?
4      A. I said the Company would follow whatever
5 the -- the appropriate legal position is on that.
6      Q. And who determines what the appropriate
7 legal position is on that?
8      A. Well, I think the law department would --
9 would provide that.
10      Q. And that's the law department at EQT?
11      A. Yes. I -- I don't know what else you're
12 asking me. That's --
13      Q. What I'm asking you is: For 50 years no
14 deductions have been taken out of oil and gas
15 royalties on Mr. -- Mr. Richards' lease.
16      A. I --
17           MR. HENDRICKSON: I object. We've
18 gone over this time and time again. I mean, if
19 you've got other questions, why don't -- can you
20 get to them, please?
21      A. I don't know.
22      Q. Okay.
23      A. I don't know. I don't know anything
24 about this specific lease. You're just trying to

Page 102

1 make me speculate.
2      Q. I don't want you to speculate.
3           How does EQT -- when you worked for
4 EQT, how do they determine whether or not it was
5 proper to take severance taxes out of royalty
6 payments?
7      A. Again, there would have been -- that
8 would be determined by somebody in the land admin
9 based on guidance from the legal department. I --
10 I think different states are different in what's
11 appropriate.
12           And of course, the -- the language of
13 a specific lease would -- would be determinate
14 also.
15      Q. And if the lease were silent as to
16 severance taxes, what was in -- in 2009 when you
17 left EQT, what was the position with regards to
18 whether or not it was proper to take those?
19      A. I don't recall offhand, and I think it
20 would be different in each state and there would
21 be guidelines that the land admin folks would have
22 based -- for that.
23           And -- and I just don't remember
24 offhand what they were.

Page 103

1      Q. So if a lease said to take it, it's okay
2 to take it? If it doesn't take it, then it
3 depends on what the legal department says?
4      A. Right. The law for that state is.
5      Q. Did you all keep copies of the NAESB, or
6 N-A-E-S-B, base contracts at EQT?
7      A. I'm -- I'm going to guess we did. I -- I
8 don't have them.
9      Q. Okay.
10      A. I didn't have them.
11      Q. I'd asked for the contracts that -- that
12 governed the sale of the oil and gas in this Case
13 or the -- I'm sorry, the gas in this Case. What
14 was provided to me were the -- the two contracts,
15 Documents 4 and 5 that -- that you have in front
16 of you, and I was never provided the -- the NAESB
17 base contract.
18           Would you expect EQT to have copies
19 of those in files somewhere?
20      A. Well, I -- I'm going to guess somebody in
21 EQT Energy had those. These are contracts that
22 not only EQT Energy and EQT Production entered
23 into, but EQT entered into with other parties.
24           So I'm -- I -- I'm going to guess

Page 104

1 that, at least at one point, they had the standard
2 contract that supports this or somebody understood
3 what the -- any supporting information was.
4      Q. Well, you were -- you signed Exhibit 5,
5 correct?
6      A. I did.
7      Q. And that references the NAESB base
8 contract?
9      A. Yeah. I think this actually is a form
10 that is -- I think this is -- I think if you look
11 at this, this page is NAESB Standard 6.3.1.
12      Q. Okay. And --
13      A. Now, I'm sure these folks have some
14 additional information and literature that
15 supports that, and I would -- North American
16 Energy Standards Board, Inc. --
17      Q. Okay. Well, look at --
18      A. -- is --
19      Q. -- look at Page 3.
20      A. The numbered Page 3 --
21      Q. Yeah. Yeah.
22      A. -- which is --
23      Q. I'm sorry.
24      A. -- Page --

Page 105

1  Q. ESP3.

2  A. Okay.

3  Q. Or EPC3. When you look at the Paragraph
4  No. 1, it says: In Section 2.17 insert "under
5  Section 11.3." Can you show me where, Section
6  2.17, "under Section 11.3," that would be inserted
7  in -- in this document?

8  A. No. Not on the pages that I have here.

9  Q. Okay. Well, these were the only pages
10 that were provided to me, so there's obviously
11 something else out there, correct?

12 A. Right.

13 Q. Okay. And it's the same with Paragraph
14 No. 2 that says in Section 10.3. There -- there
15 is no Section 10.3 in that document?

16 A. Right.

17 Q. And --

18 A. Well, Section 10.3 -- there's a 10.3.1
19 and a 10.3.2 here, but I -- I take your point.

20 Q. Do you remember actually signing off on
21 the base contract itself, a separate document?

22 A. No.

23 Q. Okay. But you wouldn't have signed this
24 document inserting paragraphs into another

Page 106

1  document without at least reviewing that other
2  document, I'm presuming, right?

3  A. I might have, yes. And the reason I say
4  that is because if you look at this other
5  document, you'll see there's an attorney's
6  signature on the --

7  Q. And you're on Exhibit 6?

8  A. Exhibit 4.

9  Q. I'm sorry, Exhibit 4?

10 A. Right. So basically I've already told
11 you I would not have been the person that -- that
12 negotiated this contract.

13    I -- I would have been an officer
14 duly authorized to bind the Company for that, and
15 I would not have -- I would not have studied the
16 details in this standard contract.

17 Q. So -- so you're -- you're the officer
18 binding a Company, and you're not going to read?
19 You're -- you're just going to let somebody stick
20 it under your nose --

21 A. I just --

22 Q. -- and say, "Here" --

23 A. -- told you that.

24 Q. -- "Here, sign this and bind the

Page 107

1  Company"?

2  A. Yes.

3  Q. Okay. Fair enough.

4     MR. WINDOM: I've got no further
5  questions.

6     MR. HENDRICKSON: We want it again.
7  We'll read.

8     THE VIDEOGRAPHER: The time is 4:12.
9  We're now going off the record. This concludes
10 the deposition.

11    (Having indicated he would like to
12 read his deposition before filing, further this
13 deponent saith not.)

14    ---oOo---

15

16

17

18

19

20

21

22

23

24

Page 108

1  STATE OF WEST VIRGINIA,
2  COUNTY OF RITCHIE, to wit;
3
4     I, David A. Absher, a Notary Public
   within and for the County and State aforesaid,
5  duly commissioned and qualified, do hereby certify
   that the foregoing deposition of JOHN BERGONZI was
6  duly taken by me and before me at the time and
   place and for the purpose specified in the caption
7  hereof, the said witness having been by me first
   duly sworn.
8
   I do further certify that the said
9  deposition was correctly taken by me in shorthand
   notes, and that the same were accurately written
10 out in full and reduced to typewriting and that
   the witness did request to read his transcript.
11
   I further certify that I am neither
12 attorney or counsel for, nor related to or
   employed by, any of the parties to the action in
13 which this deposition is taken, and further that I
   am not a relative or employee of any attorney or
14 counsel employed by the parties or financially
   interested in the action and that the attached
15 transcript meets the requirements set forth within
   article twenty-seven, chapter forty-seven of the
16 West Virginia Code.
17    My commission expires April 9, 2024.
   Given under my hand this 30th day of November,
18 2017.
19    _____
   David A. Absher
20
21
22
23
24

Official Seal
Notary Public, State of West Virginia
David Absher
Realtime Reporters
536 7th Street
Huntington WV 25701
My commission expires April 9, 2024