**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG DIVISION**


**ARNOLD K. RICHARDS and**
**MARY L. RICHARDS, his wife,**

 **Plaintiffs,**

**v.**                                                                    **Civil Action No.  1:17-CV-50-IMK**

**EQT PRODUCTION COMPANY,**
**A Pennsylvania Corporation,**

 **Defendant.**


**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR  PARTIAL SUMMARY JUDGMENT**

**I.        INTRODUCTION**

<u>A.      *Undisputed Facts:*</u>

> **1.      Plaintiffs are the owners of the oil and gas within and underlying three**
> **(3) leasehold estates operated by EQT Production Company.**

The Plaintiffs herein, Arnold K. Richards and Mary L. Richards (collectively referred to as

"Richards" or "Plaintiffs") own the oil, gas and minerals within and underlying three parcels of

real estate situate in Union District, Ritchie County, West Virginia, containing 74 acres, *more or*

*less*, situate on the waters of Rock Camp Run; 92 acres, *more or less*, situate on the waters of Rock

Camp Run; and, 98 acres, *more or less*, situate on the waters of Rock Camp Run, respectively.


The lot, tract or parcel of real estate said to contain 74 acres, *more or less*, was originally

leased between A.H. Hodge, et ux., as lessor, to J.E. Richards as lessee, by oil and gas lease dated

December 1, 1951, of record in the office of the Clerk of the County Commission of Ritchie County, West Virginia, in Lease Book 80 at page 449.   Thereafter, by ***Amendment and Ratification of Oil and Gas Lease*** dated September 4, 2014, of record in the said Clerk's office in Lease Book 277 at page 949, Richards and EQT Production Company ("EQT" or "Defendant") entered into an agreement to modify the existing 74 acre, *more or less*, lease to allow for pooling and unitization in order to develop the oil, gas, non-gaseous liquids and other products from the Marcellus Shale within and underlying the subject acreage.

The lot, tract or parcel of real estate said to contain 92 acre, *more or less*, was originally leased between Ruby Dotson, et al., as lessor, to J.E. Richards as lessee, by oil and gas lease dated December 5, 1951, of record in the office of the Clerk of the County Commission of Ritchie County, West Virginia, in Lease Book 80 at page 445.   Thereafter, by ***Amendment and Ratification of Oil and Gas Lease*** dated September 4, 2014, of record in the said Clerk's office in Lease Book 277 at page 973, Richards and EQT entered into an agreement to modify the existing 92 acre, *more or less*, lease to allow for pooling and unitization in order to develop t the oil, gas, non-gaseous liquids and other products from the Marcellus Shale within and underlying the subject acreage.

The lot, tract or parcel of real estate said to contain 98 acre, *more or less*, was originally leased between Pearl Hutchinson, et al., as lessor, to J.E. Richards as lessee, by oil and gas lease dated December 5, 1951, of record in the office of the Clerk of the County Commission of Ritchie County, West Virginia, in Lease Book 80 at page 447.   Thereafter, by ***Amendment and Ratification of Oil and Gas Lease*** dated September 4, 2014, of record in the said Clerk's office in

Lease Book 277 at page 973, Richards and EQT entered into an agreement to modify the existing 98 acre, *more or less*, lease to allow for pooling and unitization in order to develop the oil, gas, non-gaseous liquids and other products from the Marcellus Shale within and underlying the subject acreage.

It is undisputed that all three of the above-described leases have the following royalty provision:

> *"In consideration of the Premises the said party of the second part, covenants and agrees: 1st-to deliver to the credit of the Lessors, their heirs or assigns, free of cost, in the pipe line to which the Lessee may connect the wells…the equal one-eighth (1/8) part of all oil produced and saved from the leased premises; and second, to pay…one-eighth (1/8) of the market price of the gas from each and every gas well drilled on said premises, the product from which is marketed and sold off the premises, said gas to be measured by a meter."*

It is also undisputed that each of the three leases further provide as follows:

> *"…[I]f 'casing head gas' (being gas produced from oil wells) or any part thereof should be marketed and sold by said Lessee, said Lessors shall receive one-eighth of the market price of the gas and other by-products so marketed and sold."*

EQT is the successor in interest of the lessee, J.E. Richards, through various *mesne* conveyances of each of the three subject oil and gas leases.  EQT operated and produced several vertical wells on the subject leasehold estates, including the A.K. Richards and Ruby Dotson Wilson wells for which Plaintiffs (and their predecessors) have received royalty—without deduction for post-production or any other costs—since the vertical wells were drilled.

In or about 2016, EQT drilled several horizontal Marcellus Shale wells on the Pullman 96 pad—identified or referred to as "PUL96"—situate on the Wilma Wilson farm in Union District,

3

Ritchie County, West Virginia, and pursuant, in part, to the leases and modifications set forth above.  There are six (6) horizontal Marcellus shale wells drilled on the PUL96 pad for which the Plaintiffs' leases have been pooled and unitized.  Those wells are identified as **PUL96H1** (API #47-085-10219), **PUL96H2** (API #47-085-10207), **PUL96H3** (API #47-085-10220), **PUL96H4** (API #47-085-10217), **PUL96H5** (API #47-085-10211), and **PUL96H6** (API #47-085-10218). All of these particular wells produce oil, gas and/or by-products from one or more of subject three (3) leasehold estates previously described herein.

   2.    **EQT (by and through its wholly owned subsidiary, EQT Energy, LLC) has deducted post-production costs from the Plaintiffs' gross royalty payments using a "Work-back" method and thereby breached the express and implied terms of the lease.**

   Prior to the six horizontal Marcellus Shale wells being drilled under Richards' leasehold estates, older, shallow, vertical wells had been drilled thereon which produced oil and/or gas since the 1950's.  As stated above, EQT owned a number of these old, shallow, vertical wells and produced the same, paying a royalty to the Plaintiffs that was based upon the contractual royalty rate of one-eighth (1/8) of the market price for the sale of both oil and gas[1].

   Thereafter, in November, 2016, EQT also began paying royalty to the Plaintiffs for the production of oil and gas from the horizontal Marcellus Shale wells that were drilled under the Richards' leasehold estates—or for those wells that were drilled in the units that incorporated the

---

[1] The Defendant claims to have recently sold a number of these vertical wells.  During discovery, EQT provided a summary of the well production through September, 2017, and that summary shows that EQT still owns the following vertical wells: AH Hodge #1; Ruby Wilson #2; and, AK Richards R20.  *See* EQT production summary attached hereto as "Exhibit 1".

Plaintiffs' leasehold estates.[2]   However, the one-eighth (1/8) royalty for the horizontal wells was proportionately reduced by post-production costs that were calculated into the price paid for the gas[3] using the "work-back" method discussed *infra*.

During her deposition, Kristy Toia, Director of Revenue Accounting at EQT, testified that EQT Energy, LLC, ("EE") purchases EQT's gas at the wellhead and pays a price on either a dekatherm or MMbtu, which is dictated by where the gas is delivered in the interstate pipeline.[4] EE then delivers and sells the natural gas volumes into the interstate pipeline of the purchaser at a price that is based upon a "[f]irst of the month index price."[5]   Ms. Toia also stated that that, although it depends on where the gas is delivered to the interstate pipeline, most of EQT's Marcellus Shale gas is sold to a purchaser identified as "M2" (also purportedly known as "Texas Eastern" or "TETCO").[6]

Ms. Toia further testified that when royalty payments are made, EQT uses a software system called "Enertia" that makes the royalty calculations based upon data that is entered from various departments within EQT.   Included in the data that is entered into the "Enertia" system are

---

[2] The unitization of leasehold estates pays the oil and gas owners their proportionate share of royalty (i.e. one-eighth) of the entire unit's production, but which is based upon their individual percentage of leasehold acreage (net mineral acres) that each owner has in the entire unit.   Thus, as an illustration, an oil and gas owner with a one-eighth (12.5%) royalty lease, and who owns 10% of a unit's total oil and gas acreage, should receive 12.5% of 10% (for an equivalent 1.25%) of what all the wells in that unit produce over a given period of time.

[3] *See* royalty statements for November, 2016, production from the subject leaseholds attached hereto as "Exhibit 2" and "Exhibit 2", respectively).   The vertical wells (Exh. 2) show no post-production costs from the royalty.   However, the "PUL96" horizontal Marcellus wells (Exh. 3) show that deductions were taken from the Plaintiffs' royalty generated during that same month.

[4] *See* Kristy Toia Depo. (attached hereto as "Exhibit 4"), 80:5-9.

[5] *Id.* at 34:24.

[6] *Id.* at 36:2-14.

expenses for both gathering charges and getting the gas to market.[7]  These charges vary depending on what EE charges EQT but the amount also includes severance taxes[8] as well as amounts for compression, operating and maintenance charges, as well as an "allocated general and administrative cost component which is comprised of accounting, engineering, and labor costs of the EQT planning groups.[9]  Ms. Toia explains that these allocated general administrative costs include salaries, expenses associated with "having an office" and "just in general labor."[10]  In addition, Ms. Toia admitted that these royalty deductions include pipeline repairs and maintenance, compressor repairs, compressor maintenance and property taxes.[11]

      In essence, EQT claims not to take deductions directly from the Richards' oil and gas royalty.  Instead, it sells the gas at the wellhead to it's wholly owned subsidiary, EE.  EE then sells the gas on the open market to a willing third-party in an arms-length transaction.  However, the price paid to EQT by EE has already included these significant (and rather hefty) post-production costs into the value of the gas using the "work-back" method.[12]

      **3.**    **EQT admittedly does not pay royalty on extracted by-products, including non-gaseous liquids, and has thereby breached the express and implied terms of the lease.**

---

[7]  *Id.* at 48:7-13.

[8]  *Id.* at 48:14-20.

[9]  *Id.* at 139:18-140:14.

[10] *Id.* at 141:4-14

[11] *Id.* at 142:7-143:6.

[12] The U.S. District Court for the Southern District of West Virginia has already found that EQT's "work-back" method of incorporating the post-production costs in the price of intra-company wellhead sales is an improper way to calculate royalties in these cases.  See *W.W. McDonald Land Co. v. EQT Prod. Co.*, 983 F. Supp. 2d 790, 804 (S.D.W. Va. 2013), opinion clarified (Jan. 21, 2014).

It is undisputed that EQT has not paid Richards for by-products, including non-gaseous liquids ("NGLs") from these six horizontal Marcellus shale wells.  Regarding EQT's refusal to pay royalties for the "NGLs" from Richards' leases, Ms. Toia testified as follows:

"*Q. How are NGLs calculated by the revenue department or the accounting department?*

*A. Those are paid to EE, so [EQT] does not record any sort of revenue generated from NGLs.*

*Q. Okay.  So EQT Production gets no revenue from NGLs?*

*A. No. Those revenues belong to EE.*

*Q. When EE gets profits from NGLs, do you know who those are paid to?*

*A. EE.*

*Q. And EQT is the owner of EE?*

*A. Correct.*"[13]

Ms. Toia further testified:

"*Q. Okay. So you see the EE statement?*

*A.  Yes.*

*Q.  And you know that EE gets paid for NGLs?*

*A. Correct…*

*Q. EQT Production Company does not get paid, but you see the EE statements that come in?*

*A. Yes…*

*Q. Who pays EE for NGLs?*

*A. So West Virginia, we have MarkWest that processes liquids for EE, and also Williams.*

*Q. And does MarkWest send a monthly statement to EE for NGLs?*

*A. Yes.*

*Q. Okay. And does Williams do the same?*

*A. Yes.*

---

[13] *Toia Depo.* at 56:12-23.

*Q. Ultimately, if EQT Energy, LLC, makes a profit at the end of the year, do you know where that money goes?*

*A. No. I mean, it's Corporate.  To the Corporation, I would assume.*

*Q. You say it goes to the Corporation?*

*A. EQT Corporation.*"[14]

EQT claims to pay royalty on the by-products by actually paying royalties on the higher BTU content of the natural gas before removing the byproducts from the gas.  However, the Plaintiffs are not receiving the "market price" for the NGLs and that is contrary to the terms of the oil and gas leases in this matter which specifically state:

> *"...[I]f 'casing head gas' (being gas produced from oil wells) or any part thereof should be marketed and sold by said Lessee, said **Lessors shall receive one-eighth of the market price of the gas and other by-products so marketed and sold**."* (Emphasis added).

Moreover, because they cause the natural gas to burn hotter, these by-products must be extracted from the natural gas at a processing plant before the lower MMbtu gas (mostly methane) is sold into the interstate pipeline.  John Bergonzi, a retired accountant from EQT who still does consulting work for the company, testified about these by-products as follows:

*Q. And then it also talks about – about byproducts.  In the next sentence down, it says 1/8th part of the market price of the gas and other byproducts so marketed and sold.*

*A. Okay.*

*Q. Do you see that?*

*A. Yes...*

*...Q.  ...What kind of byproducts are marketed and sold from oil and gas leases, to -- to your knowledge and information?*

*A. Well, the -- in addition to -- to oil, sometimes gas is -- is -- got some heavier hydrocarbons in, and in some cases, those are just left in the stream. In other cases,*

---

[14] *Id.* at 57:13-58:24.

*they're extracted from the stream and sold separately to make the gas eligible for interstate pipeline…*

*…Q.   …So who does the separation of the heavy hydrocarbons?*

*A. Well, normally my -- my recollection is that EQT Energy or EQT Gathering - I'm not really sure which - has a third party process the – the gas and exact some of those heavier hydrocarbons and sell those separately.*

*Q. Okay.  When you say heavy hydrocarbons, what are you talking about?*

*A. Well, natural gas -- what we think of as natural gas is methane –*

*Q. Uh-huh.*

*A. -- which -- and I certainly am not a chemist or scientist, but those have -- are a lighter hydrocarbon.  And there are other hydrocarbon streams in there that have more -- that are heavier and more liquid - ethane, butane, propane - and those can be extracted out and sold separately, sometimes for more, sometimes for less.*

*Q. And you know -- for instance, MarkWest is that one of the companies that –*

*A. I think it is, yes.*

*Q. -- separates out?*

*A. Yes.*

*Q. But EQT itself does not -- or any of the affiliates don't have any processing plant to separate those liquids that you know of?*

*A. I don't think they have any in West Virginia, and they probably don't have any at all at this point.[15]*

EQT admits that these extracted by-products are marketed and sold from the Richards lease.  Furthermore, EQT admits that the Plaintiffs are not paid royalty on the market price of the extracted by-products that are marketed and sold.  Instead, per Kristy Toia's testimony, EQT Energy, LLC ("EE"), a wholly-owned subsidiary of EQT, receives and retains all of the proceeds

---

[15] *See* John Bergonzi Depo. Tr. (attached hereto as "Exhibit 5") 47:9-50:10.

from the marketing and sale of these extracted by-products, in direct contravention of the contract terms.

## B.    *Procedural History:*

On February 27, 2017, the Plaintiffs filed a civil action against EQT in the Circuit Court of Ritchie County, West Virginia (17-C-8).  The civil action asserted claims for breach of contract, failure to account for royalties and fraud.  On or about April 3, 2017, the Defendant filed its notice of removal, successfully removing the civil action to this Court.  The parties have since had sufficient opportunity to undertake discovery and this matter is now proper for judgment as a matter of law on this limited issue.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).  Once the party seeking summary judgment meets the initial burden of showing that there is no genuine issue of material fact, "[t]he burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." *Temkin v. Frederick County Comm'rs,* 945 F.2d 716, 718 (4th Cir.1991), *cert. denied,* 502 U.S. 1095 (1992) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986)).

"[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256.  The Court must perform a threshold inquiry to determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.  Summary judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979) (citing *Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir.1950)).[16]

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. The Court will not "weigh the evidence and determine the truth of the matter."  *Anderson,* 477 U.S. at 249.   In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Although the Court must view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete

---

[16] *See* <u>CSX Transp., Inc. v. Gilkison</u>, No. 5:05CV202, 2009 WL 2357142, at *2 (N.D.W. Va. July 30, 2009).

evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must satisfy its burden of proof by offering more than a mere "scintilla of evidence" to support its position. *Anderson,* 477 U.S. at 252. Likewise, conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion. *See Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987); *Ross v. Comm'ns Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985), *abrogated on other grounds, Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).[17]

### III.   ARGUMENT

#### A.   *This matter is proper for summary judgment by the Court.*

This issue arises because of the breach of express terms of three oil and gas leases. Under West Virginia law, "'It is the province of the court, and not of the jury, to interpret a written contract.' *Franklin v. Lilly Lumber Co.,* 66 W.Va. 164, 66 S.E. 225." Syl. Pt. 1, *Stephens v. Bartlett*, 118 W. Va. 421, 191 S.E. 550 (1937). The Plaintiffs aver that these lease terms are plain and unambiguous. In fact, for sixty (60) years the predecessors of the parties and the parties hereto complied with those lease terms. It was not until 2016 that EQT knowingly and willfully made

---

[17] See *W.W. McDonald Land Co. v. EQT Prod. Co.*, 983 F. Supp. 2d 790, 796 (S.D.W. Va. 2013), <u>opinion clarified</u> (Jan. 21, 2014)

the decision to breach the terms of these particular contracts for the sole purpose of retaining a larger share of the gas sales proceeds in order to increase its profits.

However, even if it is alleged by the Defendant that these contracts somehow have become ambiguous after 60 years, "[t]he question as to whether a contract is ambiguous is a question of law to be determined by the court." Syl. Pt. 1 (in part), *Berkeley County Pub. Serv. Dist. v. Vitro Corp. of Am.,* 152 W.Va. 252, 162 S.E.2d 189 (1968).  Therefore, insofar as there are no issues of material fact in dispute regarding Count Two, the breach of contract claim, this matter is within the province of the Court for determination and it is proper for the Court to grant partial summary judgment, as a matter of law, on the breach of contract claim as alleged in the Plaintiffs' Complaint.

**B.      *Count Two - Breach of Contract – Underpayment of Royalties***

     **1.      Plaintiffs must be paid royalty on the "market price" of the natural gas based upon the express language of the contract.**

The Plaintiffs' leases state in relevant part:

> *"In consideration of the Premises the said party of the second part, covenants and agrees…to pay…one-eighth (1/8) of the **market price** of the gas from each and every gas well drilled on said premises…."*

"In oil and gas practice, there are two generally used lease clauses dictating the amount of royalties due under a lease: the "market value" clause and the "proceeds" clause. Under a market value clause, royalties are paid based upon the market value of the gas; under a proceeds royalty clause, upon the amount of money received by the lessee upon its sales of gas." *Imperial Colliery Co. v. Oxy USA Inc.*, 912 F.2d 696, 700 (4th Cir. 1990).  In *Imperial Colliery,* Oxy USA sold gas to Equitable (ironically, the predecessor company of EQT) at a price that was fixed by contract and Oxy USA paid royalties based upon the proceeds it received from Equitable, less costs for transportation, compression and gathering.  However, the market value of Imperial Colliery's

natural gas was significantly higher than the price paid to Oxy USA by Equitable.  The U.S. District Court and the Fourth Circuit Court of Appeals both rightly determined that Oxy USA should pay royalties based on the **market price** of the gas.  That calculation was determined by "the price that a willing buyer would pay a willing seller in a free market…." *Id.* at 701.

In this matter, the plain language of the leases call for the payment of natural gas royalty based upon one-eighth (1/8) of the "market price."  Just as discussed above in *Imperial Colliery*, the Plaintiffs herein also have "market value" leases and not "proceeds" leases.

Contrary to these express, unambiguous, contract terms, EQT sells the natural gas from the Richards wells to EE at a price below the "market value" for the gas.  That gas is then transported to the "market" through midstream operations of EQT subsidiaries or sister companies. Ultimately the Richards' gas is sold to a company known as M2 (aka "Texas Eastern" or "TETCO") at a point of sale where EE is paid the "market value" or "market price" based upon the "first of the month index price."[18]

Just as in *Imperial Colliery*, the Plaintiffs herein are entitled to royalty based upon the market price of their natural gas — the price that a willing buyer would pay a willing a seller for the natural gas in a free market.  In this case, the willing buyer is M2.  The market price M2 pays a willing seller is the "first of the month index price" at the interstate pipeline.  Under the plain and unambiguous language of these leases, and under West Virginia law, that "first of the month index price" is the price upon which EQT should be paying the Plaintiffs their one-eighth (1/8) royalty.

---

[18] *Toia Depo.*, 34:24.

2.     **EQT, as Lessee, must bear all post-production costs incurred to bring the gas to market.**

In the case *sub judice*, the plain and simple language of the leases state:

> *"In consideration of the Premises the said party of the second part, covenants and agrees…to pay…one-eighth (1/8) of the market price of the gas from each and every gas well drilled on said premises, the product from* **which is marketed and sold off the premises**, *said gas to be measured by a meter."* (emphasis added).

It is most certainly implied and presumed that the natural gas must be gathered and transported if it is to be "sold off the premises."

In this matter, EQT sells their Marcellus gas to EE at the wellhead for a price that is contractually agreed to between EQT and EE.  That contract price is significantly lower than the "market price" or "first of the month index price" paid by the willing purchaser, M2, at the point of sale in M2's interstate pipeline.  The wellhead price paid to EQT by EE is lower than the market price paid to EE because the wellhead price is adjusted downward for various, significant costs and expenses that EQT, EE and other of EQT's subsidiary companies incur in exploring and developing natural gas assets in West Virginia.  This industry practice of downward adjustment of royalties is known as a "work-back".  As discussed later, EQT has already been found to be in violation of well-established law in West Virginia by improperly using "work-back" to reduce royalty payments to its lessors in such oil and gas leases.

Specifically, EQT attempts to use "work-back" to avoid fundamental and well-established West Virginia oil and gas law which says, "If an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale."

Syl. Pt. 4, *Wellman v. Energy Res., Inc.*, 210 W. Va. 200, 202, 557 S.E.2d 254, 256 (2001); and, "Language in an oil and gas lease that is intended to allocate between the lessor and lessee the costs of marketing the product and transporting it to the point of sale must expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, identify with particularity the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), and indicate the method of calculating the amount to be deducted from the royalty for such post-production costs." Syl. Pt. 10, *Estate of Tawney v. Columbia Nat. Res., L.L.C.*, 219 W. Va. 266, 268, 633 S.E.2d 22, 24 (2006).

Interestingly, in the case of *W.W. McDonald Land Co. v. EQT Prod. Co.*, 983 F. Supp. 2d 790 (S.D.W. Va. 2013), opinion clarified (Jan. 21, 2014), Judge Goodwin specifically dismissed thes industry practice of reducing royalty by "work-back" and found that "Tawney's specificity requirements apply to royalty payments made under [EQT's] work-back method…." In his discussion of EQT's improper use of "work-back", Judge Goodwin made the following pointed observation about the practice:

> "Finally, the defendants argue that Tawney is inapplicable because EQT Production sells gas at the wellhead and, since 2005, has taken no monetary deductions from royalties. However, EQT Production sells the gas at the wellhead to EQT Energy, a sister company. The defendants cannot calculate royalties based on a sale between subsidiaries at the wellhead when the defendants later sell the gas in an open market at a higher price. Otherwise, gas producers could always reduce royalties by spinning off portions of their business and making nominal sales at the wellhead. I predict with confidence that, if confronted with this issue, the Supreme Court of Appeals would hold the same. See Howell v. Texaco, Inc., 112 P.3d 1154 (Okla.2004) ("an intra-company contract is not an arm's length transaction, [and] it is not a legal basis on which [a producer] can calculate royalty payments"); Beer v. XTO Energy, Inc., CIV–07–798–L, 2010 WL 476715 (W.D.Okla. Feb. 5, 2010) (gas sale at wellhead between two controlled, affiliated companies not appropriate for royalty calculation).*
>
> *Further, in order to determine a wellhead price at which EQT Production sells gas to EQT Energy, defendants essentially admit they continue to deduct post-*

> *production expenses. To determine the wellhead price, the defendants use a "work-back method" which "involves subtracting post-production costs that enhance the value of the gas from the interstate connection price." (Mem. in Supp. of Defs.' Joint Mot. for Summ. J. [Docket 170], at 25). Absent lease language to the contrary, Tawney requires lessees to pay royalties free of these costs. The defendants cannot avoid Tawney by simply reorganizing their businesses and making intra-company wellhead sales."*

Id. at 804.

As in *Wellman*, *Tawney*, and *W.W. McDonald Land Co.*, the Plaintiffs herein are entitled to their full one-eighth (1/8) royalty under the lease and should not pay any of the post-production costs to get natural gas to market. At least one District Court has already found that EQT's practice of reducing the gas royalty using "work-back" is improper under similar leases. Likewise, such reductions in royalty payments to the Plaintiffs herein is certainly improper. EQT and/or its subsidiary companies must bear all the costs of gathering and transporting the natural gas to the market at the interstate pipeline of the willing purchaser and cannot avoid *Tawney* through sweetheart—below market value—deals with wholly owned subsidiaries and sister companies for the sake of increasing its bottom line.

### 3. EQT must pay Plaintiffs for NGL's produced and sold from the leases based upon the express language of the contract.

The three subject oil and gas leases contain the same language regarding the sale of by-products, which is as follows:

> *"...[I]f 'casing head gas' (being gas produced from oil wells) or any part thereof should be marketed and sold by said Lessee, said Lessors shall receive* ***one-eighth of the market price of the gas and other by-products so marketed and sold.***" (Emphasis added).

EQT admitted that it does not pay the Plaintiffs for the market price of any by-products from the subject oil and gas leases. However, under the plain language of the leases, the Plaintiffs

should most certainly receive one-eighth (1/8) of the "market price of the…by-products so marketed and sold."

The fact is, the MMBtu of the raw gas from these wells is too high for interstate pipelines. It must be treated and the heavy hydrocarbons (by-products) must be removed from the methane. Retired EQT employee John Bergonzi testified that "sometimes gas is -- is -- got some heavier hydrocarbons in, and in some cases, those are just left in the stream. In other cases, they're extracted from the stream and sold separately to make the gas eligible for interstate pipeline…"[19] As noted above, Kristy Toia testified that when EQT's subsidiary companies sell these by-products, the profits for the same are ultimately realized by EQT.

It is improper and unlawful for EQT to sell these by-products without paying the proportionate royalty for the same to the Plaintiffs.  As noted by Judge Goodwin, "[t]he defendants cannot calculate royalties based on a sale between subsidiaries at the wellhead when the defendants later sell the gas in an open market at a higher price. Otherwise, gas producers could always reduce royalties by spinning off portions of their business and making nominal sales at the wellhead." The fact is, EE is paying EQT a nominal price for the raw gas at the wellhead and then realizing significant profit when the EQT subsidiary sells the extracted by-products downstream at market to companies such as Williams or MarkWest.

---

[19] Bergonzi Depo. Tr., 48:4-10

### III.      CONCLUSION

In regards to Count Two, breach of contract—underpayment of royalties, the Plaintiffs are entitled to judgment as a matter of law.  The Defendant's conduct violated the express and implied terms of the valid and existing oil and gas leases that have held the subject leasehold acreage by continuous production for a period in excess of sixty (60) years.  The Defendant's failure to properly pay market price royalties for natural gas; refusal to pay the market price for extracted by-products marketed and sold from the leases;  and, deduction of post-production costs from natural gas royalties through "work-back", are improper and unlawful under *Tawney* and *Wellman* and furthermore constitute a breach of the oil and gas lease terms.  Accordingly, the Plaintiffs respectfully request that the Court grant summary judgment on Count Two of their Complaint against EQT.

> **ARNOLD K. RICHARDS and**
> **MARY L. RICHARDS, his wife,**
> **Plaintiffs,**
> **By Counsel,**

/s/ Scott A. Windom
Rodney C. Windom (WV Bar No. 4091)
Scott A. Windom (WV Bar No. 7812)
**Windom Law Offices, PLLC**
101 East Main Street
Harrisville, WV 26362
(304) 643-4440
Fax: (304) 643-2947
rwindom@windomlawoffices.com
swindom@windomlawoffices.com
**COUNSEL FOR PLAINTIFFS**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG DIVISION**

**ARNOLD K. RICHARDS and
MARY L. RICHARDS, his wife,**

 **Plaintiffs,**

**v.**                                                               **Civil Action No.  1:17-CV-50-IMK**

**EQT PRODUCTION COMPANY,
A Pennsylvania Corporation,**

 **Defendant.**

**<u>CERTIFICATE OF SERVICE</u>**

       I, Scott A. Windom, counsel for Plaintiffs, Arnold K. Richards and Mary L. Richards, do hereby certify that I have served a true and accurate copy of the foregoing *"Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment"* was served on the following this 12th day of **January, 2018**, by using the CM/ECF which will send notification of such filing to the following CM/ECF participants:

David K. Hendrickson (WV Bar #1678)
Carl Fletcher, Esq. (WV Bar #1225)
HENDRICKSON & LONG PLLC
214 Capitol St.
Charleston, WV 25301
304-346-5500 (Main) 304-346-5515 (Fax)
<u>daveh@handl.com</u>
<u>cfletcher@handl.com</u>

*/s/ Scott Windom*
**SCOTT A. WINDOM, ESQ.**
W. Va. State Bar No. 7812
**Windom Law Offices, PLLC**
101 East Main Street
Harrisville, West Virginia  26362
Telephone:  (304) 643-4440
FAX:  (304) 643-2947
**COUNSEL FOR PLAINTIFFS,**
**ARNOLD K. RICHARDS &**
**MARY L. RICHARDS**