IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

ARNOLD K. RICHARDS and
MARY L. RICHARDS,

        Plaintiffs,

v.                                          Civil Action No.  1:17cv50-IMK

EQT PRODUCTION COMPANY,

        Defendant.

### DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

EQT Production Company ("EQT Production") submits this Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment (ECF 31).  In their Motion, Plaintiffs have moved for summary judgment on their claim for Breach of Contract asserted in Count II of the Complaint.

Plaintiffs' claims in this case relate to the payment of royalties relating to three (3) oil and gas leases (the "Leases).  (ECF 1-1).  In Count II of their Complaint, Plaintiffs allege an underpayment of royalties for gas produced pursuant to these Leases.  Succinctly, Plaintiffs seek payment from EQT Production for the value of the costs to gather and compress gas from the location of the gas sales (i.e., the wellheads) to a downstream interstate pipeline location.  To find in favor of Plaintiffs, this Court must determine, as a matter of law, either: (1) that EQT Production has violated the terms of the Leases that are at issue and is obligated to pay royalties on an amount larger than it receives; or, (2) that the contract between EQT Production and EQT Energy – which provides for a wellhead sale of gas – must be disregarded, presumably because it is an invalid affiliate "deal" between alleged alter egos.

The gas sales are incompliance with the terms of the Leases which do not preclude a wellhead sale like the one at issue and actually support the pricing formula by which EQT Production is paid by EQT Energy, LLC ("EQT Energy"). Moreover, this Court should not disregard the contract between EQT Production and EQT Energy where Plaintiffs have not: (1) asserted an alter ego relationship or claim for liability in the pleadings; (2) provided any evidence upon which to find that such a relationship exists; or (3) made any showing that the pricing formula is not fair or does not reflect a market value where it is sold.

Accordingly, when the facts of this case and inferences are considered and viewed in favor of EQT Production as is required when ruling on Plaintiffs' Motion, it is clear that EQT Production has offered concrete evidence from which a reasonable juror could return a verdict in its favor. Having failed to demonstrate that judgment as a matter of law on their breach of contract claim is proper, Plaintiffs' Motion must be denied. *See* Fed. R. Civ. P 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Collard v. Smith Newspapers, Inc.*, 915 F. Supp. 805 (S.D.W. Va. 1996).[1]

### STATEMENT OF FACTS

EQT Production is the sole Lessee to the Leases and has the right to develop and produce gas from the Lease premises. (ECF 6, ¶ 6). All of these Leases include the following royalty provision:

> In consideration of the Premises the said party of the second part, covenants and agrees: 1st-to deliver to the credit of the Lessors, their heirs or assigns, free of cost, in the pipe line to which the Lessee may connect the wells…the equal one-eighth (1/8) part of all oil produced and saved from the leased premises; and

---

[1] While Plaintiffs may have set forth in their Motion and supporting Memorandum additional standards upon which summary judgment may be granted, they have failed to meet those standards.

> second, to pay…one-eighth (1/8) of the market price of the gas from each and every gas well drilled on said premises, the product from which is marketed and sold off the premises, said gas to be measured by a meter.

(ECF 6, ¶ 15). The Leases were not drafted by EQT but were acquired through various mesne conveyances. (ECF 6, ¶ 14). The Leases have been amended to allow for pooling and unitization to allow for horizontal drilling but the royalty payment provisions of the Leases have not been modified. (ECF 6, ¶¶ 8, 10, 12).

Plaintiffs' claims in this case relate to the payment of royalties with respect to six (6) horizontal Marcellus Shale wells drilled on the "Pullman 96" pad that is located on a tract adjacent to the Lease premises. (ECF 6, ¶¶ 18 and 19). EQT Production sells the natural gas produced from the subject wells to an affiliate, EQT Energy, pursuant to a Base Contract for Sale and Purchase of Natural Gas (the "Gas Sales Contract"). *See* Exh. 1, EQT Production Company's Responses to Plaintiffs' First Set of Combined Discovery Requests, INT. 1(c), 1(d), 1(f), 4, 5 and 6. Natural gas produced from the pooled acreage for the wells located on the "Pullman 96" pad passes through a meter(s) located at or near the pad and wellheads where, pursuant to the Gas Sales Contract, EQT Energy takes custody of the gas. *See* Exh. 2, Tr. of Kristy Toia, pp. 22-28, 51-52; and, *see* Exh. 3, Tr. of John Bergonzi, pp. 21-24.

The Gas Sales Contract establishes a pricing formula whereby EQT Production is paid a market value price in an amount equal to "the first of the month index price applicable to the interstate pipeline/gas gathering system into which the gas is delivered, less gathering-related charges, retainage, and any other agreed to charges." *See* Exh. 1. This index price is an objectively verifiable market price, which reflects the value of the gas sold in the relevant geographic region. *Id*. *See also*, Exh. 2 (Toia Tr.), pp, 34-36, 100. To arrive at the price for the sales point where the gas is sold (i.e., the wellhead), a work-back method whereby certain post-production expenses of gathering and compressing the gas to a downstream market are deducted

3

from the downstream index price of the gas sold to achieve a wellhead price. *See* Exh. 3 (Bergonzi Tr.), pp. 21-23, 53-54. Plaintiffs' royalties are calculated based upon this market value where the gas is sold – the wellhead. *See* Exh. 2 (Toia Tr.), pp. 51-52, 80-81, 147-148.

## ARGUMENT

Plaintiffs claim they were not paid the full amounts for royalties due under the Leases and seek summary judgment with respect to their claim for Breach of Contract asserted in Count II of the Complaint. (ECF 31). Plaintiffs assert that EQT "breached the express terms of the contracts" by taking "wrongful deductions" from "the royalties due to Plaintiffs …" (ECF 1-1, ¶¶ 31-33). In particular, Plaintiffs erroneously claim that their royalties should be based on a price for natural gas that is received by EQT Energy (not a party to this action) rather than EQT Production, which is the only Defendant in this case and only entity with an obligation to pay royalties to Plaintiffs.

The evidence in this case establishes that Plaintiffs' royalties are properly calculated pursuant to the terms of the Leases. At a minimum, material issues of fact preclude judgment as a matter of law.

**A.   EQT PRODUCTION'S SALE OF GAS TO EQT ENERGY CANNOT BE DISREGARDED BECAUSE PLAINTIFFS HAVE FAILED TO ALLEGE OR PROVE FACTS SUFFICIENT TO SHOW ALTER EGO**

Plaintiffs' claims are brought only against EQT Production -- the sole lessee to the Leases and only entity with an obligation to pay royalties under the Leases. Plaintiffs have not made any allegation that anyone other than EQT Production is liable for the claims asserted in the Complaint. (ECF 1-1). Because Plaintiffs failed to set forth any facts or make any claims in the pleadings of alter ego or other type of vicarious liability, EQT Production's wellhead sale of natural gas to EQT Energy cannot be disregarded. EQT Energy is a separately created entity engaged in the purchase and marketing of natural gas. While EQT Energy may be an indirect

4

subsidiary of EQT Production, these entities operate as separate and distinct businesses and there is absolutely no evidence to the contrary in this case. *See* Exh. 1.

Plaintiffs suggest that the Court should ignore the fact that a contractual sale of natural gas from the Lease premises did not occur between EQT Production and EQT Energy. In order to do so, this Court must determine that EQT Energy is EQT Production's alter ego. Despite the fact that Plaintiffs did not bring this claim before the Court, the Court does not have any information before it to even consider this issue. Plaintiffs posit that the only requirement for disregarding the contractual sale between these companies is for this Court to determine that the price received by EQT Production from EQT Energy for natural gas sales is not the best deal that could have been achieved. This argument, however, overlooks the royalty payment provisions of the Leases which provide that royalties for gas sold from the Lease premises are to be $1/8^{th}$ of the market price of the gas "measured by a meter." (ECF 6, ¶ 15). Here, the evidence establishes that the price received by EQT Production for the gas is the market price of the gas measured at the wellhead, which valuation point is co-located with the meters situate at or near the wells located on the "Pullman 96" pad and into which natural gas from the Lease premises flows and is measured. *See* Exh. 2 (Toia Tr), 22-28, 51-52; and, *see* Exh. 3 (Bergonzi Tr.), pp, 21-24.

Moreover, Plaintiffs' contention that that sale between EQT Production and EQT Energy may be ignored misapprehends the strict standards that are necessary to disregard a contract between two corporate entities. West Virginia law has long recognized that, "[a]s a general rule, corporations are considered wholly separate entities from each other and from those who own them." *Tucker v. Thomas*, 853 F. Supp.2d 576, 590 (N.D.W. Va. 2012), *citing*, *Laya v. Erin Homes, Inc.,* syl. pt. 1 & 2 177 W. Va. 343, 352 S.E.2d 93 (1986). Thus, legally, there is a presumption that corporate entities are separate, and that their corporate form may be disregarded

5

only under exceptional circumstances. *See Laya v. Erin Homes, Inc.*, 177 W. Va. 343, S.E.2d 93 (1986) (recognizing that corporations are presumed to be separate entities and that the "corporate entity may be disregarded" only "[u]nder exceptional circumstances"); *Southern States Co–Operative, Inc. v. Dailey*, 167 W. Va. 920, 280 S.E.2d 821 (1981) (recognizing that the mere showing that one corporation is owned by another is not sufficient justification for a court to disregard their separate corporate structure). As further explained by the Supreme Court of Appeals of West Virginia in *Laya*, *supra*,

> While, legally speaking, a corporation constitutes an entity separate and apart from the persons who own it, such is a fiction of the law introduced for purpose of convenience and to subserve the ends of justice; and it is now well settled, as a general principle, that **the fiction should be disregarded when it is urged with an intent not within its reason and purpose, and in such a way that its retention would produce injustices or inequitable consequences**.

Syl.pt. 2, *Laya*, 177 W. Va. 343, 352 S.E.2d 9, *quoting*, Syl. pt. 10, *Sanders v. Roselawn Memorial Gardens, Inc.,* 152 W. Va. 91, 159 S.E.2d 784 (1968) (emphasis added).

Situations where the corporate veil may be pierced generally involve jurisdictional issues, *i.e.,* whether a corporation is subject to the forum state's jurisdiction when only a subsidiary or affiliate is present there, *see e.g., Norfolk Southern Ry. Co. v. Maynard*, 190 W. Va. 113, 437 S.E.2d 277 (1993), and when the defendant corporation is essentially judgment proof, *see*, *e.g., Dieter Engineering Services, Inc. v. Parkland Development, Inc.*, 199 W. Va. 48, 483 S.E. 28 48 (1996) (defendant corporation inadequately capitalized to pay judgment; court stated that failure to adequately capitalize a corporation for the reasonable risks of the corporate undertaking "one of the most significant factors in determining whether the corporate veil should be pierced").

Neither of these circumstances is applicable here: EQT Production is the party Defendant in this action, mooting any jurisdictional issues, and Plaintiffs have offered no facts, and do not even allege, that EQT Production will be unable to satisfy any judgment that Plaintiffs might

obtain. Moreover, of paramount importance, EQT Production has exercised independence with respect to the conduct that is at issue in this litigation. The crux of Plaintiffs' claims is that EQT Production has underpaid them by deducting post-production expenses from their royalties. The decision of what to pay Plaintiffs in royalties resides solely with EQT Production. At the end of the day, the only party whose conduct is at issue here is EQT Production. To the extent it may be determined that Plaintiffs were underpaid royalties, which EQT Production denies, the sole entity responsible for that conduct is EQT Production.

Plaintiffs' reliance on *W.W. McDonald Land Co. v. EQT Prod. Co.*, 983 F. Supp. 2d 790 (S.D.W. Va. 2013), opinion clarified (Jan. 21, 2014), to support their claim that the sale between EQT Production and EQT Energy should be disregarded because they are affiliated entities is misplaced. There, the plaintiffs asserted claims against a number of entities affiliated with EQT Production. In particular, the plaintiffs asserted claims for conspiracy and joint venture against the defendants in that case which, if proven, could have provided a basis upon which to hold one or more the defendants in that case, including EQT Energy, liable for alleged acts and omissions of EQT Production with respect to the royalty payments at issue. In fact, the court denied, in part, the motion for summary judgment filed by EQT Energy and others, finding that there was a genuine dispute of material fact as to whether those defendants were vicariously liable for the debts and obligations of EQT Production. *Id*. at 814. Therefore, the court's judgment in *McDonald* that EQT Production could not utilize a work-back method to calculate royalty at the wellhead when the sale was between affiliates came in the context of a case in which the issue of the possible vicarious liability of EQT affiliates was before the court. No similar facts are at issue in this case where EQT Production is the sole Defendant in the case.

Respectfully, EQT Production further submits that the *McDonald* opinion cited by Plaintiffs also misapplies the rulings in *Howell v. Texaco, Inc.*, 112 P.3d 1154 (Okla. 2004) and *Beer v. XTO Energy, Inc.*, Civ.07-798-L, 2010 WL 476715 (W.D. Okla. Feb. 5, 2010)[2]. In *Howell*, the court found that the intra-company sales at issue could not be used to establish the market price for gas where: (1) the sales were between divisions of the same company; and (2) the defendant gas producer and lessee with the duty to pay royalties was paying royalties based on one price but selling the gas for a higher price. *Howell*, 112 P.3d at 1160. In *Beer*, the court similarly disregarded the wellhead gas sales at issue where those sales were between "two controlled, affiliated companies…" *Beer*, Civ.07-798-L, 2010 WL 476715, *2. Notably, the court's holding that the defendant producer's wellhead sales to an affiliate could not be used to calculate royalties was based upon the defendant producer's admission that the contract which provided for wellhead sales between the affiliates was "not arm's-length" and the defendant did not dispute that it "control[ed]" the affiliate. *Id*. at *2-3. Importantly, the court also found that the defendant failed to offer evidence to establish a prevailing market price for the gas. *Id*.

The facts relied upon in *Howell* and *Beer* to disregard the affiliate sales in those cases are notably absent here where the record is devoid of evidence of control by EQT Production over EQT Energy (much less any claim in the pleadings that would permit the disregard of the separate corporate structures), and there is undisputed evidence as to the market index price for the gas that is sold by EQT Production. Indeed, the court's analysis in *Howell* supports EQT Production's royalty payment practice where the price at which royalty is calculated is based on the market price of the gas at the wellhead. In *Howell*, the court recognized that, when, as here, "the gas is marketable at the wellhead, the reasonable post-production costs may be charged

---

[2] A copy of this case is provided as Exh. 4.

against the royalty payments … This is so because the referenced starting point in the calculations is the value of the gas after processing and the royalty owners are entitled only to the value of the gas that is marketable at the wellhead." *Howell*, 112 P.3d at 1159-1160.

Even assuming that Plaintiffs' pleadings had presented an appropriate situation for considering alter ego liability, they have demonstrated no factual basis for doing so. The separate corporate structures of EQT Production Company and EQT Energy must be observed and maintained. Because there is no basis in either law or fact to disregard or ignore EQT Production's sales of natural gas to EQT Energy, the motion should be denied.

**B.    PLAINTIFFS HAVE FAILED TO SHOW THAT THE SALE BETWEEN EQT PRODUCTION AND EQT ENERGY IS NOT ARMS-LENGTH OR FAIR**

The question in this case is not to whom EQT Production sold the gas. The question is whether EQT Production paid the proper royalties under the Leases. Even if this Court elects to consider whether EQT Production's sales of gas to EQT Energy may be disregarded, Plaintiffs have nonetheless failed to offer evidence to establish that the sales between these companies are not arms-length or fair. While Plaintiffs argue that the sales of gas from EQT Production to EQT Energy should be ignored, they have produced no evidence indicating that the pricing formula set forth in the Gas Sales Contract does not provide for a fair market price for the gas at the relevant valuation point. Nor have they presented facts showing that the Gas Sales Contract was not fairly negotiated or that the terms are otherwise unjust, unfair or inconsistent with industry practices and standards.

To the contrary, Plaintiffs cite to evidence showing that the price is based upon an objective index price, less the necessary costs incurred to move the gas from the wellhead and related meter(s) to additional downstream markets. (ECF 32, pp. 4-6, 14). The applicable interstate pipeline into which natural gas from the Lease premises flows is the Texas Eastern

9

Transmission, LP ("TETCO") pipeline system. (ECF 32, p. 14). *See also*, Exh. 2, (Toia Tr.), pp. 34-36, 100. The TETCO Market Zone "2" covers West Virginia and the TETCO M2 Zone index price is the applicable index price for natural gas produced from the Lease premises. *See* Exh. 2, (Toia Tr.), pp. 34-36, 100. Notably, Plaintiffs appear to state that the TETCO M2 index price represents a market price but they contend (wrongfully) that their royalties should be calculated solely upon a downstream index price (ECF 32, pp. 13-14). Plaintiffs' contention is not supported by the terms of Leases which state that royalties for gas sold from the Lease premises are to be equal to the market price of the gas "measured by a meter." (ECF 6, ¶ 15). Importantly, the Leases do not prohibit a wellhead sale as provided by the terms of EQT's Gas Sales Contract. *Id*. Here, in fact, the wellheads at issue are co-located with meters into which natural gas from the Lease premises flows and is measured. *See* Exh. 2 (Toia Tr), 22-28, 51-52; and, *see* Exh. 3 (Bergonzi Tr.), pp, 21-24.

*Imperial Colliery Company v. OXY USA, Inc*., 912 F.2d 696, 700 (4th Cir. 1990)[3], relied upon by Plaintiffs, supports EQT Production's royalty payment practice. There, the court recognized that, "[u]nder a market value clause, royalties are paid based upon the market value of the gas …" and made clear that, regardless of the price received, the lessor in a market value lease is entitled to his proportionate share of the market value of the gas at the agreed upon valuation location. *Imperial Colliery Co.,* 912 F.2d at 700. Market value is the price a willing seller obtains from a willing buyer. *Exxon Corp. v. Middleton,* 613 S.W.2d 240, 246 (Tex. 1981). There are generally two methods that are accepted in the oil and gas industry and courts throughout the country for determining market value at the well: (1) comparable sales, and (2)

---

[3] Contrary to Plaintiffs' contention, the "Equitable Gas Co." identified in *Imperial Colliery* is not EQT Production's predecessor. The entity in that case was a distribution company that was an affiliate of EQT Production's actual predecessor – Equitable Production Company – and had a separate corporate history from EQT Production.

10

the work-back method. *See e.g. Heritage Resources, Inc. v. Nations Bank,* 939 S.W.2d 118 (Tex. 1996). The work-back method involves subtracting post-production costs that enhance the value of the gas from the interstate connection price to arrive at the value of the gas in its unprocessed state at the well. *See, e.g., Id., Potts v. Chesapeake Exploration, LLC,* Civil Action No. 3:12–CV–1596–O, 2013 WL 874711 (N.D. Tex. Mar. 11, 2013); *Clear Creek Oil & Gas Co. v. Bushmiaer,* 264 S.W. 830, 832 (Ark. 1924); *Howell v. Texaco*, 112 P.3d 1154, 1159 (Okla. 2004); *Sternberger v. Marathon Oil Co.,* 894 P.2d 788 (Kan. 1995). The work-back methodology is commonly used where, as here, it is difficult to determine comparable sales. Plaintiffs have failed to provide any evidence of comparable sales to refute EQT Production's evidence that its sales of gas equal to market value. *Imperial Colliery* acknowledges that where the lease designates an agreed upon valuation location, the price at which royalties are calculated should reflect the market value of the gas *at that point* – not downstream. It further indicates that West Virginia may, as other states have, recognize that the work-back methodology is an appropriate means of calculating market value at the well. In fact, the Supreme Court of Appeals of West Virginia has already endorsed the use of this method in calculating a wellhead price for royalties owed pursuant to West Virginia's Flat Rate Statute, W. Va. Code § 22-6-8.[4] *See Leggett v. EQT Production Company*, 239 W. Va. 264, 800 S.E.2d 850, 853 (2017).

Plaintiffs have offered no evidence to show that the sales are not fair sales or that they do not reflect an arm's length transaction. Even if it were determined that the sales are not an arm's length transaction, Plaintiffs have failed to show that the market value would be any different

---

[4] W. Va. Code § 22-6-8 provides that a lessee shall pay royalties pursuant to the statute in an amount that is "not less than one eighth of the total amount paid to or received by or allowed to the owner of the working interest at the wellhead for the oil or gas so extracted, produced or marketed before deducting the amount to be paid to or set aside for the owner of the oil or gas in place, on all such oil or gas to be extracted, produced or marketed from the well."

than an arm's length transaction. To the contrary, *Leggett* recognizes EQT Production's practice as a valid method to determine a market value for the gas sold at the wellhead. The sales are fair and should be recognized as such by this Court.

### C. PLAINTIFFS HAVE FAILED TO SHOW THAT THE GAS SALES BETWEEN EQT PRODUCTION AND EQT ENERGY ARE NOT MARKET PRICE

The price received by EQT Production for the gas is the market price of the gas measured at the wellhead. This valuation point is co-located with the meters situate at or near the wells located on the "Pullman 96" pad. The price is equal to the objective TETCO M2 index price less the necessary costs incurred to move the gas from the wellhead and related meter(s) to downstream markets. (ECF 32, pp. 4-6, 14); and, *see* Exh. 2 (Toia Tr.), pp. 22-28, 34-36, 51-52, 80-81, 100, 147-178; and, *see* Exh. 3 (Bergonzi Tr), 21-24, 53-54. This pricing formula is an acceptable means of determining a market wellhead price for gas. *See e.g.* Syl. pt. 8, *Leggett*, 239 W. Va. 264, 800 S.E.2d 850; *Imperial Colliery Co.,* 912 F.2d at 700; *Potts v. Chesapeake Exploration, LLC,* Civil Action No. 3:12–CV–1596–O, 2013 WL 874711, *5 (N.D. Tex. Mar. 11, 2013); *Clear Creek Oil & Gas Co. v. Bushmiaer,* 264 S.W. 830, 832 (Ark. 1924); *Howell v. Texaco*, 112 P.3d 1154, 1159 (Okla. 2004); *Sternberger v. Marathon Oil Co.,* 894 P.2d 788 (Kan. 1995).

EQT Production does not actually deduct post-production gathering and compression costs from Plaintiffs' royalties. Rather, pursuant to the Gas Sales Contract, these costs are a component of the price that is received by EQT Production. *See* Exh. 1; and *see* Exh. 2 (Toia Tr.), pp. 51-52, 80-81, 147-178; and, *see* Exh. 3 (Bergonzi Tr), 21-24, 53-54. Despite the fact that no deductions are taken by EQT Production, in an effort to provide full information to royalty owners such as Plaintiffs regarding production and revenues received for the gas, each royalty remittance statement includes a column identified as "Gross Deducts Owner Deducts."

(ECF 32-2). The amounts in this column are incurred by EQT Production as a component of the sales price it receives. These amounts are utilized in determining the amounts paid to EQT Production by EQT Energy pursuant to the Gas Sales Contract. (ECF 32-2). *See also*, Exh. 2 (Toia Tr.), pp. 96-97. In other words, these are the amounts that are utilized as part of the work-back methodology. These "Deducts" are merely shown on Plaintiffs' royalty remittance statements to provide transparency to royalty owners regarding the revenues received by EQT Production and to avoid the type of fraud claims that were asserted by the plaintiffs in *Tawney v. Columbia Natural Resources, LLC*, 219 W. Va. 266, 633 S.E.2d 22 (2006). *See e.g*. Exh. 2 (Toia Tr.), pp. 96-97. EQT Production actually adds back in the value of depreciation and return on investment for the costs that are incurred to move the gas to the TETCO M2 pipeline distribution system and utilized in the pricing formula before calculating Plaintiffs' royalty. *See* Exh. 2 (Toia Tr.), pp. 113-114. EQT Production, therefore, actually pays the royalty owners more than $1/8^{th}$ of the price that it receives.

The fact that EQT Production shows the downstream costs on remittance statements does not render the wellhead sale between EQT Production and EQT Energy invalid. Even if there was a claim with regard to the "Deducts" line items on the remittance statements, the proper remedy in such an event would not be to undo the affiliate sale. It would be to measure how Plaintiffs have been damaged, if at all. In this instance, Plaintiffs cannot show damage caused by such a disclosure, nor does the information provided in the remittance statements provide a basis upon which to find that EQT Production has breached the terms of the subject Leases.

Unlike *Tawney v. Columbia Natural Resources*, LLC, 219 W. Va. 266, 633 S.E.2d 22 (2006), and *Wellman v. Energy Resources, Inc.*, 210 W. Va. 200, 211, 557 S.E.2d 254, 265 (2001), the issue before this Court with respect to Plaintiffs' royalty payments is not whether a

lessee may take deductions, but whether the royalty received is truly reflective of the market value of the gas at the valuation point directed by the Leases. The work-back formula provided by EQT Production's Gas Sales Contract determines the market value of the gas at that point by utilizing one of the options endorsed throughout the industry and by numerous courts as a fair way to determine what gas is worth at the well.

Moreover, the holding in *Tawney*, which assumes a downstream sale by the lessee, is inapplicable here where Plaintiffs' royalties are to be calculated upon the market value of the gas as measured by a meter and EQT Production took no deductions. In *Tawney*, the leases stated that the lessor's royalty was to be calculated "at the well," "at the wellhead" or similar language. The court found this language alone ambiguous **when the gas was not sold at the well**. *Id*. at 273, 633 S.E.2d at 29 (emphasis added). Thus, the basis for the ambiguity found in *Tawney* does not exist here, as sales by EQT Production occur at the wellhead pursuant to the negotiated Gas Sales Contract.[5] Here, the wellhead is where the meter(s) through which natural gas from the wells situate on the "Pullman 96" pad passes. EQT Production takes no deductions from the revenues received at this location prior to paying royalties to Plaintiffs. *See* Exh. 2 (Toia Tr.), pp. 22-28, 34-36, 51-52, 80-81, 147-178; and, *see* Exh. 3 (Bergonzi Tr), 21-24, 53-54.

Plaintiffs' claims in this case are brought solely against EQT Production. While the gas sales are to a related entity, EQT Production has contracted for an objective index price, less the

---

[5] To the extent this Court may question whether *Tawney's* lease drafting requirements and finding of ambiguity in the leases there are applicable to the Leases and royalty payments at issue in this case, it may be proper to certify the question to the Supreme Court of Appeals of West Virginia for consideration in light of *Leggett v. EQT Production Company*, 239 W. Va. 264, 800 S.E.2d 850 (2017). There, the court held that the term "at the wellhead" is not ambiguous and authorizes the use of the work-back or net-back method to calculate royalty at the wellhead. *Id*. at Syl. pt. 8. Accordingly, *Tawney's* finding that the term "at the wellhead" was ambiguous is limited to the specific facts of that case and not controlling under West Virginia law under facts like those at issue here. The *Leggett* court particularly noted the "faulty legs" upon which Tawney's holdings are based. *Leggett,* 239 W. Va. 264, 800 S.E.2d at 862.

necessary costs incurred to move the gas from the wellhead and related meter(s) to downstream markets. This pricing formula is designed to obtain the best available price for both EQT Production and its royalty owners. Having calculated Plaintiffs' royalties based upon objective criteria that are market based and as directed by the terms of the Leases, Plaintiffs' claim for summary judgment on their breach of contract claim must be dismissed. Indeed, at the very least, there are genuine issues of material fact on these issues that preclude judgment as a matter of law as requested by Plaintiffs.

**D.     NO SEPARATE ROYALTY IS DUE FOR NATURAL GAS LIQUIDS**

Summary judgment on Plaintiffs' claim for the payment of royalties relating to the sale of natural gas liquids must also be denied. The Leases provide that royalties shall be paid on the sale of "by-products" where they are "*marketed and sold by said Lessee….*" (ECF 32, p. 17).[6] EQT Production is the sole lessee to the Leases (ECF 6, ¶ 6) and the evidence is unequivocal that that EQT Production does not sell any separated natural gas liquids from the Lease premises. The evidence further establishes that EQT Production does not receive any revenue for separated byproducts. *See* Exh. 1, INT 1(f) and 6. Rather, EQT Production sells natural gas in its raw or nearly raw state to EQT Energy prior to processing at a price that reflects the thermal value of the gas.

Plaintiffs' contention that they are purportedly entitled to royalties for the sale of natural gas liquids by EQT Energy - which is not a Defendant in this case - is without merit. As previously discussed, while EQT Energy may be an indirect subsidiary of EQT Production, both operate as separate and distinct businesses and there is absolutely no evidence to the contrary. *See* Exh. 1, INT 1(c). There is no valid claim made by Plaintiffs or basis upon which to ignore

---

[6] Plaintiffs have not provided any evidence regarding what constitutes a "by-product" under the Leases.

the corporate structures of EQT Production and EQT Energy. *See e.g. Laya,* 177 W. Va. at 347, 352 S.E.2d at 97. In fact, the undisputed evidence establishes that revenues from the sale of natural gas liquids belong to EQT Energy and EQT Production does not receive revenues from these sales. As Plaintiffs' note in their Memorandum, Kristy Toia, Director of Revenue Accounting at EQT, testified as follows:

> *Q. How are NGLs calculated by the revenue department or the accounting department?*
>
> *A. Those are paid to EE [EQT Energy, LLC], so [EQT] does not record any sort of revenue generated from NGLs.*
>
> *Q. Okay. So EQT Production gets no revenue from NGLs?*
>
> *A. No. Those revenues belong to EE.*
>
> *Q. When EE gets profits from NGLs, do you know who those are paid to?*
>
> *A. EE.*

See Exh. 2 (Toia Tr.), pp. 6-7.

Moreover, the market price upon which EQT Production is paid for gas sold from the Lease premises is based upon the volume of gas that is sold and reflects the thermal (Btu) value of that gas. *See* Exh. 1, INT 1(f). Plaintiffs share in the higher price that is received for the sale of gas that considers this thermal value. *See* Exh. 2 (Toia Tr.), pp. 22-24. If royalty payments were made based on the thermal value of the gas (upon which Plaintiffs' royalties are calculated) *and* based on the value of separated natural gas liquids (separation and sales that EQT Production never makes), a double payment for the liquids would result. This would provide Plaintiffs with an inequitable windfall and with royalties that are not contemplated by the terms of the Leases. If a separate payment for liquids were received, processing charges incurred to separate the natural gas liquids would need to be deducted from the price received by EQT Production, thereby reducing the amount payable as royalty. Plaintiffs actually benefit by

receiving the thermal value of the gas before any of the costs associated with separation have been incurred. Plaintiffs have received a royalty for the natural gas liquids or "by-products" that are in the gas stream at the time of the sale but do not receive a separate royalty for products that EQT Production never sells, for which it receives no revenue, and is not provided for in the Leases. Accordingly, Plaintiffs' claim for the payment of royalties on the sale of such products must fail.

## CONCLUSION

WHEREFORE, for the reasons stated in this Memorandum, and to be asserted upon oral argument, if necessary, Defendant EQT Production Company respectfully requests that Plaintiffs' Motion for Partial Summary Judgment be denied.

**EQT PRODUCTION COMPANY,**

**By Counsel.**

*/s/ David K. Hendrickson    01/26/2018*
David K. Hendrickson, Esquire (#1678)
Carl L. Fletcher, Esquire (#1225)
**HENDRICKSON & LONG, PLLC**
214 Capitol Street (zip 25301)
P.O. Box 11070
Charleston, West Virginia   25339
(304) 346-5500
(304) 346-5515 (facsimile)
daveh@handl.com
cfletcher@handl.com
*Counsel for Defendant*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**ARNOLD K. RICHARDS and
MARY L. RICHARDS, his wife,**

      **Plaintiffs,**

**v.**　　　　　　　　　　　　　　　　　　**CIVIL ACTION NO. 1:17-cv-50
(Judge Keeley)**

**EQT PRODUCTION COMPANY,**

      **Defendant.**

## CERTIFICATE OF SERVICE

I, David K. Hendrickson, do hereby certify that on the **26th day of January, 2018**, I have served the foregoing **"DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT"** upon Plaintiffs, using the Court's CM/ECF system, which will electronically deliver a true copy thereof to the following:

    Rodney C. Windom, Esquire
    Scott A. Windom, Esquire
    Windom Law Offices, PLLC
    101 East Main Street
    Harrisville, West Virginia  26362
    *Counsel for Plaintiffs*

           /s/  David K. Hendrickson     01/26/2018
           David K. Hendrickson, Esquire (#1678)
           Carl L. Fletcher, Esquire (#1225)
           **HENDRICKSON & LONG, P.L.L.C.**
           214 Capitol Street (zip 25301)
           P.O. Box 11070
           Charleston, West Virginia 25339
           (304) 346-5500
           (304) 346-5515 (facsimile)
           daveh@handl.com
           cfletcher@handl.com