```
IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
```

ARNOLD K. RICHARDS and
MARY L. RICHARDS,

        Plaintiffs,

v.                //    CIVIL ACTION NO. 1:17CV50
                                 (Judge Keeley)

EQT PRODUCTION COMPANY,

        Defendant.

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 31]**

      This case involves claims for breach of contract and fraud related to royalty payments for natural gas interests. The plaintiffs, Arnold and Mary Richards (the "Richards"), are owners of mineral interests in Ritchie County, West Virginia. The Richards allege that the defendant, EQT Production Company ("EQT Production"), has failed to provide accurate accountings of the gas removed from certain wells, including the amounts received and costs deducted from royalties. The complaint also alleges that EQT Production has breached the express terms of the relevant leases and committed fraud by improperly calculating royalties and making improper deductions. EQT Production denies these allegations, contending that its royalty payments to the Richards are in compliance with the lease terms.

      Pending before the Court is the Richards' motion for partial summary judgment on their breach of contract claim. For the reasons that follow, the Court **DENIES** the motion (Dkt. No. 31).

**RICHARDS, ET AL. v. EQT**                                                                 **1:17CV50**

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 31]**

## I. BACKGROUND

### A. Factual Background

Many of the facts in this case are not in dispute. Nonetheless, as this is a dispositive motion filed by the plaintiffs, the Richards, the Court reviews the evidence in the light most favorable to EQT, the non-moving party. See Providence Square Assocs., L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir. 2000).

Each of the Richards' claims relate to the payment of royalties relating to three oil and gas leases (collectively, the "Leases") (Dkt. Nos. 41-2, 41-3, 41-4). EQT Production, the sole lessee to the Leases, has the right to develop and purchase gas from the Lease premises. Id. at 1. The Leases include the following royalty provision:

> In Consideration of the Premises the said party of the second part, covenants and agrees: 1st-to deliver to the credit of the Lessors, their heirs or assigns, free of cost, in the pipe line to which the Lessee may connect the wells ... the equal one-eighth (1/8) part of all oil produced and saved from the leased premises; and second, *to pay ... one-eighth (1/8) of the market price of the gas from each and every gas well drilled on said premises, the product from which is marketed and sold off the premises, said gas to be measured by a meter.*

Id. at 2 (emphasis added) (the "Royalty Provision"); see also Dkt. Nos. 51-1; 51-2; 51-3. Although the Leases were amended in 2014 to

2

allow for pooling and unitization for horizontal drilling, the Royalty Provisions have not been modified. Also relevant is a provision, as follows:

> "...if 'casing head gas' (being gas produced from oil wells) or any part thereof should be marketed and sold by said Lessee, said Lessors shall receive one-eighth of the market price of the gas and other by-products so marketed and sold."

Id. (the "By-Product Provision").

In 2016, EQT drilled six horizontal wells on "Pullman 96," a well pad located on a tract adjacent to the Lease premises. It is undisputed that these wells produce natural gas from the leasehold estates. It is also undisputed that EQT sells the natural gas produced from the wells to an affiliate, EQT Energy, LLC ("EQT Energy"), pursuant to a Base Contract for Sale and Purchase of Natural Gas ("Gas Sales Contract") (Dkt. No. 40-1 at 5). Natural gas produced from the pooled acreage passes through meters located at or near the pad and wellheads where, pursuant to the Gas Sales Contract, EQT Energy takes custody of the gas. EQT Energy then delivers and sells the gas to third-party purchasers on the open market.

Notably, the Gas Sales Contract establishes a pricing formula whereby EQT Energy pays EQT Production an amount equal to "the first of the month index price applicable to the interstate

3

pipeline/gas gathering system into which the gas is delivered, less gathering related charges, retainage, and any other agreed to charges." Id. To arrive at the price for the point where the gas is sold to EQT Energy (i.e., at the wellhead), EQT Production utilizes a "work-back method," whereby certain post-production expenses of gathering and compressing the gas to a downstream market are deducted from the downstream index price of the gas sold. The Richards' royalty payments are then calculated based on the price where the gas is sold to EQT Energy - the wellhead.

**B.   Procedural Background**

The Richards filed their complaint on February 27, 2017, in the Circuit Court of Ritchie County, West Virginia (Dkt. No. 1-1). EQT removed the case to this Court on April 3, 2017, based on diversity of citizenship (Dkt. No. 1). The complaint asserts four causes of action, including (1) failure to properly account for royalties, (2) breach of contract, (3) breach of fiduciary duties and negligence, and (4) fraud and constructive fraud (Dkt. No. 1-1 at 14-17).

On April 7, 2017, the Richards moved to remand the case (Dkt. No. 3), and on April 10, 2017, EQT filed its answer, together with a partial motion to dismiss Count Three of the complaint for failure to state a claim (Dkt. No. 4-6). During a scheduling

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 31]**

conference on June 22, 2017, the Court denied the Richards' motion to remand, and the parties stipulated to the voluntary dismissal of the plaintiffs' claims for breach of fiduciary duties and negligence. Following discovery, the Richards moved for partial summary judgment on their breach of contract claim (Dkt. No. 31). The motion is now fully briefed and ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When ruling on a motion for summary judgment, the Court reviews all the evidence "in the light most favorable" to the nonmoving party. Providence Square Assocs., L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir. 2000). The Court must avoid weighing the evidence or determining its truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex Corp. v. Catrett,

477 U.S. 317, 323 (1986). Once the moving party has made the necessary showing, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256 (internal quotation marks and citation omitted). The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment; the evidence must be such that a rational trier of fact could reasonably find for the nonmoving party. Id. at 248-52.

### III. APPLICABLE LAW

"A federal court exercising diversity jurisdiction is obliged to apply the substantive law of the state in which it sits." Volvo Const. Equip. N. Am. v. CLM Equip. Co., Inc., 386 F.3d 581, 599-600 (4th Cir. 2004) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 79 (1938)). In West Virginia, "[a] claim for breach of contract requires proof of the formation of a contract, a breach of the terms of that contract, and resulting damages." Sneberger v. Morrison, 776 S.E.2d 156, 171 (W. Va. 2015) (citing Syl. Pt. 1, State ex rel. Thornhill Grp., Inc. v. King, 759 S.E.2d 795 (W. Va. 2014)).

In order to prevail on their motion for summary judgment, the Richards must establish the following four elements: "[T]he existence of a valid, enforceable contract; that [they] ha[ve]

6

performed under the contract; that [EQT] has breached or violated its duties or obligations under the contract; and that [the Richards] ha[ve] been injured as a result." See Exec. Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc., 681 F. Supp. 2d 694, 714 (S.D.W. Va. 2009) (citing 23 Williston on Contracts § 63:1 (Richard A. Lord, ed., 4th ed. West 2009)).

When the existence of a written contract is not in dispute, "[i]t is the province of the Court, and not of the jury, to interpret" the contract. Syl. Pt. 1, Toppings v. Rainbow Homes, Inc., 490 S.E.2d 817 (W. Va. 1997). "A valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." Syl. Pt. 2, id. "A contract is ambiguous when it is reasonably susceptible to more than one meaning in light of the surrounding circumstances and after applying the established rules of construction." Williams v. Precision Coil, Inc., 459 S.E.2d 329, 342 n.23 (W. Va. 1995). "The general rule as to oil and gas leases is that such contracts will generally be liberally construed in favor of the lessor, and strictly as against the lessee." Syl. Pt. 5, Energy Dev. Corp. v. Moss, 591 S.E.2d 135 (W. Va. 2003).

## IV. DISCUSSION

**A. Natural Gas Royalties**

In their motion for summary judgment on Count Two, the Richards first allege that, by using a "work-back" method to deduct certain post-production costs from their royalty payments, EQT Production has breached the Royalty Provision of the Leases (Dkt. No. 32 at 4-6). The parties do not dispute that the Leases comprise valid, enforceable contracts, or that the Richards have complied with the Lease terms (Dkt. Nos. 32 at 1-3; 40 at 2-3). After considering the parties' arguments and evidentiary submissions, however, the Court concludes that material facts regarding EQT Production's alleged breach of contract are in dispute and therefore **DENIES** the Richards' motion for summary judgment on this claim (Dkt. No. 31).

**1. EQT Energy**

As an initial matter, because the parties devote a significant portion of their briefing to a debate of the issue, the Court will address the effect, or lack thereof, of EQT Production's sale of natural gas to EQT Energy--a related entity--on the royalty payments owed to the Richards under the Leases. Relying heavily on W.W. McDonald Land Co. v. EQT Prod. Co., 983 F.Supp.2d 790 (S.D.W. Va. 2013), opinion clarified (Jan. 21, 2014), the Richards contend

8

that EQT Production has violated the Royalty Provision, as well as applicable West Virginia law, by selling gas produced from the subject wells in "sweetheart–-below market value--deals" with its subsidiary, EQT Energy (Dkt. No. 32 at 17). EQT Production argues that granting summary judgment would require the Court impermissibly to "ignore" EQT Production's sale of gas to EQT Energy, where the Richards have not alleged that any entity other than EQT Production is liable for the alleged breach of contract (Dkt. No. 40 at 4). In the alternative, it argues that the Richards have failed to offer any evidence establishing that the gas sales between the two companies are "not arms-length or fair." Id. at 9.

In W.W. McDonald, a case similarly arising from a dispute over royalty payments related to gas well leases, the plaintiff-landowners alleged that West Virginia law prohibited the defendants, including EQT Production (the lessee) and several related entities (the non-lessees), from deducting post-production costs from royalty payments. 983 F.Supp.2d at 795. The plaintiffs collectively brought several counts against the defendants, including claims for breach of contract and joint venture. Id. at 796. Following discovery, the non-lessee defendants moved for summary judgment on the breach of contract claim, arguing that they were not in privity of contract with the plaintiffs. Id. at 809.

Finding that there was a genuine dispute of material fact "whether the non-lessee defendants [we]re vicariously liable for the debts and obligations of EQT Production," the Court denied the motion. Id.

Here, as in W.W. McDonald, EQT Production is the sole lessee to the Leases and, therefore, the only entity with a contractual obligation to pay royalties under the Leases. However, unlike W.W. McDonald and as argued by EQT Production, the Richards did not plead, nor have they otherwise alleged, that EQT Energy is liable to them under the alter ego doctrine or any other theory of vicarious liability. Rather, the Richards elected to bring their breach of contract claim only against EQT Production.

While EQT Energy may be a subsidiary of EQT Production, the Richards have not alleged any facts, nor set forth any evidence, to overcome the presumption that the two entities are separate and that their corporate form should not be disregarded. See Laya v. Erin Homes, Inc., 352 S.E.2d 93, 97 (W. Va. 1986) (recognizing that corporations are presumed to be separate entities and that the "corporate entity may be disregarded" only "[u]nder exceptional circumstances"); S. States Coop., Inc. v. Dailey, 280 S.E.2d 821, 827 (W. Va. 1981) ("The mere showing that one corporation is owned by another or that they share common owners is not a sufficient

justification for a court to disregard their separate corporate structure.").

At bottom, the party to whom EQT Production sells the natural gas produced from the subject wells, and the nature of the relationship between those parties, is not properly at issue in this case. The relevant question, rather, is whether EQT Production has paid proper royalties to the Richards under the relevant Lease provision.

### 2. "Market Price" Royalty

As noted above, the Royalty Provision requires EQT Production to pay the Richards

> one-eighth (1/8) of the market price of the gas from each and every gas well drilled on said premises, the product from which is marketed and sold off the premises, said gas to be measured by a meter.

The Richards contend that, by calculating royalty payments based on the sale the natural gas from the leased wells for an amount equal to "the first of the month index price applicable to the interstate pipeline/gas gathering system into which the gas is delivered, <u>less gathering related charges, retainage, and any other agreed to charges</u>," EQT Production has breached the Royalty Provision, which unambiguously obligates it to remit payments based on the "market price" of the gas (Dkt. No. 32 at 13-14; 15-17) (emphasis added).

EQT Production argues that the Richards have failed to show that the price paid by EQT Energy at the wellhead is not, in fact, the "market price of the gas" at that point of sale (Dkt. No. 40 at 12).

EQT Production does not dispute that, in order to determine the price of the gas where it is sold to EQT Energy (i.e., at that particular point of sale), a work-back method is used to deduct certain post-production expenses of gathering and compressing the gas to a downstream market (Dkt. No. 40 at 3-4). That a downstream market exists, however, does not mean that "markets" do not also exist at other potential points of sale, for example, as here, at the wellhead.

In W.W. McDonald, the court found that, under West Virginia law, the "lessees ha[d] an implied duty to bear all costs incurred until the gas reaches market," which occurred at some point downstream of the wells at issue. 983 F.Supp. at 800. Here, the Richards rely on the ruling in W.W. McDonald to support their contention that EQT Production must bear all costs incurred gathering and transporting the gas from the Leased wells to market, which, according to the Richards, exists only downstream from the wells (i.e., at the interstate pipeline) (Dkt. No. 32 at 15-17). Notably, the parties in W.W. McDonald had stipulated at oral

argument that the "market" was the "first place <u>downstream</u> of the well where the gas can be sold to any willing buyer and title passed to that buyer." <u>Id.</u> at 800 (emphasis added). Here, there is no such stipulation. Moreover, the Richards have put forth no evidence that the term "market," as contemplated in the Royalty Provision, can refer <u>only</u> to a point downstream of the wellhead.

Also instructive is the Fourth Circuit's determination in <u>Imperial Colliery Co. v. Oxy USA Inc.</u> that, where royalties are paid based upon the market value of the gas, "market value is computed by ascertaining the price that a willing buyer would pay a willing seller in a free market...." 912 F.2d 696, 701 (4th Cir. 1990). Here, the Richards have cited no evidence that would support a finding that the price paid by EQT Energy to EQT Production is not "the price that a willing buyer would pay to a willing seller," <u>i.e.</u>, the fair "market value," for gas sold at the wellhead.

On the contrary, from the record before it, the Court cannot conclude that the price paid by EQT Energy at the wellhead, pursuant to the Gas Sales Contract, is not the same price EQT Production would receive if it were to sell the gas at the same point of sale to any unrelated third-party buyer. In other words, the Richards have not shown that utilization of the work-back

13

method has resulted in an inaccurate determination of the market price of the gas for sales occurring at the wellhead.[1]

For these reasons, the Court concludes that, while the Richards have submitted enough evidence to preclude a genuine dispute that the Leases obligate EQT Production to pay royalties based on the "market price" of the gas produced, they have not established whether the pricing formula set forth in the Gas Sales Contract provides for a fair market price for the gas at the relevant valuation point (here, at the wellhead). Because this question of fact is material to EQT's obligations under the Leases, the Richards are not entitled to judgment as a matter of law regarding EQT Production's performance, and the Court **DENIES** the motion for summary judgment on this claim.

---

[1] In light of the fact that West Virginia recognizes that "a lessee must bear all costs incurred in marketing and transporting the product to the point of sale unless the oil and gas lease provides otherwise," the Supreme Court of Appeals of West Virginia in Tawney held that "at the wellhead"-type language in a royalty provision was ambiguous and thus insufficient to indicate that the lessee could deduct post-production expenses from the lessors' royalty. Estate of Tawney v. Columbia Nat. Res., LLC, 633 S.E.2d 22, 24-25, 28 (W. Va. 2006). The holding in Tawney, however, presumes a sale of gas downstream from the wellhead. Id. at 26 ("[T]he gas is not sold at the wellhead. In fact, the gas is not sold until the lessee adds value to it by preparing it for market, processing it, and transporting it to the point of sale."). Unlike in Tawney, and pursuant to the Gas Sales Contract, the gas is, in fact, sold at the wellhead. Accordingly, the ambiguity inherent to the leases at issue in Tawney does not exist in this case.

**B.   Natural Gas Liquids**

The Richards also contend that EQT has breached the By-Product Provision of the Leases by failing to remit royalties for the sale of certain natural gas by-products, specifically natural gas liquids ("NGLs") (Dkt. No. 32 at 17). The By-Product Provision provides that

> . . . if 'casing head gas' (being gas produced from oil wells) or any part thereof should be marketed and sold by said Lessee, said Lessors shall receive one-eighth of the market price of the gas and other by-products so marketed and sold.

Dkt. Nos. 41-2, 41-3, 41-4 at 1.

In their motion, the Richards argue that the By-Product Provision requires EQT to pay them for NGLs produced and sold from the Lease premises (Dkt. No. 32 at 17-18). EQT Production, however, argues that the plain language of the By-Product Provision imposes no such obligation (Dkt. No. 40 at 15-16).

The Leases unambiguously provide for the circumstance under which the Richards shall receive royalties for the sale of any natural gas by-products, including NGLs: if such by-products are "marketed and sold <u>by said Lessee</u>" (Dkt. Nos. 41-2, 41-3, 41-4 at 1) (emphasis added). It is undisputed that EQT is the sole lessee to the Leases (Dkt. Nos. 32 at 3; 40 at 2). Critically, it is also undisputed that EQT Production neither markets nor sells natural

15

gas by-products from the Lease premises, but rather, sells the natural gas in its raw, or nearly raw, state to EQT Energy, which, in turn, uses a third party to process the gas, including the separation of heavier hydrocarbons for the production of NGLs. John Bergonzi, a consultant and accountant previously employed by EQT, testified about the production of NGLs as follows:

> Q: ... So who does the separation of the heavy hydrocarbons?
>
> A: Well, normally my -- my recollection is that EQT Energy or EQT Gathering - I'm not really sure which - has a third party process the - the gas and exact [sic] some of those heavier hydrocarbons and sell those separately.
>
> ...
>
> Q: And you know -- for instance, MarkWest is one of the companies that -
>
> A. I think so yes.
>
> Q. -- separates out?
>
> A. Yes.
>
> Q. But EQT itself does not -- or any of its affiliates don't have any processing plant to separate those liquids that you know of?
>
> A. I don't think they have any in West Virginia, and they probably don't have any at all at this point.

(Dkt. No. 31-4 at 12-13). Nor does EQT receive any revenue for the sale of such by-products. As argued by EQT Production, unrefuted

testimony provided by EQT's Director of Revenue Accounting, Kristy Toia, establishes that revenues from the sale of any NGLs belongs to EQT Energy, not EQT Production:

> Q: How are NGLs calculated by the revenue department or the accounting department?
>
> A: Those are paid to EE [EQT Energy], so [EQT Production] does not record any sort of revenue generated from NGLs.
>
> Q: Okay. So EQT Production gets no revenue from NGLs?
>
> A: No. Those revenues belong to EE.
>
> Q: When EE gets profits from NGLs, do you know who those are paid to?
>
> A: EE.

(Dkt. No. 31-3 at 14).

Therefore, based on the parties' briefing and the evidence submitted, the Court is unable to conclude as a matter of law that no reasonable juror could find by a preponderance of the evidence that EQT Production complied with the By-Product Provision of the Leases. Accordingly, it **DENIES** the Richards' motion for summary judgment on this claim.

## V. CONCLUSION

For the reasons discussed, the Court **DENIES** the plaintiffs' motion for partial summary judgment on their breach of contract

claim (Dkt. No. 31). The case will proceed to trial as scheduled (Dkt. No. 50).

It is so **ORDERED**.

The Court **DIRECTS** the Clerk to transmit copies of this Memorandum Opinion and Order to counsel of record.

DATED: July 5, 2018.

>　　　/s/ Irene M. Keeley
>　　　IRENE M. KEELEY
>　　　UNITED STATES DISTRICT JUDGE